IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MELINDA WILLIAMS,　　　　　　　　　:
As Administratrix of the Estate of　　:
Brian P. Williams,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiff,　　　　　　　　:　　3:13-CV-01151
　　　　　　　　　　　　　　　　　　　:　　(JUDGE MARIANI)
　　v.　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
MARK PAPI,　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant.　　　　　　　:

## MEMORANDUM OPINION

### I.　Introduction

Presently before the Court is a Motion to Dismiss (Doc. 9), filed by Mark Papi, a Tunkhannock Township Police Officer who is alleged to have shot and killed the Plaintiff's husband during the course of his official duties. For the reasons discussed in this Opinion, the Court will deny Defendant's Motion.

### II.　Factual Allegations

Plaintiff's Complaint alleges the following well-pleaded facts.

On November 7, 2012, decedent Brian Williams attended a counseling session with Community Counseling Services in Tunkhannock, Pennsylvania. (Compl., Doc. 1, at ¶ 6.) During the course of this session, an employee or agent of Community Counseling Services requested that a mental health commitment warrant be issued against Mr. Williams. (Id. at ¶ 9.) Police officers from Overfield Township arrived at Williams's home after the

1

counseling session, purportedly for reasons related to his mental health commitment, though they did not in fact have the warrant at the time that they arrived. (*Id.* at ¶¶ 14-15, 18.) The officers then called for back-up from other police departments, which was answered by Defendant Mark Papi and other officers. (*Id.* at ¶¶ 16-17.)

The officers from the various Township Police Departments then remained outside of Williams's home, apparently awaiting the issuance of a warrant. (*Id.* at ¶ 21.) While waiting, they did a number of things "to further antagonize Mr. Williams who was having a mental health breakdown." (*Id.* at ¶ 56.a.) This included pepper-spraying his dogs, (*id.* at ¶ 24), and preventing his wife and mother from entering the house to speak with him, even though "Mr. Williams told [Tunkhannock Township Police Chief Stanley] Ely that he would come out [of the house] as long as he got to talk to his wife and mother," (*see id.* at ¶¶ 32-35). He was apparently only allowed to speak with the two women over the phone, during which conversations he "told his wife . . . that he was ready to come out several times." (*Id.* at ¶¶ 27, 29.) His wife further "told the police that she would be able to get her husband to come outside if she could just go inside and talk to him." (*Id.* at ¶ 31.) In the same vein, Mr. Williams "told his mother [as well as another unidentified police officer] that he had a bag packed and was coming out of the house." (*Id.* at ¶¶ 28, 37.)

However, "[i]nstead of waiting for Mr. Williams to come out peacefully, officers took out their shields and guns" and proceeded to enter the house via the front door and the

basement door, despite his mother's protestations that he would leave willingly. (*See id.* at ¶¶ 38-41.)

At this point, Williams is believed to have been "inside a bedroom in the basement of the home, behind a closed door." (*See id.* at ¶ 42.) "According to the police," he also "possessed a two foot long fireplace poker." (*Id.* at ¶ 46.) Multiple officers entered his basement room, "armed with, *inter alia*, shields, tasers, and guns." (*Id.* at ¶ 45.) Defendant Papi was among these officers, even though he "had received instructions requiring him to stay outside, in the perimeter of the home, to make sure that Mr. Williams did not attempt to flee." (*Id.* at ¶ 43.)

Upon entering the room, the officers knocked Williams to the ground and then shocked him multiple times with tasers when he attempted to stand. (*Id.* at ¶¶ 47, 50.) The confrontation ended "only minutes" after the police entered the house when Papi shot Williams twice with his gun. (*Id.* at ¶¶ 51-53.) Williams died shortly thereafter, with his cause of death listed as "multiple gunshot wounds." (*Id.* at ¶¶ 54-55.)

Melinda Williams, wife of the deceased, then filed the above-captioned action in federal court. Her Complaint alleges three causes of action against Mark Papi (and no other officers), to wit: an unreasonable seizure under 42 U.S.C. § 1983 (Count I); assault (Count II); and battery (Count III). Defendant filed the instant Motion to Dismiss on all Counts. It is to this Motion that the Court now turns.

3

## III. <u>Standard of Review</u>

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should

4

identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations, alterations, and quotation marks omitted). This "plausibility" determination will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. Analysis

### a. Count I

Count I of Plaintiff's Complaint is styled as alleging a violation of "42 U.S.C. § 1983." It states: "Defendant's conduct against Mr. Williams, including his use of unreasonable force, constituted an unreasonable seizure under the Fourth Amendment to the United States Constitution. In addition, such conduct constituted a deprivation of Mr. Williams's due process rights under the Fourteenth Amendment to the United States Constitution." (Compl. at ¶ 59.) Defendant seeks dismissal of this Count on a variety of grounds, which the Court discusses below.

### i. Fourth vs. Fourteenth Amendments

First, Defendant argues that what he interprets as "Plaintiff's civil rights claim under the Fourteenth Amendment" should be dismissed under the case of *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), which held that all claims of excessive force in connection with a Fourth Amendment seizure "should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395; *see also* Def.'s Br. in Supp. of Mot. to Dismiss, Doc. 10, at 6.

The proposition cited is undoubtedly a valid one. *Cf. also Albright v. Oliver*, 510 U.S. 266, 273, 114 S. Ct. 807, 813, 127 L. Ed. 2d 114 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process,' must be the guide for analyzing these claims.") (internal quotation marks omitted); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260-61 (3d Cir. 2010) (adopting the rule that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process").

Nonetheless, the rule of *Graham*, *Albright*, and *Betts* does not apply to the case at hand. Those cases all involved Plaintiffs who brought constitutional claims exclusively under the substantive due process clause of the Fourteenth Amendment and not a more

specific provision, e.g., those in the first eight Amendments to the Bill of Rights. *See Albright*, 510 U.S. at 269 ("Albright then instituted this action . . . alleging that Oliver deprived him of substantive due process under the Fourteenth Amendment—his 'liberty interest'—to be free from criminal prosecution except upon probable cause."); *Graham*, 490 U.S. at 390 (plaintiff alleged a "violation of rights secured to him under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983") (internal quotation marks omitted); *Betts*, 621 F.3d at 261 ("Because [Betts's] allegations fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment, we hold that the more-specific-provision rule forecloses Betts's substantive due process claims.").

In the instant case, on the other hand, Plaintiff explicitly brought her claim under the Fourth Amendment. The Court reads the reference to the Fourteenth Amendment included in Count I only as an invocation of the incorporation doctrine. Under the incorporation doctrine, the Fourth Amendment and other provisions of the Bill of Rights apply on their face only to the federal government, and were incorporated against the states later by operation of the Fourteenth Amendment's Due Process Clause. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 8, 88 S. Ct. 1868, 1873, 20 L. Ed. 2d 889 (1968) (describing "the Fourth Amendment, made applicable to the States by the Fourteenth") (citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081 (1961)). Because Plaintiff brought a claim under the Fourth Amendment for the actions of a police officer employed by a Pennsylvania municipality, she was not only not barred from invoking the Fourteenth Amendment, but was

indeed *required to* allege it to make her claim cognizable. *See, e.g., Palko v. Connecticut*, 302 U.S. 319, 324-25, 58 S. Ct. 149, 151-52, 82 L. Ed. 288 (1937) (collecting cases and concluding that "[i]n these and other situations immunities that are valid as against the federal government by force of the specific pledges of particular amendments have been found to be implicit in the concept of ordered liberty, and thus, *through the Fourteenth Amendment*, become valid as against the states") (emphasis added). In seeking dismissal based on cases which held that Plaintiff cannot bring a claim under the Fourteenth Amendment Due Process Clause standing alone, Defendant plainly misconstrues the nature of the incorporation doctrine and the requirements for alleging violations of the Bill of Rights against agents of the several states.

### ii. Sufficiency of the Pleadings

Next, Defendant argues that dismissal of Plaintiff's Complaint is appropriate because it appears on the face of the Complaint that Defendant's Fourth Amendment seizure of Williams—i.e., his act of shooting and killing him—was reasonable as a matter of law. (*See* Doc. 10 at 7.) Claims that police officers used excessive force against a plaintiff, as in the instant case, are properly treated as falling under the Fourth Amendment's prohibition of unreasonable seizures. *See Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) ("The Supreme Court has held that all claims of excessive force by police officers, in the context of an arrest, investigatory stop, or other 'seizure,' should be analyzed under the Fourth Amendment."). Moreover, such "claim[s] for excessive force under the Fourth

Amendment require[] a plaintiff to show that a seizure occurred and that it was unreasonable." *Id.* (quoting *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002)).

"There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985). Accordingly, here, as noted in Defendant's Brief in Support of his Motion, the only issue is whether Defendant's actions in shooting and killing Williams were reasonable. (*See* Doc. 10 at 7.)

Because such a determination depends on "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force," the Third Circuit has held that "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas*, 365 F.3d at 198 (citing *Abraham v. Raso*, 183 F.3d 279, 290-91 (3d Cir. 1999)). But, even if, following discovery, the reasonableness of Defendant's use of force is settled before the case reaches the jury, it is surely premature to expect the Court to make such a resolution at the motion to dismiss stage, when the only issue before it is to determine whether Plaintiff's Complaint alleges facts that "*plausibly* give rise to an entitlement for relief." *Connelly*, 706 F.3d at 212 (emphasis added).

In this regard, Defendant makes many assertions of fact in support of his Motion that either involve gross generalizations or cannot reasonably be implied from the facts of the Complaint. For instance, Defendant asserts that "decedent was in a dangerous state of mind, as revealed by the indisputable fact that police were at his residence to execute a

9

mental health warrant obtained under the clear and present danger standards of the Mental Health Procedures Act," (Doc. 10 at 9), even though the Complaint makes no mention of what kind of mental health warrant the police were charged with executing. He also extrapolates from Plaintiff's simple allegation that "[a]ccording to the police, Mr. Williams possessed a two foot long fireplace poker," (Compl. at ¶ 46), the conclusion that "[Williams] was clearly using the poker in a manner that endangered the police officers who were present in the room with him," (Doc. 10 at 9-10.) Obviously, this conclusion is unsupported by a fair reading of the Complaint. By asking the Court to accept his own characterization of these facts as true, Defendant essentially asks the Court to convert his Motion to Dismiss into a Motion for Summary Judgment, or even—because all of his asserted facts appear to be in dispute—to a mini-trial. This the Court cannot do.

Indeed, the only way that Defendant's arguments could have any merit is if the Court could conclude that, as a matter of law, people with mental health warrants against them, or people in possession of fireplace pokers, are inherently dangerous. Such a conclusion, however, would do violence to the Third Circuit's injunction that all claims of excessive force must be evaluated based on the "relevant facts and circumstances" of each particular case. *Rivas*, 365 F.3d at 198. It would also defy common sense; when evaluating the particular facts and circumstances of each case, it cannot be said that a passive individual with a mental health warrant against him is just as dangerous as an obstreperous one, or that a plaintiff with a fireplace poker on the floor out of arm's reach is just as dangerous as one

thrusting the poker at police. Rather, the factfinder must have specific information to determine whether all these facts and circumstances came together in the instant case to warrant the actions that Defendant Papi took, before it can enter judgment in Papi's favor.

In sum, the circumstances of Williams's own death are unique only to him. They cannot be generalized according to abstract notions of "danger" or by appeals to other cases in which plaintiffs with fireplace pokers or similar weapons were found to be dangerous.[1]

### iii. Qualified Immunity

Defendant next argues that "an additional and fully sufficient basis exists to dismiss Plaintiff's Fourth Amendment claim, namely qualified immunity." (Doc. 10 at 12.) In deciding whether to grant qualified immunity, the Court must consider two questions: First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This latter requirement means that the "contours of the right must be sufficiently clear that a reasonable official would understand

---

[1] Though Defendant cites several such cases, *see McCormick v. City of Fort Lauderdale*, 333 F.3d 1234 (11th Cir. 2003); *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994); *Williams v. City of Scranton*, 2013 WL 1339027 (M.D. Pa. 2013), none of these are persuasive because (1) they all involve facts unique to the individual situation of each case and (2) none of them involve Motions to Dismiss, but rather all involve either grants of summary judgment or appeals therefrom, all of which takes place after discovery has given the parties time to present the Court with a well-developed factual record.

11

that what he is doing violates that right." *Id.* at 202, 121 S. Ct. at 2156 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)). If the answer to both questions is "yes," then there can be no qualified immunity.

However, the Third Circuit has cautioned that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Newland v. Reehorst*, 328 Fed. App'x 788, 791 n.3 (3d Cir. 2009). It has likewise held that when a "complaint failed to disclose whether the defendants' actions did not violate a clearly established constitutional right, dismissal on qualified immunity grounds was premature." *Debrew v. Auman*, 354 Fed. App'x 639, 642 (3d Cir. 2009) (citing *Thomas v. Independence Twp.*, 436 F.3d 285, 291 (3d Cir. 2006)).

At this time, it appears that the present case is one of the "vast majority of cases" in which a determination of qualified immunity is inappropriate at the pleading stage. When we view the facts in the Complaint in the light most favorable to the Plaintiff, the Complaint does indicate that Defendant violated Williams's constitutional rights by using excessive force to effect a Fourth Amendment seizure against him. Moreover, the protections of the Fourth Amendment are sufficiently clear that Defendant should have known that shooting Williams to death violated those protections. It may be that discovery will cast a new light on the qualified immunity analysis. But on the face of Plaintiff's Complaint, there is certainly no reason to believe that qualified immunity exists as a matter of law, any more than there is

reason to hold, for the reasons discussed above, that the killing itself was necessarily justified.

### iv. Punitive Damages

Finally, Defendant argues that Plaintiff's claim for punitive damages should be stricken from Count I, because the Complaint only involves "actions that Defendant allegedly performed in his official capacity, as a police officer of Tunkhannock Township," whereas "[p]unitive damages are not permitted in civil rights claims under Section 1983 against individual defendants in their official capacities." (Doc. 10 at 13.)

The Supreme Court has emphasized that suits against state actors in their official capacity "generally represent only another way of pleading an action against *an entity of which an officer is an agent.*" *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361, 116 L. Ed. 2d 301 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3104, 87 L. Ed. 2d 114 (1985)) (emphasis added). In other words:

> Suits against state officials in their official capacity therefore should be treated as suits against the State. Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation. . . . Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, on the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.

*Id.*, 112 S. Ct. at 361-62. Further, previous decisions

> make[] clear that the distinction between official-capacity suits and personal-capacity suits is more than a mere pleading device. State officers sued for damages in their official capacity are not "persons" for purposes of the suit

13

because they assume the identity of the government that employs them. By contrast, officers sued in their personal capacity come to court as individuals.

Id. at 27, 112 S. Ct. at 362 (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989)) (internal alterations, citations, and quotation marks omitted).

Here, there is no indication that Mark Papi is sued in his official capacity. First of all, the Complaint never uses the phrase "official capacity." And while it never uses the phrase "personal capacity" either, the Court believes that it is obvious, from a fair reading of the pleadings, that Papi is indeed sued in his personal capacity. This is made clear by the fact that the gist of Plaintiff's Complaint is not some general Complaint against the Township or Police Department (neither of which is named as a Defendant), but simply against Papi himself, who is listed in the section entitled "The Parties" as "a police officer *working for* the Tunkhannock Township Police Department." (Compl. at ¶ 4 (emphasis added).) The fact that Plaintiff identifies Papi as someone "working for" the Police Department is evidence that she does not consider Papi to be considered legally coterminous with the government actor that employs him. Moreover, this conclusion is buttressed by the fact that, if Papi were to "die or leave office," the new officer hired to replace him could not be liable for Williams's injuries. The injuries are, under the facts alleged in the Complaint, Papi's individual responsibility alone, and are nowhere attributed to his specific office.

Therefore, this lawsuit presents a clear example of a Complaint alleged against a defendant acting in his personal capacity. Indeed, Defendant's argument that the case

14

presents an official-capacity lawsuit because Defendant "is [being sued] simply because he was a Tunkhannock Township Police Officer," (Def.'s Reply Br. in Supp. of Mot. to Dismiss, Doc. 18, at 5), would confound the distinctions between the official- and personal-capacity lawsuits mandated by Supreme Court case law. It would, furthermore, transform every 1983 action into an official-capacity lawsuit, given that every personal-capacity suit must necessarily be against a defendant acting under color of state law—i.e. a defendant who was acting for the government at the time in question—to even be cognizable under 1983 at all. *Cf., e.g., Barna v. City of Perth Amboy*, 42 F.3d 809, 817 (3d Cir. 1994) (holding that when officers were off-duty "when the altercation [complained of] occurred" and when "the evidence indicates that the underlying nature of the dispute was personal," officers were not acting under color of state law and, therefore, a 1983 action against them could not proceed). Plaintiff has made sufficient allegations that Defendant, under color of state law, acted in his individual capacity.

Accordingly, the Court will not strike Plaintiff's claim for punitive damages.

### b. Counts II and III

The last basis of Defendant's Motion to Dismiss seeks dismissal of Counts II (Assault) and III (Battery) from Plaintiff's Complaint. This argument follows the same pattern as that rejected above. That is, Defendant argues that, even if it is true that he did indeed shoot and kill Williams, "[t]hese allegations clearly indicate that Defendant lacked the required intent to commit either an assault or a battery, as he acted only for the safety of

himself and the other officers and not in an attempt to cause apprehension of harmful contact to the decedent." (Doc. 10 at 14.) To so conclude, Defendant relies on the same arguments that Williams had a mental health warrant against him, that he "armed himself with a two-foot fireplace poker," and that he "continued to menace officers with the poker." (*Id.*)

However, as discussed above, this interpretation of events is not supported by the facts alleged in the Complaint. Nor can the Court determine as a matter of law that Defendant must have necessarily acted in self-defense because, as in Count I, the acts giving rise to the cause of action are necessarily fact-dependent. The factfinder will ultimately need to determine whether, among other things, Papi "reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force in order to save himself therefrom," at the time that he shot Williams before Papi can successfully assert self-defense to the torts of assault and battery. *See Commonwealth v. Black*, 376 A.2d 627, 630 (Pa. 1977).[2] There is not enough information in the Complaint, unaided by discovery, to determine whether Papi really was in a situation where self-defense was legally permissible. As such, the Court will not dismiss the assault and battery claims.

---

[2] "Th[is] citation[ is to a] criminal case[], but the law governing the right of self-defense in civil cases is much the same." *Kitay v. Halpern*, 158 A.2d 309, 310 (Pa. Super. Ct. 1932).

16

## V. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. 9) is **DENIED**. A separate Order follows.

_____
Robert D. Mariani
United States District Judge