**IN THE COURT OF COMMON PLEAS FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MELINDA WILLIAMS,<br>as Administrator of the Estate of<br>BRIAN P. WILLIAMS,<br>Plaintiff<br><br>v.<br><br>MARK PAPI, ROBERT ROBERTS,<br>STANLEY ELY, PAUL MILLER,<br>TERRANCE FISHER, SLADE PROFKA<br>JOHN KREIG, ROGER HARDY,<br>WILLIAM OLSZEWSKI,<br>TUNKHANNOCK TOWNSHIP,<br>OVERFIELD TOWNSHIP,<br>TUNKHANNOCK BOROUGH,<br>MESHOPPEN BOROUGH,<br>Defendants | : | No: 3:CV-13-1151<br><br>CIVIL ACTION - LAW<br><br>JURY TRIAL DEMANDED |

**<u>STATEMENT OF MATERIAL FACTS</u>**

1. In late September 2012, the decedent, Brian Williams, became suicidal and required the intervention of police because he was threatening to kill himself with a gun he believed if his wife, Melinda Williams, left him “then there was no sense of living.” He voluntarily committed himself to inpatient psychiatric treatment for 72 hours and then followed up with regular sessions at Community Counseling Services in Tunkhannock, PA. He continued to have “dreams” in which “somebody was going to die but he didn’t know who, and it scared him.” <u>Exhibit 1 (Deposition of Melinda Williams), N.T., at 7-9, 14</u>.

2. On the morning of November 7, 2012, the decedent’s wife, Plaintiff Melinda Williams, informed the decedent that the marriage between her and decedent was “done.” His demeanor on that date was described as “crying and shaking.” <u>Exhibit 1 (Deposition of Melinda Williams), N.T., at 10-11; Exhibit 3 (Deposition of Shirley</u>

Williams), N.T., at 6.

    3.   At approximately 1:30 on the same date, Williams, attended a pre-scheduled counseling session at Community Counseling Services with Dr. Rakesh Sharma, M.D., a board certified psychiatrist since 1984.  Amended Complaint, ¶ 21, 23; Exhibit 2 (Deposition of Rakesh Sharma, M.D.), N.T., at 5-6, 38.

    4.   At the counseling session, Williams informed Dr. Sharma that "he was going to put her six feet under" and that "he was talking about his wife" and he reported to the doctor that "he had received legal separation papers from his wife, and . . . that he had grabbed her by the throat and he had also written a note where he had said that he was going to put her six feet under."  Exhibit 2 (Deposition of Rakesh Sharma, M.D.), N.T., at 41-43.

    5.   Dr. Sharma immediately recommended that Williams enter inpatient psychiatric treatment for his homicidal mindset and Williams repeatedly refused despite the doctor's earnest entreaties.  Exhibit 2 (Deposition of Rakesh Sharma, M.D.), N.T., at 42-43.

    6.   Dr. Sharma then explained to Williams that a petition to have him involuntarily committed to inpatient treatment would be filed due to Williams "clear threats toward his wife," his "obsessive thinking," his "significantly increased" stress because "he had received legal separation papers from his wife."  Exhibit 2 (Deposition of Rakesh Sharma, M.D.), N.T., at 42-44.

    7.   Williams replied to Dr. Sharma, "you will not put me away," and "walked out of the room."  Exhibit 2 (Deposition of Rakesh Sharma, M.D.), N.T., at 43-44; Exhibit 4 (Deposition of Paul Williams), N.T., at 18-20.

8. Dr. Sharma then "filled out the 302 papers" to initiate involuntary commitment. Exhibit 2 (Deposition of Rakesh Sharma, M.D.), N.T., at 45, 46.

9. Dr. Sharma completed the 302 commitment form because he believed that Williams constituted a "clear and present danger to others" because "he had reported that he grabbed her by the throat and he had expressed thoughts of harming his wife and saying if she leaves, she'll be six feet under.  And he was also depressed."  Exhibit 2 (Deposition of Rakesh Sharma, M.D.), N.T., at 47-49; Exhibit 20 (302 Warrant).

10. After completing the 302 involuntary commitment paperwork, Dr. Sharma handed it over to Tony Black, who took it to Overfield Township Police.  Both Tony Black and an unidentified police officer spoke with Melinda Williams and informed her of Williams' threat against her life and advised her to not go home until he had been secured.  Exhibit 1 (Deposition of Melinda Williams), N.T., at 12-13;  Exhibit 2 (Deposition of Rakesh Sharma, M.D.), N.T., at 52-53.

11. After Williams stormed out of his counseling session, he returned to his home, which was located at 1246 State Route 307, Factoryville, in Overfield Township, PA, where he resided with his wife, Plaintiff Melinda Williams, and two of his three children.  Amended Complaint, ¶ 25, 27, 28.

10. On November 7, 2012, Slade Profka was an on-duty police officer in Overfield Township, and he received a 9-1-1 call advising him to contact the communications center, and when he did the center informed him that "Williams had made a threat to go home and kill his wife" to his doctor at Community Counseling and that he was traveling to his home in Overfield Township in a Chevy Cavalier.  Profka advised communications that he was responding to the residence. Exhibit 5 (Deposition

of Slade Profka), N.T., at 18-20; Exhibit 6 (Deposition of Paul Miller), N.T., at 19.

11. Profka then called Williams' wife, Melinda Williams and advised her of the threat from her husband and told her to either go to a friend's house or to the Pump N Pantry  Exhibit 5 (Deposition of Slade Profka), N.T., at 21-23.

12.  Officer Profka and Corporal Paul Miller, also of Overfield Township Police Department, then arrived at the Williams' home , and observed Williams walking up his driveway, but he entered the home, ignoring their attempts to speak with him.  Williams also ignored Corporal Miller when he knocked on the door after Williams entered the home.   They were the first police officers on the scene, and Corporal Miller was the commanding officer on the scene throughout the incident.  Exhibit 4 (Deposition of Paul Williams), N.T., at 8-9; Exhibit 5 (Deposition of Slade Profka), N.T., at 22-24; Exhibit 6 (Deposition of Paul Miller), N.T., at 17-22; Exhibit 8 (Deposition of Stanley Ely), N.T., at 16, 19-20; Exhibit 10 (Deposition of Robert Roberts), N.T., at 10, 15, 17; Exhibit 11 (Deposition of John Kreig), N.T., at 19, 21; Exhibit 12 (Deposition of William Olszewski), N.T., at 11-12; Exhibit 13 (Deposition of Roger Hardy), N.T., at 19-20, 28;  Exhibit 14 (Deposition of James Dunleavy), N.T., at 19-20;  Exhibit 15 (Deposition of Jaime Lopez), N.T., at 13-14;  Exhibit 16 (Deposition of Craig Flynn), N.T., at 18-19.

13.  Paul Williams approached the officers, who informed him that they were receiving a mental health warrant to commit Williams and wanted to talk with Williams before the warrant arrived.  Paul Williams advised the officers that he would enter the home and discuss the issue with Williams, and he approached the unlocked door and spoke with Williams.  Exhibit 4 (Deposition of Paul Williams), N.T., at 9-10; Exhibit 6 (Deposition of Paul Miller), N.T., at 22-23.

14. Paul Williams informed Williams, who was wearing jeans, a tee shirt, a work shirt, and putting on work boots that "the police were there and they had a 302 warrant coming for him . . . he did not like that. . . . He said, tell them to get off my property." When Paul Williams conveyed this message to the officers, "they backed down off, down in toward my property."  Exhibit 4 (Deposition of Paul Williams), N.T., at 10-11, 13 Exhibit 5 (Deposition of Slade Profka), N.T., at 25.

15. Approximately 10-15 minutes later, Paul Williams then re-entered the home and spoke with Williams again about coming out and going voluntarily with the police. Williams replied that "I want them to rescind that warrant; I am not going to the hospital. . . . All I want to do is get rid of these thoughts and bad dreams I'm having that somebody is going to get hurt or killed." Paul Williams left the home and informed the police officers that Williams had told him "There's no way I'm coming out without a problem."  Exhibit 4 (Deposition of Paul Williams), N.T., at 11-12, 16; Exhibit 5 (Deposition of Slade Profka), N.T., at 24;  Exhibit 16 (Deposition of Craig Flynn), N.T., at 24.

16. At approximately this time, Paul Williams spoke briefly over the phone with Overfield Township Police Chief Terry Fisher, who was off duty and unable to be present, about the developing situation involving Williams, informing him that Williams "was very upset, and he was not going to come out of the house."  Exhibit 4 (Deposition of Paul Williams), N.T., at 15; Exhibit 7 (Deposition of Terrance Fisher), N.T., at 31; Exhibit 8 (Deposition of Stanley Ely), N.T., at 19.

17. After approximately 10-15 additional minutes had elapsed, Paul Williams approached the house again to speak with Williams a third and last time, but found that

Williams had locked the door and would not admit him to the home. Exhibit 4 (Deposition of Paul Williams), N.T., at 12, 16.

18. Terry Fisher called Williams' phone and left a message to call him back. Williams did several minutes later, and when Fisher informed Williams about the mental health warrant and that the officers were there and he had to go with them, Williams kept repeating calmly and a matter of factly, "I ain't going, I ain't going" and then hung up the phone. Chief Fisher informed Corporal Miller that Williams refused to come out. Exhibit 6 (Deposition of Paul Miller), N.T., at 33; Exhibit 7 (Deposition of Terrance Fisher), N.T., at 31-33.

19. Melinda Williams testified that she called Williams while she was traveling to the scene and spoke with him about the warrant and police, and he informed her that while he did not want to kill her, "he wasn't going" back to the hospital. Exhibit 1 (Deposition of Melinda Williams), N.T., at 14-15.

20. At some point in the discussions, Paul Williams informed Overfield Township Police that he believed that all weapons had been removed from the house in connection with the September 2012 incident, but police were unable to verify if Williams was armed or not as he remained out of sight within the home. Exhibit 5 (Deposition of Slade Profka), N.T., at 26; Exhibit 6 (Deposition of Paul Miller), N.T., at 28; Exhibit 8 (Deposition of Stanley Ely), N.T., at 36; Exhibit 9 (Deposition of Mark Papi), N.T., at 27, 31; Exhibit 10 (Deposition of Robert Roberts), N.T., at 27-28.

21. Corporal Dunleavy, of the State Police, explained that police remained concerned about the status of weapons within the home because the "concern was he took weapons from the home and then there was a point where he could have gone

back and brought the weapons back into the home, because it was my understanding that there was a delay in between those two time frames." Exhibit 14 (Deposition of James Dunleavy), N.T., at 30.

22. Officer Robert Roberts of Tunkhannock Township arrived as the third officer on scene, while Officer Mark Papi, also of Tunkhannock Township, arrived as the fourth officer to respond to the request for assistance from Overfield Township.  Exhibit 9 (Deposition of Mark Papi), N.T., at 25-26, 28; Exhibit 10 (Deposition of Robert Roberts), N.T., at 18-19.

23. As other police officers arrived on the scene, including Corporal James Dunleavy of the Pennsylvania State Police, Chief William Olszewski and Sergeant Hardy of Tunkhannock Borough, Corporal Miller briefed them on the situation and established a perimeter around the home to monitor Williams' whereabouts.  Exhibit 6 (Deposition of Paul Miller), N.T., at 28; Exhibit 9 (Deposition of Mark Papi), N.T., at 25-27; Exhibit 10 (Deposition of Robert Roberts), N.T., at 18, 21; Exhibit 11 (Deposition of John Kreig), N.T., at 24-25; Exhibit 12 (Deposition of William Olszewski), N.T., at 15-16; Exhibit 13 (Deposition of Roger Hardy), N.T., at 8, 19, 32-34;  Exhibit 14 (Deposition of James Dunleavy), N.T., at 22;  Exhibit 15 (Deposition of Jaime Lopez), N.T., at 18-19; Exhibit 16 (Deposition of Craig Flynn), N.T., at 21.

24. At one point, Williams attempted to sneak out the back door of the home, but quickly retreated back in before police could apprehend him.  Exhibit 5 (Deposition of Slade Profka), N.T., at 38-39; Exhibit 6 (Deposition of Paul Miller), N.T., at 30; Exhibit 9 (Deposition of Mark Papi), N.T., at 28;  Exhibit 10 (Deposition of Robert Roberts), N.T., at 21-23.

25. At no time did the police officers pepper spray Williams' four dogs, which were loose outside during the incident. Exhibit 4 (Deposition of Paul Williams), N.T., at 17;   Exhibit 5 (Deposition of Slade Profka), N.T., at 59; Exhibit 6 (Deposition of Paul Miller), N.T., at 31;   Exhibit 9 (Deposition of Mark Papi), N.T., at 35; Exhibit 10 (Deposition of Robert Roberts), N.T., at 24, 30; Exhibit 11 (Deposition of John Kreig), N.T., at 27; Exhibit 13 (Deposition of Roger Hardy), N.T., at 42; Exhibit 14 (Deposition of James Dunleavy), N.T., at 31;   Exhibit 16 (Deposition of Craig Flynn), N.T., at 28.

26. Melinda Williams arrived at the scene and spoke with Corporal Miller, who asked her to call Williams and convince him to come out.  She called him and had a brief conversation in which "he just kept saying he wasn't coming out, he has work, providing for his family."  Exhibit 1 (Deposition of Melinda Williams), N.T., at 18.

27. Melinda Williams testified that she called and spoke with Williams three-four additional times that afternoon at the request of Corporal Miller, but the conversations were essentially the same, except for the last call in which "he said that I am not going to the hospital, but I will stay with my mom and dad." Exhibit 1 (Deposition of Melinda Williams), N.T., at 20-21.

28. The mental health warrant arrived approximately 45 minutes to an hour after the first officers arrived on the scene, as did several local police officers and state police officers as well as Chief Stanley Ely, from Tunkhannock Township.  Exhibit 5 (Deposition of Slade Profka), N.T., at 32-34; Exhibit 6 (Deposition of Paul Miller), N.T., at 31; Exhibit 8 (Deposition of Stanley Ely), N.T., at 16, 19-20; Exhibit 10 (Deposition of Robert Roberts), N.T., at 18-19.

29. Melinda Williams provided police with a drawing of the floorplan of the home

and a key to the front door of the house.  Exhibit 1 (Deposition of Melinda Williams), N.T., at 21.

30.  Chief Ely offered to try to build rapport with Williams and approached Melinda Williams who was on the phone with Williams, overhearing her "berating her husband for what he had done.  That he basically embarrassed her in the community."  She handed him the phone, and he asked Williams, who was "upset," if he could approach and speak with him.  Initially Williams refused, but Ely convinced him to talk with him.  Exhibit 8 (Deposition of Stanley Ely), N.T., at 22-24.

31.  Chief Ely approached and began to speak with Williams at a distance of approximately 15 feet from the side door to the home, which Williams had "cracked" open slightly to allow his head to emerge.  Ely explained the warrant and that he needed Williams to come out and go to the hospital voluntarily and Williams replied "F.U. I'm not coming out.  F.U. I want to talk to my wife.  I want to talk to my mother. Ely informed him that he could not do that until Williams exited the hose, to which Williams replied, "I'm not going to hurt them.  F.U. I'm not coming out, not until they come up to talk to me."  Exhibit 5 (Deposition of Slade Profka), N.T., at 35-37; Exhibit 6 (Deposition of Paul Miller), N.T., at 31-33, 36; Exhibit 8 (Deposition of Stanley Ely), N.T., at 21-22, 24-26; Exhibit 10 (Deposition of Robert Roberts), N.T., at 34.

32.  Williams requested that Melinda Williams and Shirley Williams, who had arrived on scene at about 2:20 p.m., enter the home to speak with him, but, police, including the commanding officer, Corporal Miller, declined over concerns for the wife and mother's safety, in case Williams had a weapon and tried to make good on his threat to shoot his wife. Exhibit 3 (Deposition of Shirley Williams), N.T., at 17; Exhibit 5

(Deposition of Slade Profka), N.T., at 41; Exhibit 6 (Deposition of Paul Miller), N.T., at 34-36; Exhibit 8 (Deposition of Stanley Ely), N.T., at 29-31, 35;  Exhibit 9 (Deposition of Mark Papi), N.T., at 31-32; Exhibit 12 (Deposition of William Olszewski), N.T., at 17-19, 27; Exhibit 13 (Deposition of Roger Hardy), N.T., at 44;  Exhibit 14 (Deposition of James Dunleavy), N.T., at 26.

    33. Chief Ely's purpose in talking to Williams was to get him to leave the home peacefully, but Williams refused to leave or to step out so Chief Ely could see his hands.  The first exchange between Chief Ely and Williams ended in under five minutes because Williams was becoming "somewhat agitated."  Exhibit 8 (Deposition of Stanley Ely), N.T., at 26-27, 31, 35, 37.

    34. Corporal Dunleavy, of the State Police, overheard Melinda Williams arguing with Williams over the phone about their marital problems and "now he had made these statements for there to be a 302 warrant" which he felt were not "conducive to our mission there" because "you don't want to aggravate the situation."  So, he then used Melinda Williams' phone and explained to Williams what was going on, offered to help, and explained why police could not permit Melinda Williams to talk with Williams in the driveway outside the home due to concerns over her personal safety. Exhibit 14 (Deposition of James Dunleavy), N.T., at 27-29, 41, 58.

    35. Approximately 10 minutes later, Chief Ely again spoke with Williams from about 15 feet away, at the side door, and again Williams only cracked the door to extend his head out and asked for his wife and mother to come up to speak with him and again Chief Ely explained that he could not comply as long as Williams remained in the home, would not show his hands, and could be a threat to their safety.  Exhibit 8

(Deposition of Stanley Ely), N.T., at 38-39, 40-41.

36. This second conversation was also broken off when Williams became increasingly agitated when Chief Ely did not comply with his request to send Williams' wife and mother up to speak with him.  Exhibit 8 (Deposition of Stanley Ely), N.T., at 41-42.

37. After the second conversation with Chief Ely, Chief Ely returned and reported the status to Corporal Miller.  At this time three state police officers arrived as did several local police officers including, Chief John Krieg of Meshoppen Borough, and Chief William Olszewski and Sergeant Roger Hardy, both of Tunkhannock Borough, and the police officers began to discuss a plan to try to get Williams to come out of the house.  Exhibit 8 (Deposition of Stanley Ely), N.T., at 42-43;  Exhibit 9 (Deposition of Mark Papi), N.T., at 29   Exhibit 10 (Deposition of Robert Roberts), N.T., at 35; Exhibit 11 (Deposition of William Olszewski), N.T., at 4-5.

38. At this time, Defendant, Officer Mark Papi, of Tunkhannock Township, was covering the front door of the house and the back wall by watching from the northeast corner of the house, with Officer Profka observing the opposite sides of the home. Exhibit 5 (Deposition of Slade Profka), N.T., at 28; Exhibit 8 (Deposition of Stanley Ely), N.T., at 45-46, 53.

39. The officers formulating the plan discussed several options including (1) the Pennsylvania State Police Response Team, which was rejected as futile per the advice of the instruction of Corporal Dunleavy of the State Police; (2) continued negotiations between Chief Ely and Williams; and (3) to try to talk to Williams and convince him to come out of the house where police could ensure that he was unarmed and apprehend

him. Corporal Miller decided on the last option because Ely's negotiations with Williams were futile, and the SERT team would take four hours to arrive and police had no idea what was going on inside the house because Williams was out of sight, all of the doors were closed, and the curtains were all drawn.  Exhibit 5 (Deposition of Paul Miller), N.T., at 36-37; Exhibit 8 (Deposition of Stanley Ely), N.T., at 46-49; Exhibit 10 (Deposition of Robert Roberts), N.T., at 35-36; Exhibit 12 (Deposition of William Olszewski), N.T., at 30-33; Exhibit 13 (Deposition of Roger Hardy), N.T., at 39-40, 48-52, 56, 67;  Exhibit 14 (Deposition of James Dunleavy), N.T., at 34-35, 46-47.

      40.  The plan entailed Chief Ely talking to Williams to get him to come out the door far enough for a Corporal Dunleavy of the State Police, stationed by the house out of Williams' sight, to tase him and allow the officers to take him into custody. Exhibit 6 (Deposition of Paul Miller), N.T., at 37-38; Exhibit 8 (Deposition of Stanley Ely), N.T., at 47, 52;  Exhibit 9 (Deposition of Mark Papi), N.T., at 37-38;  Exhibit 10 (Deposition of Robert Roberts), N.T., at 35-36; Exhibit 11 (Deposition of John Kreig), N.T., at 28-29, 33-34; Exhibit 13 (Deposition of Roger Hardy), N.T., at 48-52;  Exhibit 14 (Deposition of James Dunleavy), N.T., at 36-38;  Exhibit 15 (Deposition of Jaime Lopez), N.T., at 19-20.

      41.  If Williams retreated into the house, then a second team of officers was to enter the home through the front door, on the "go" signal of a nearby State Police Officer, proceed to the basement, and apprehend Williams.  Officer Mark Papi volunteered to provide lethal cover for Officer Roberts if the group had to advance into the home, which is a standard tactic when officers deploy tasers to apprehend an individual.  Exhibit 6 (Deposition of Paul Miller), N.T., at 37-38; Exhibit 8 (Deposition of

Stanley Ely), N.T., at 52; Exhibit 9 (Deposition of Mark Papi), N.T., at 37-40; Exhibit 10 (Deposition of Robert Roberts), N.T., at 35-36; Exhibit 11 (Deposition of John Kreig), N.T., at 28-29, 33-34, 37-39, 41; Exhibit 13 (Deposition of Roger Hardy), N.T., at 48-52; Exhibit 14 (Deposition of James Dunleavy), N.T., at 36-38; Exhibit 17 (Expert Report of Emanuel Kapelsohn), at 16.

  42. Chief Ely approached the side door again, yelling for Williams, who eventually responded to the door, cracked it about 8-10 inches, stuck his head out and began saying to Chief Ely "you're not coming in. You're not taking me. Get out of here," before he "simply stopped talking to me, slammed the door shut, and I saw him go back into the basement." He was "obviously upset" and locked the door. Exhibit 8 (Deposition of Stanley Ely), N.T., at 53-55; Exhibit 15 (Deposition of Jaime Lopez), N.T., at 22-23; Exhibit 16 (Deposition of Craig Flynn), N.T., at 30, 33-36.

  43. The group of officers up at the front door of the home consisted of Chief John Kreig, Chief William Olszewski, Corporal Miller, Sergeant Hardy, Robert Roberts, and Mark Papi and entered the home through the front door, which Williams had locked, cleared the first floor and proceeded down the stairs to the basement. Officer Robert Roberts of Tunkhannock Township was the first police officer to enter the home with the ballistic shield he was carrying, while Mark Papi was the last officer who entered the home through the front door. Exhibit 6 (Deposition of Paul Miller), N.T., at 38-39, 43-46; Exhibit 8 (Deposition of Stanley Ely), N.T., at 56; Exhibit 9 (Deposition of Mark Papi), N.T., at 22, 37-41; Exhibit 10 (Deposition of Robert Roberts), N.T., at 36, 40-43; Exhibit 11 (Deposition of John Kreig), N.T., at 28-29, 36-37, 41; Exhibit 12 (Deposition of William Olszewski), N.T., at 43; Exhibit 13 (Deposition of Roger Hardy),

N.T., at 48-53, 57-58; Exhibit 15 (Deposition of Jaime Lopez), N.T., at 24-25, 29-30; Exhibit 16 (Deposition of Craig Flynn), N.T., at 35, 39-40.

      44. As the officers searched the basement, they observed Williams retreat into the bedroom at the far end of the hall, slamming the door as police approached. Chief Kreig opened the basement door to the outside and Chief Ely and Slade Profka joined the other officers outside the bedroom door, repeatedly ordering Williams to open the door, but he refused to do so. Exhibit 6 (Deposition of Paul Miller), N.T., at 46-47; Exhibit 8 (Deposition of Stanley Ely), N.T., at 57, 61; Exhibit 9 (Deposition of Mark Papi), N.T., at 41-43; Exhibit 10 (Deposition of Robert Roberts), N.T., at 43; Exhibit 11 (Deposition of John Kreig), N.T., at 42-43; Exhibit 13 (Deposition of Roger Hardy), N.T., at 63; Exhibit 16 (Deposition of Craig Flynn), N.T., at 41-42.

      45. Williams yelled at the officers outside the door "You're going to be sorry. Don't do this," and "Don't come in here," or the officers would be "sorry." Exhibit 9 (Deposition of Mark Papi), N.T., at 43; Exhibit 10 (Deposition of Robert Roberts), N.T., at 44, 46-47; Exhibit 12 (Deposition of William Olszewski), N.T., at 45; Exhibit 15 (Deposition of Jaime Lopez), N.T., at 31-33.

      46. When the door did not open, Officer Roberts pushed the shield against the door, but was unable to budge it until Officer Papi also pushed on the door with Officer Roberts, breaching it. Officer Roberts pitched forward into the room and stumbled, bumping into Williams and knocking him into a seated position on the bed from which he immediately rebounded to his feet, while Officer Papi, Seargeant Hardy, and Chief Kreig also entered the bedroom after Officer Roberts. Exhibit 5 (Deposition of Slade Profka), N.T., at 49; Exhibit 6 (Deposition of Paul Miller), N.T., at 47-48; Exhibit 8

(Deposition of Stanley Ely), N.T., at 62-63; Exhibit 9 (Deposition of Mark Papi), N.T., at 48-50; Exhibit 10 (Deposition of Robert Roberts), N.T., at 44-51; Exhibit 13 (Deposition of Roger Hardy), N.T., at 21, 64-65, 70-72.

47. As Williams immediately rebounded off the bed to his feet, he began to wildly slash and swing, in his right hand, a 2 foot long fireplace poker at police at shoulder-head level, "trying to strike them," while the officers yelled at him, from about four feet away, to "Drop it, Drop it."   Exhibit 5 (Deposition of Slade Profka), N.T., at 52-53, 59-61; Exhibit 6 (Deposition of Paul Miller), N.T., at 54-56; Exhibit 8 (Deposition of Stanley Ely), N.T., at 70-72;  Exhibit 10 (Deposition of Robert Roberts), N.T., at 50-51; Exhibit 12 (Deposition of William Olszewski), N.T., at 46-48;  Exhibit 13 (Deposition of Roger Hardy), N.T., at 71-72, 76-77;  Exhibit 14 (Deposition of James Dunleavy), N.T., at 48;  Exhibit 15 (Deposition of Jaime Lopez), N.T., at 37;  Exhibit 16 (Deposition of Craig Flynn), N.T., at 49, 62-63.

48. Chief Kreig and Seargent Hardy each fired a taser Williams, but they failed to have any effect on him and he continued to shout at the officers to get out of the room, while continuing to swing the poker at the officers' heads while Officer Roberts was wedged against Officer Papi with the shield into the corner of the room and unable to move or to raise the shield to defend himself.  Exhibit 5 (Deposition of Slade Profka), N.T., at 49, 59-61; Exhibit 6 (Deposition of Paul Miller), N.T., at 54-56; Exhibit 8 (Deposition of Stanley Ely), N.T., at 68-69, 73; Exhibit 9 (Deposition of Mark Papi), N.T., at 52-55; Exhibit 10 (Deposition of Robert Roberts), N.T., at 51-53, 58, 67; Exhibit 11 (Deposition of John Kreig), N.T., at 11-12, 45-47, 54-55; Exhibit 12 (Deposition of William Olszewski), N.T., at 47-50;  Exhibit 13 (Deposition of Roger Hardy), N.T., at 72-

76.

49. Police continued to command Williams to get down and to drop the poker, which had a pointed end, like an "ice pick," but he continued to menace them by waving it at them in a figure-eight motion and yelling at them aggressively to "Get the fuck out of here," and to "Leave me the fuck alone." Exhibit 6 (Deposition of Paul Miller), N.T., at 56-57; Exhibit 8 (Deposition of Stanley Ely), N.T., at 68-69, 73; Exhibit 9 (Deposition of Mark Papi), N.T., at 52-55; Exhibit 10 (Deposition of Robert Roberts), N.T., at 51, 53-54, 55; Exhibit 11 (Deposition of John Kreig), N.T., at 55; Exhibit 12 (Deposition of William Olszewski), N.T., at 49.

50. Chief Ely then fired a third taser at Williams, striking him, but after an instantaneous hesitation, he resumed menacing the police, but this time by raising it over his head and pointing the sharp end like a spear towards Officers Roberts and Papi, who were only 3-4 feet away. Exhibit 6 (Deposition of Paul Miller), N.T., at 56-57; Exhibit 8 (Deposition of Stanley Ely), N.T., at 70, 73-74; Exhibit 9 (Deposition of Mark Papi), N.T., at 55-57; Exhibit 10 (Deposition of Robert Roberts), N.T., at 55-57; Exhibit 11 (Deposition of John Kreig), N.T., at 55-56; Exhibit 12 (Deposition of William Olszewski), N.T., at 49-50.

51. As the officers continued to command Williams to put the poker down, he instead "started to move forward" and advanced it down and toward Officers Papi and Roberts by "closing the gap" and making a "pitching motion" over his head. At this time, Officer Papi had his firearm at the "high ready" and was commanding Williams repeatedly to "put the poker down, put the poker down." Exhibit 8 (Deposition of Stanley Ely), N.T., at 68-69, 73-74, 78; Exhibit 9 (Deposition of Mark Papi), N.T., at 55-59;

Exhibit 10 (Deposition of Robert Roberts), N.T., at 57-58; Exhibit 13 (Deposition of Roger Hardy), N.T., at 77-80.

52. Officer Papi gave Williams "two verbal commands to put it down. As I was saying that, he began to close the gap there with it raised. I felt that me and Officer Roberts were going to be a target of his attack, and at that time I fired two shots at Mr. Williams", what is known as a 'double tap' and he "fell back onto the bed." Exhibit 6 (Deposition of Paul Miller), N.T., at 56-57; Exhibit 8 (Deposition of Stanley Ely), N.T., at 68-69, 73-74, 77-78; Exhibit 9 (Deposition of Mark Papi), N.T., at 57-60; Exhibit 10 (Deposition of Robert Roberts), N.T., at 58-59; Exhibit 11 (Deposition of John Kreig), N.T., at 55-56; Exhibit 12 (Deposition of William Olszewski), N.T., at 47-49; Exhibit 13 (Deposition of Roger Hardy), N.T., at 77-81.

53. Officer Papi removed the poker from Williams's reach, placing it onto the floor, and police handcuffed him before performing CPR and summoning emergency medical personnel from an ambulance. Exhibit 6 (Deposition of Paul Miller), N.T., at 59-60; Exhibit 9 (Deposition of Mark Papi), N.T., at 63; Exhibit 10 (Deposition of Robert Roberts), N.T., at 59-60; Exhibit 11 (Deposition of John Kreig), N.T., at 58-60; Exhibit 12 (Deposition of William Olszewski), N.T., at 51; Exhibit 13 (Deposition of Roger Hardy), N.T., at 85; Exhibit 14 (Deposition of James Dunleavy), N.T., at 49; Exhibit 15 (Deposition of Jaime Lopez), N.T., at 38-41; Exhibit 16 (Deposition of Craig Flynn), N.T., at 52-53.

54. The shooting occurred at 4:14 p.m. and police were on the scene for approximately two hours prior to the shooting. Exhibit 3 (Deposition of Shirley Williams), N.T., at 21; Exhibit 6 (Deposition of Paul Miller), N.T., at 58.

55. Williams passed away almost immediately.  Exhibit 10 (Deposition of Robert Roberts), N.T., at 61.

56. Officer Roberts testified that "at the same time Officer Papi discharged his weapon, I felt that one of us was about to be seriously injured, and I was reaching for my sidearm as well."  Exhibit 10 (Deposition of Robert Roberts), N.T., at 68-69.

57. Sergeant Hardy testified that he feared for his safety and the other officers when "he started to come forward," and that "from the onset, when he was swinging, had I been any closer, I'm sure that he would have hit me."  He added that he believed "it was capable of killing an officer." Exhibit 13 (Deposition of Roger Hardy), N.T., at 82, 96.

58. Corporal Miller testified that "from my vantage point and an officer safety issue, I believe the right thing was done."  Exhibit 6 (Deposition of Paul Miller), N.T., at 63.

59. Chief Ely testified that police opened the door because "We had no idea at that point what he was doing inside.  For all we know, he could have been attempting to commit suicide."  Exhibit 8 (Deposition of Stanley Ely), N.T., at 66-67.

60. Sergeant Hardy testified that based on Williams' actions, Hardy believed "that he was not going to follow any verbal commands.  He was not going to leave the house, and his intent was to injure someone or anyone that would attempt to do that." Exhibit 13 (Deposition of Roger Hardy), N.T., at 26.

61. State Trooper Jaime Lopez, who entered the home to provide backup to the municipal police officers that entered the front door of the home, testified that "upon getting closer to Williams, like I said earlier, that moment unfolded instantly, and I could

see multiple Taser deployments were being utilized but to no avail . . . It seemed to be a Taser appropriate situation.  When hearing that Mr. Williams had a poker, and there was a wood burning stove, a fireplace right within view, so it made sense. . . . And recognizing that the multiple officers Taser deployments were not working, I figured the expandable baton might be an appropriate weapon of choice.  And it was likely . . . I may be one of the next officers to engage Mr. Williams.  I figured utilizing the expandable baton might be a formidable option to getting him to drop the poker."
Exhibit 15 (Deposition of Jaime Lopez), N.T., at 35-36.

  62.  All defendant police officers possessed Act 120 municipal police officer training, which included training on the use of force, the serving of warrants, and handling interactions with mentally and emotionally disturbed individuals as part of the mandatory MPOETC training from 2001 to the present.  Exhibit 17 (Expert Report of Emanuel Kapelsohn), at 14; Exhibit 18, (Expert Report of Mark Keeler), at 11.

  63.  Plaintiff has no evidence that any policy of Overfield Township, Tunkhannock Township, Meshoppen Borough, or Tunkhannock Borough in the manner in which they trained their police officers to serve a 302 mental health warrant has ever been demonstrated to be constitutionally defective on any occasion prior to November 7, 2012.

               **SCHEMERY ZICOLELLO**

              By:  /s/Michael J. Zicolello
                Michael J. Zicolello
                I.D. #65522
                Attorney for Defendants
             333 Market Street
             Williamsport, PA 17701
             (570) 321-7554

**IN THE COURT OF COMMON PLEAS FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MELINDA WILLIAMS, as Administrator of the Estate of BRIAN P. WILLIAMS, Plaintiff | : | No: 3:CV-13-1151 |
| v. | : | CIVIL ACTION - LAW |
| MARK PAPI, ROBERT ROBERTS, STANLEY ELY, PAUL MILLER, TERRANCE FISHER, SLADE PROFKA JOHN KREIG, ROGER HARDY, WILLIAM OLSZEWSKI, TUNKHANNOCK TOWNSHIP, OVERFIELD TOWNSHIP, TUNKHANNOCK BOROUGH, MESHOPPEN BOROUGH, Defendant | : | JURY TRIAL DEMANDED |

**CERTIFICATE OF SERVICE**

Michael J. Zicolello certifies that a copy of the foregoing Concise Statement of Facts has been served upon the following individual and in the manner indicated below on this _30th_ day of November, 2015:

VIA ELECTRONIC FILING

Shelley L. Centini, Esquire
The Dyller Law Firm
88 North Franklin Street
Wilkes-Barre, PA 18701

**SCHEMERY ZICOLELLO**

By: /s/Michael J. Zicolello
Michael J. Zicolello
I.D. #65522
Attorney for Defendants

333 Market Street
Williamsport, PA 17701
(570) 321-7554