**IN THE COURT OF COMMON PLEAS FOR THE**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MELINDA WILLIAMS, | : | |
| as Administrator of the Estate of | : | No: 3:CV-13-1151 |
| BRIAN P. WILLIAMS, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION - LAW |
| MARK PAPI, ROBERT ROBERTS, | : | |
| STANLEY ELY, PAUL MILLER, | : | |
| TERRANCE FISHER, SLADE PROFKA | : | |
| JOHN KREIG, ROGER HARDY, | : | |
| WILLIAM OLSZEWSKI, | : | |
| TUNKHANNOCK TOWNSHIP, | : | |
| OVERFIELD TOWNSHIP, | : | JURY TRIAL DEMANDED |
| TUNKHANNOCK BOROUGH, | : | |
| MESHOPPEN BOROUGH, | : | |
| Defendants | : | |

_____

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

_____

Michael J. Zicolello
I.D. #65522
Attorney for Defendants

333 Market Street
Williamsport, PA 17701
Telephone:  (570) 321-7554
Facsimile: (570) 321-7845
Email: mike@sz-law.com

## TABLE OF CONTENTS

**PAGE**

I.      FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      1

II.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      5

        A.      Qualified Immunity and Excessive Force Claims . . . . . . . . . . . . . .      7

        B.      Supervisor Liability and Qualified Immunity. . . . . . . . . . . . . . . .      18

        C.      Monell Claims Against the Municipalities . . . . . . . . . . . . . . . . . .      21

        D.      ADA and RA Claims Against the Municipalities. . . . . . . . . . . . .      25

        E.      Intentional Tort Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      30

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      30

        CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      32

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                **PAGE**

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986) . . . . . . . . . . . . . . .  6

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009) . . . . . . . . . . . . . . . . . . . . . . . . 18,19,20,21

<u>Barkes v. First Corr. Med. Inc.</u>, 766 F.3d 307, 319 (3rd Circuit)  . . . . . . . . . . . . .  19,20

<u>Brennan v. Norton</u>, 350 F.3d 399, 428 (3rd Cir. 2003) . . . . . . . . . . . . . . . . . . . . .  24

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . .  5,6

<u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) . . . . . . . . . . . . . . . . . . . .  23

<u>City & County of San Francisco v. Sheehan</u>, 135 S.CT. 1765,
        1774 (U.S. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8,11,12,16,17,18

<u>Connick v. Thompson</u>, 536 U.S. 51, 131 S.Ct. 1350, 1359 (2011) . . . . . . . . . . . . . 21,22

<u>Curley v. Klem</u>, 499 F.3d 199, 206 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . .  8

<u>D.E. v. Cent. Dauphin Sch. Dist.</u>, 2013 U.S. Dist. LEXIS 626, *14
        (M.D. Pa. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Doe v. Old Forge Borough</u>, 2015 U.S. Dist. LEXIS 85902, 26-30
        (M.D. Pa. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Estate of Smith v. Marasco</u>, 430 F.3d 140, 148 (3rd Cir. 2005) . . . . . . . . . . . . . . . .9,10

<u>Defreitas v. Montgomery County Corr. Facility</u>, 525 Fed. Appx.
        170, 178 (3rd Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Graham v. Connor</u>, 490 U.S. 386, 396 (U.S.1989) . . . . . . . . . . . . . . . . . . . . . . . .  10

<u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 256-46 (3rd Cir. 2006) . . . . . . . . . . . . . .  24

<u>Kocher v. Larksville Borough</u>, 926 F. Supp.2d 579, 607 (M.D. Pa. 2013) . . . . . . . . .  24

<u>McDonald v. Pennsylvania</u>, 62 F.3d 92, 95 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . .  25

<u>Monell v. New York City Dept. Of Social Servs.</u>, 436 U.S. 658 (1978) . . . .  21,22, 23,24

Natale v. Camden Cnty Corr. Facility, 318 F.3d 575, 584 (3rd Cir. 2004) . . . . . . . . . .  22

Pembaur v. City of Cincinnati, 475 U.S. 469, 481-482 (U.S. 1986) . . . . . . . . . . . . .  24

Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) . . . . . . . . . . . . . . . . . . . . .  30

Rivas v. City of Passaic, 365 F.3d 181, 198 (3rd Cir. 2004) . . . . . . . . . . . . . . . . . . . .  10

Santiago v. Warminster Twp., 629 F.3d 121, 135 (3d Cir. Pa. 2010) . . . . . . . . . . . .  24

Schorr v. Borough of Lemoyne, 2002 U.S. Dist. LEXIS 25668,
      *16 (M.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Seibert v. Lutron Elecs, 408 Fed. Appx. 605, 607-08 (3rd Cir. 2010) . . . . . . . . . . . . . 26

St. Louis v. Praprotnik, 485 U.S. 112, 124 (U.S. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 23

Taylor v. Barkes, 135 S.CT 2042 (U.S. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Williams v. City of Scranton, 566 Fed. Appx. 129 (3rd Cir. 2014) . . . . . . . . . 11,12,13,16

Williams v. West Chester, 891 F.2d 458, 467 (3rd Cir. 1989) . . . . . . . . . . . . . . . . . . . . 23

**STATUTES**

Fed R.C.P. 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5,6

Fed. R.C.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Fed. R.C.P. 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

18 §508(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

18 Pa. C.S.A. §2702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16,28

18 Pa. C.S.A. §2706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16,28

29 U.S.C. §794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,10,18,24

42 U.S.C. §12101(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

42 U.S.C. §12102(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

42 U.S.C. §12132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

50 Pa. C.S.A. §7302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

53 Pa. C.S.A. §66902 . . . . . . . . . . . . . . . .   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

53 Pa. C.S.A. §46123.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.  FACTS

A detailed description of the facts with citations to the evidence supporting them can be found in the "Statement of Facts" in support of summary judgment, which is hereby incorporated by reference.  However, for the ease of the Court, a brief recitation of the facts will be included.

Plaintiff, Melinda Williams, was married to the decedent, Brian Williams, and the two were having marital difficulties, premised on a long-standing affair between Brian Williams and an acquaintance, which had recently been discovered by Melinda.  This discovery had led to state police, in late September 2012, visiting the Williams residence and taking Brian Williams to the hospital over concerns for his mental health.  On the morning of November 7, 2012, Melinda Williams informed Brian Williams that she was filing for a divorce.  He became distraught, but, with his mother, Shirley Williams accompanying him, he attended his regularly scheduled counseling session at Community Counseling Services, with Dr. Rackesh Sharma, M.D., who was treating him regularly in connection with his psychological issues stemming from his affair.

At the counseling session, Brian Williams informed Dr. Sharma that he was going to kill his wife, Melinda Williams, and that he had recently grabbed her by the throat during an argument.  He also informed the doctor that he had written a note in which he indicated that he was going to put Melinda Williams "six feet under."  Dr. Sharma urged Brian Williams to immediately enter voluntary hospitalization, but he refused.  Dr. Sharma therefore informed Brian Williams that he was going to make out a 302/mental

health warrant, and that police would take him into custody and take him to the hospital for an involuntary mental evaluation.  Brian Williams walked out and drove home to his residence in Overfield Township, Pennsylvania.  Dr. Sharma completed the 302 warrant application, noting that Brian Williams constituted a clear and present danger to others based upon his threat to his wife and his recent physical violence to her.

Overfield Township police officers, Corporal Paul Miller and Slade Profka, received notification of the mental health warrant from dispatch and were told to report to the Williams' residence.  Corporal Miller was the ranking police officer on duty in Overfield Township, as Overfield Township Police Chief, Terrance Fisher, was off duty at the time of notification of the mental health warrant.  As Miller and Profka arrived at the residence, at approximately 2 pm, Brian Williams was walking into the home, but he ignored their attempts to talk to him, retreating into the home and closing the door.  The officers knocked on the door and asked to talk to him about the 302 warrant, but received no reply, so they returned to their patrol car, which was parked in the driveway.

Brian Williams' father, Paul Williams, then approached the officers, who informed them that they were at the residence awaiting a mental health warrant to take Brian Williams to the hospital for treatment based upon a threat to kill his wife.  Paul Williams offered to enter the home, talk with Brian Williams, and attempt to convince him to come out and go with the police for treatment.  Paul Williams then entered the home, explained the situation to Brian Williams and asked him to come with police.  Brian Williams refused, and told Paul Williams to tell the officers to get off his property.  Paul Williams explained this to the officers, and then returned to the residence in another attempt to convince Brian Williams to come with police.  This attempt was also

unsuccessful, as Brian Williams again informed Paul Williams that he was not going to come out without a problem.  Some time later, Paul Williams approached the Williams' home again to speak with Brian Williams to convince him to go with police voluntarily, found the door locked, and Brian Williams would not open it.

The mental health warrant arrived at approximately 2:45 p.m., while additional police officers arrived from 2 pm to approximately 3:30 pm, including Chief Stanley Ely, Robert Roberts, and Mark Papi of Tunkhannock Township; Chief William Olszewski and Roger Hardy of Tunkhannock Borough; Chief John Kreig of Meshoppen Borough; and Corporal James Dunleavy and Troopers Jamie Lopez and Craig Flynn of the Pennsylvania State Police.  Police used this time to establish a perimeter around the home and to communicate with Brian Williams in order to convince him to leave the home and allow police to take him to the hospital voluntarily.  During this period of time, Chief Fisher, Chief Ely, Melinda Williams, and Corporal Dunleavy spoke with Brian Williams on the phone on several occasions, with the result of each phone call being that Brian Williams repeatedly refused to come out of the home and go with police voluntarily.

Under Corporal Miller's instructions, Chief Ely took the lead in attempting to talk with Brian Williams in person and to convince him to come with police, and he spoke with Brian Williams on three separate occasions.  Each conversation took place with Chief Ely approximately fifteen feet from the basement door and Brian Williams cracking the basement door with only his head out, demanding that his wife and mother be permitted to come up where he could see them–in the driveway– and speak with him. Each time, Brian Williams demanded that his wife and mother come up to speak with

3

him, and as Chief Ely explained why he could not permit this unless he would emerge

from the home and permit police to verify that he was not armed, Brian Williams became

agitated, forcing Chief Ely to break off negotiations.  During these conversations, Brian

Williams continued to refuse to exit the home and come with police.

After the second conversation between Chief Ely and Brian Williams, several of

the police officers met with Corporal Miller and formulated a plan to gain custody of

Brian Williams.  The officers discussed the unremitting futility of negotiations, as well as

the fact that the State Police SERT team was unavailable.  Ultimately, it was decided

that Chief Ely would approach the basement door and engage Brian Williams in

conversation again in the hopes that he would either agree to come out and go with

police or that he could be tasered and taken into custody by Corporal Dunleavy, of the

State Police.  A group of municipal police officers, including Corporal Miller, Chiefs Kreig

and Olszewski, and Officers Hardy, Robert Roberts, with a ballistic shield, and Mark

Papi, who, in accordance with his training, volunteered to provide lethal cover.

Chief Ely approached the basement door, with Corporal Dunleavy in position to

attempt to tase Brian Williams, but when Williams came to the door, he was angry and

shouted that the officers were not to come in and that they were not "taking" him before

slamming the basement door and retreating into a basement bedroom.  On the signal

from Corporal Dunleavy that the conversation with Brian Williams had failed, the

municipal police officers entered the upstairs of the home with a key provided by

Melinda Williams and swept the upstairs before proceeding down the stairs into the

basement.  As the officers searched the basement, they spotted Brian Williams

retreating into the basement bedroom, but he slammed the bedroom door shut as they

4

approached.  Chief Kreig opened the basement door and let Chief Ely enter the basement hallway outside the closed door.

The officers repeatedly commanded Brian Williams to open the door, but he refused and yelled at them that they would be sorry if they entered the bedroom.  Officer Roberts pushed against the door with his shield, and with the assistance of Officer Papi, pushed open the door, and stumbled into the bedroom, bumping into Brian Williams and knocking him into a seated position the bed, from which he immediately rebounded to his feet, thrusting a two foot long poker at police and yelling.  Officer Roberts and Papi were within 4 feet of Brian Williams, and the shield was trapped under Roberts.  The officers repeatedly ordered Brian Williams to drop the poker and to get down.  Tasers were fired by Officer Hardy, Chief Ely, and Chief Kreig, without effect.  Instead Brian Williams raised the poker over his head and advanced toward Officers Papi and Roberts.  Officer Papi fired two shots, striking Brian Williams in the right arm with the raised poker and the torso, causing his death.

## II.  ARGUMENT

### <u>LEGAL STANDARD FOR SUMMARY JUDGMENT</u>

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R.C.P. 56(a).  "If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Summary judgment shall be granted "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.C.P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp., 477 U.S. at 323-24.

When considering a motion for summary judgment, courts apply well settled standards. To begin, "when the nonmoving party has the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponents claim." Id. at 323. Rather, the moving party need only show "that there is an absence of evidence to support the nonmoving party's case." Id. at 324. Consistently, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Similarly, "a party asserting that a fact cannot be . . . disputed must support the assertion by citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R.C.P. 56(c). Once the moving party has carried this initial burden, the burden shifts to the nonmoving party to demonstrate that a genuine issue remains for trial. Fed. R.C.P. 56(e).

The summary judgment standard "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). A factual dispute is material if it might affect the outcome of a claim under the applicable law and it is genuine only if there is a sufficient basis for a reasonable fact finder to

return a verdict for the non-moving party.  Id. 248-249.  "Factual disputes that are

irrelevant or unnecessary will not be counted" at summary judgment.  Id. at 248.  "At the

summary judgment stage the judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for

trial."  Id. at 249.

However, "in the face of the defendant's properly supported motion for summary

judgment, the plaintiff [may] not rest on his allegations . . . to get to a jury without any

significant probative evidence tending to support the complaint."  Id. at 249.  Similarly, "if

the evidence is merely colorable. . .  or is not significantly probative . . . summary

judgment may be granted."  Id. at 249-250. (citations omitted).  Consistently, the United

States Supreme Court has noted that "formerly it was held that if there was what is

called a scintilla of evidence in support of a case the judge was bound to leave it to the

jury, but recent decisions of high authority have established a more reasonable rule, that

in every case, before the evidence is left to the jury, there is a preliminary question for

the judge, not whether there is literally no evidence, but whether there is any upon which

a jury could properly proceed to find a verdict for the party producing it, upon whom the

onus of proof is imposed."  Id. at 251.   Under this standard, summary judgment should

be granted to Defendants on all claims raised against them in the Amended Complaint.

## A.   QUALIFIED IMMUNITY AND EXCESSIVE FORCE CLAIMS

In Counts I and II of the Amended Complaint, Plaintiff raises Fourth Amendment

excessive force claims against municipal police officers, Mark Papi, Robert Roberts,

Chief Ely, Paul Miller, Slade Profka, Chief Kreig, Roger Hardy, and Chief Olszewski in

connection with their actions on November 7, 2012 in serving a mental health warrant on

the decedent Brian Williams.  Summary judgment for the officers is appropriate on these claims because the uncontested facts demonstrate that the officers are protected by qualified immunity, based upon both prongs of the qualified immunity test.

The doctrine of qualified immunity dictates that "public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." City & County of San Francisco v. Sheehan, 135 S.Ct. 1765, 1774 (U.S. 2015).  Consistently, "an officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." Id.  Notably, "this exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Id.

Qualified immunity involves a two-part test. "In the first step, a court must address whether the officer's conduct violated a constitutional right." Curley v. Klem, 499 F.3d 199, 206 (3rd Cir. 2007).  In excessive force cases, the Third Circuit has held that "the relevant inquiry is the reasonableness of the officer's belief as to the appropriate level of force, which should be judged from the officer's on-scene perspective, and **_not_** in the 20/20 vision of hindsight." Id. (emphasis added). The first step of the qualified immunity analysis involves an assessment of the totality of the circumstances confronting the officer and "depends on all of the chaotic details that emerge in real time in real life." Id. at 211.

"If, and only if, the court finds a violation of a constitutional right, the court moves

to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability." Id. at 207.  Under this prong of the test, "the question at this second step is whether the right that was violated was clearly established, or, in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.  "This inquiry must be undertaken in light of the *__specific context__* of the case, not as a broad general proposition." Id. (emphasis added).  The Third Circuit has further explained that "the second step is the immunity analysis and addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit." Id.  In summary, the focus of the second prong of "the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." Id.

Examining the first part of the qualified immunity analysis, namely whether the officers' conduct violated a constitutional right of the decedent, Brian Williams, it is clear that the actions of no individual officer did.  In Counts I and II, Plaintiff has couched her excessive force claims against the following police officers based on their individual actions: Mark Papi, Robert Roberts, Chief Ely, Paul Miller, Slade Profka, Chief Kreig, Roger Hardy, and Chief Olszewski.

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a seizure occurred and that it was unreasonable." Estate of Smith v. Marasco, 430 F.3d 140, 148 (3rd Cir. 2005). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (U.S. 1989). "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  <u>Id.</u> at 397.  The test involves "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  <u>Id.</u> at 397.  "Additional factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  <u>Rivas v. City of Passaic</u>, 365 F.3d 181, 198 (3rd Cir. 2004).  Furthermore, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396.  The Supreme Court has repeatedly emphasized that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  <u>Id.</u> at 396-97.  Finally personal involvement must be demonstrated because, "in order to prevail on a §1983 claim against multiple defendants, a plaintiff must show that each individual defendant violated his constitutional rights."  <u>Estate of</u>

Smith, 430 F.3d at 151.

Two recent cases illustrate well, how courts apply the qualified immunity analysis when faced with a police shooting of an armed potentially mentally ill person,  City & County of San Francisco v. Sheehan, 135 S.Ct. 1765 (U.S. 2015) and Williams v. City of Scranton, 566 Fed. Appx. 129 (3rd Cir. 2014).  Each will be discussed at some length as they are particularly relevant to the merits of the present case.

In Sheehan, Sheehan occupied a group home for the mentally ill, in which she resided in a private room.  Sheehan, 135 S.Ct. at 1769.  A social worker entered her room to conduct a welfare check, and she told him to leave and threatened to kill him with a knife, at which point the social worker left the room without actually seeing if Sheehan had a knife.  Id. at 1770.  The social worker completed an application under California law to have Sheehan detained for temporary evaluation and treatment, including checking "off boxes indicating that Sheehan was a 'threat to others' and 'gravely disabled,' but he did not mark that she was a danger to herself" before contacting police for assistance transporting her to a mental health facility.  Id.  Two police officers initially responded, viewed the temporary mental health detention application, proceeded immediately to Sheehan's door, knocked, and told her that "we want to help you."  Id.  Not hearing any reply from Sheehan, the officers used a key provided by the social worker to enter Sheehan's room, causing her to react "violently" by grabbing a kitchen knife with a five inch blade, approaching the officers, and threatening to kill them if they did not leave.  Id.  The officers retreated out of the room and called for back up while Sheehan closed the door.  Id.  Instead of waiting for backup to arrive, the officers re-entered the room, with their handguns drawn, which prompted

11

Sheehan, who was still holding the knife to yell at the officers to leave or she was going to attack them with the knife.  Id. at 1771.   "In any event, [Officer] Reynolds began pepper-spraying Sheehan in the face, but Sheehan would not drop the knife."  Id. Instead, "when Sheehan was only a few feet away, [Officer] Holder shot her twice, but she did not collapse. [Officer] Reynolds then fired multiple shots."  Id.  After Sheehan finally fell wounded by the shots, a third officer (who had just arrived) kicked the knife out of her hand.  Sheehan survived."  Id.

In conducting a qualified immunity analysis, the Court held that under the first prong, the officers "did not violate any federal right when they opened Sheehan's door [and entered the room] the first time."  Id. at 1775.  Similarly, the Court held that the officers did not violate any constitutional rights when they opened the door and entered the room the second time.  Id.  But, crucially, for the first prong and in connection with the shooting of Sheehan, the Court held that "we also agree with the Ninth Circuit that after the officers opened Sheehan's door the second time, their use of force was reasonable.  Reynolds tried to subdue Sheehan with pepper spray, but Sheehan kept coming at the officers until she was 'only a few feet from a cornered Officer Holder.'" Id. "***At this point the use of deadly force was justified***."  Id. (emphasis added).  The Court went on to add that "nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds."  Id.

Consistent with Sheehan, the Third Circuit recently held a use of deadly force reasonable in  Williams v. City of Scranton, 566 Fed Appx 129 (3rd Cir. 2014), an appeal from the Middle District of Pennsylvania in which a district court had granted summary judgment on the basis of that the use of deadly force did not violate the decedent's

rights.  In <u>Williams</u>, police responded to reports of a domestic disturbance involving

Williams, and met her at the door to her apartment building, where they observed her

nude and asking incoherent questions.  <u>Id.</u> at 130-131.  Williams then fled upstairs to her

apartment, and the officers entered her apartment through the open door.  <u>Id.</u> at 131.

They observed several knives in the kitchen on the oven, and called for an ambulance

and EMTs for a possible 302 commitment.  Ultimately, the officers decided to not

commit Williams, but to instead cite her for disorderly conduct.  <u>Id.</u>  Hearing this,

Williams entered the kitchen and emerged with a large knife.  <u>Id.</u>  "The officers pulled

their service weapons and ordered Williams to stop and put down her knife, but she

refused and moved toward Smith, point the knife at him."  <u>Id.</u>  After issuing several

warnings, which Williams ignored, [the officers] shot Williams," who died of her wounds.

<u>Id.</u>

    In light of these facts, the court found that "the officers' use of deadly force

against Williams was reasonable as a matter of law."  <u>Id.</u> at 132.  The Court noted "we

agree with the District Court that 'no reasonable juror could find that the use of deadly

force violated Ms. Williams Fourth Amendment rights."  <u>Id.</u>  The Court further stated that

"the undisputed facts reveal that Williams rapidly moved toward Smith with a large knife,

ignored repeated warnings to stop and to drop the knife, and was no more than five feet

away from Smith at the time she was shot.  Under these circumstances the SPD officers

had probable cause to believe that Williams posed a significant threat of serious bodily

injury or death."  <u>Id.</u> The Court concluded that "it was objectively reasonable for the

officers to believe that using deadly force was necessary."  <u>Id.</u>

    Turning now to the undisputed facts in this case, no reasonable juror could find

that any officer used unreasonable force against the decedent at any time.  Before

entering the home, officers possessed a warrant issued under Section 302 of

Pennsylvania's Mental Health Procedures Act, 50 Pa. C.S.A. §7302, which indicated

that Brian Williams constituted a clear and present danger to others and that he had

threatened to kill his wife, Melinda Williams, at a counseling appointment less than one

hour prior to the arrival of police at his home on November 7, 2012.  For approximately

two hours, the officers attempted on multiple occasions to speak with and negotiate with

Brian Williams in a consistent and non-threatening manner, before entering the home

with a key provided by Melinda Williams, when it became apparent that there was no

reasonable way to convince Williams to surrender to police.  Throughout the dialogue

with police, in person and over the phone, his father, and his wife over the phone, Brian

Williams remained adamant that he was **_not_** going to go willingly to the hospital with

police and that he would **_not_** cooperate with them by leaving the home and

demonstrating that he was unarmed.  Indeed, until police secured the scene after he

was shot, police were unable to confirm if Brian Williams had access to any firearms and

he consistently rebuffed their attempts to do so by refusing to come out of the home,

refusing to show his hands, and closing all of the doors and window drapes in the home.

In a last ditch attempt, police attempted to lure the decedent out of the home so he

could be secured with nonlethal force through tasering by non-defendant State Trooper

Corporal Dunleavy, but that plan failed when Brian Williams became angry and

retreated, locking the basement door, abruptly ending the conversation with Chief Ely.

     This abrupt termination of the conversation signaled to the police officers waiting

near the front door of the home, Corporal Miller, Roger Hardy, Robert Roberts, Mark
Papi, Chief Kreig, and Chief Olszewski to enter the home, without force, using the key
provided by Melinda Williams.  The officers, according to plan, swiftly swept and cleared
the top floor of the home before proceeding to the basement to locate and apprehend
Brian Williams.  As the officers arrived in the basement and began to search, they
observed Williams retreating into the basement bedroom and slamming the door.  The
officers approached the bedroom, ordering the out-of-sight Brian Williams to open the
door and surrender.  He refused, and yelled to police that they would be sorry if they
entered the room.

Chief Kreig then let Chief Ely and Slade Profka into the basement hallway by
unlocking the basement door that the decedent slammed when he stopped talking to
Chief Ely.  Chief Ely attempted to restart a dialogue with Brian Williams to convince him
to open the door and surrender, but he adamantly refused to do so and continued to
shout at police instead.  Officer Roberts then placed his synthetic shield against the
bedroom door and, with the assistance of Officer Papi, pushed into the bedroom through
the door, bumping into Brian Williams and knocking him into a seated position on the
bed, from which he immediately rebounded thrusting and slashing at police with a two-
foot long fireplace poker with a sharpened hook at the end.  At this point, Officers
Roberts and Papi were stuck, wedged into the corner of the room between the door, the
wall of the room and Brian Williams, and unable to gain any shelter from the synthetic
shield which was trapped under Roberts.

The officers repeatedly yelled to Brian Williams to put down the poker and get
down on the floor, but instead he continued thrusting and swinging the poker at them.  At

15

this point, Officer Hardy, Chief Kreig, and Chief Ely each fired tasers at Brian Williams without effect.  When the last taser, Chief Ely's, was fired and had no effect, Brian Williams advanced, closing the distance from police with the poker raised above his head, moving towards Officer Roberts and Officer Papi, who were within four feet of Williams.  Officer Papi and Officer Roberts were in fear of their lives from the attack with the poker, and Officer Papi fired two shots instantaneously, striking Williams and causing him to fall back upon the bed.  He died of his wounds shortly thereafter.

In this case, as in Sheehan and Williams, police were confronted with a dangerous mentally ill individual who was menacing police with a deadly weapon, who had threatened at least one other person with death earlier in the day, who adamantly refused to go with police despite two hours of attempting to convince him to come peacefully, and who was ignoring police commands and advancing on the officers who were in immediate proximity to serious bodily injury or death.  Furthermore, police had probable cause to also believe that Brian Williams had committed the crimes of terroristic threats, under 18 Pa. C.S.A. § 2706, in threatening his wife and the felony of aggravated assault, under 18 Pa. C.S.A. § 2702,  against the police officers at the time that he was shot by the tasers of Officer Hardy and Chiefs Ely and Olszewski, and eventually the handgun of Officer Papi.  Chief Olszewski, Slade Profka, Paul Miller, and Robert Roberts in fact utilized _**no**_ force against the decedent, except for the inadvertent bump that Officer Roberts gave the decedent when Roberts stumbled through the basement bedroom door, let alone excessive force.  No officer engaged in excessive force against Williams.  Rather, Brian Williams was a violent, armed, and dangerous individual, who was attacking police with a deadly weapon from mere feet away, and the

16

police officers had only seconds to determine to use deadly force to stop his attack after non-deadly force had completely failed to subdue him; the use of force by all police officers was objectively reasonable as a matter of law at all times.  No jury could find that the police officers engaged in excessive force, and they are entitled to qualified immunity on this basis.

However, in the alternative, if the Court were to somehow find that the officers committed some error in the quantum of force used on November 7, 2012, they are still entitled to qualified immunity as any Fourth Amendment right of Brian Williams was not clearly established in the specific factual context of this case. As noted earlier in this Brief, Brian Williams was a dangerous individual who was actively resisting arrest with a deadly weapon, when police used force against him.  As Sheehan explicitly emphasizes, clearly established law should not be defined "at a high level of generality" such as "the right to be free from unreasonable searches and seizures."  Sheehan, 136 S. Ct. at 1775-76.  Rather the clear establishment prong of the test must accurately account for the circumstances encountered by police in attempting to take Williams into custody.  In this case, just as in Sheehan, police were faced with an individual who was "dangerous, recalcitrant, law-breaking, and out of sight," and police appropriately entered the home and the bedroom, where they were confronted with the need to defend themselves with non-lethal and then lethal force.  Id. at 1776.

Furthermore, to the extent that Plaintiff's expert contends that the police are not entitled to qualified immunity because they are alleged to have not followed their training with respect to barricaded mentally ill individuals, the Supreme Court, in Sheehan, held that "even if an officer acts contrary to her training, however . . . that does ***not*** itself

17

negate qualified immunity where it would otherwise be warranted.  Rather so long as a reasonable officer could have believed that his conduct was justified, a plaintiff can not avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." Id. at 1777.  In conclusion, just as in Sheehan, "qualified immunity applies because these officers had no fair and clear warning of what the Constitution requires." Id. at 1778. Accordingly, summary judgment should be entered against Plaintiffs on Counts I and II of the Amended Complaint.

### B.    SUPERVISOR LIABILITY AND QUALIFIED IMMUNITY

In Count VI, Plaintiff brings a claim against Chiefs Fisher, Ely, Kreig, and Olszewski and against Corporal Miller based upon the alleged knowledge and acquiescence of the officers to the actions of the subordinate police officers on site. Defendants are also entitled to summary judgment on this Count.

The United States Supreme Court addressed "supervisor liability" in Section 1983 suits based upon a supervisor's "knowledge and acquiescence in their subordinates" actions. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  The Court noted that, of course, vicarious liability is not a valid basis to hold a supervisor liable for the conduct of a subordinate.  Id. at 677.  The Court rejected supervisor liability predicated on the alleged "knowledge and acquiescence" of the supervisor outright, holding that "in a § 1983 suit . . . --where masters do not answer for the torts of their servants--the term 'supervisory liability' is a misnomer." Id. at 677.   Instead, the Court held that purpose/intent, in the form of personal orders to a subordinate to cause a constitutional tort, rather than mere knowledge of unconstitutional conduct was necessary to state any claim for supervisory

liability.  Id.

By its clear terms, Iqbal precludes a finding of supervisor liability on the part of any of these police officers as none of the officers expressly ordered Mark Papi to use deadly force or ordered Chief Kreig, Chief Ely, or Roger Hardy to use their tasers. Rather, each subordinate officer who used force, including Papi, Kreig, Ely, and Hardy acted independently based upon his training and reasonable perception of the dire circumstances facing them rather than pursuant to any specific instructions from the Defendant supervising police officers.  Notably, Chief Fisher was not even present for the events on November 7, 2012 until after Brian Williams was deceased, so there is simply no evidence of personal involvement by him outside of a phone call with Corporal Miller and a phone call to Brian Williams to attempt to convince him to leave the home peacefully.

Furthermore, in construing Iqbal, the Third Circuit has recently assessed its impact on the "knowledge and acquiescence" theory of supervisor liability, noting that "we do not read Iqbal to have abolished supervisory liability in its entirety."  Barkes v. First Corr. Med. Inc., 766 F.3d 307, 319 (3rd Cir. 2014) (rev'd on grounds of qualified immunity at Taylor v. Barkes, 135 S.Ct 2042 (U.S. 2015).  "Rather we agree with those courts that have held that, under Iqbal, the level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged."  Barkes, 766 F.3d at 319.  Although Barkes was a case involving an Eighth Amendment violation rather than an allegation of excessive force, the Court cited with approval a 10th Circuit decision in an excessive force case that held that for liability to attach to a supervisor he or she must make a "deliberate, intentional act" that causes a subordinate to use

19

excessive force.  Id. at 321.  The Court went on to indicate that in excessive force cases involving supervisor liability, "the focus was on the force the supervisor used or caused to be used, the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else." Id.  The Third Circuit then noted that excessive force claims "require a plaintiff to show that officials applied force maliciously and sadistically for the very purpose of causing harm or with a knowing willingness that harm occur."  Id.  Thus, to the extent that the Third Circuit can be considered to have approved some form of supervisor liability in excessive force cases after Iqbal, the focus still remains on the intentional acts of the supervisor that must have caused subordinates to violate rights.

In this case, even applying the standard supervisor liability standard for excessive force that the Third Circuit indicated would be appropriate in Barkes, the officers are entitled to summary judgment on Count VI for several reasons.  First, no officer ordered Mark Papi, Chief Kreig, Chief Ely, or Roger Hardy to use force against Brian Williams. Rather, as noted earlier in this Brief, each officer acted independently based upon his training and reasonable perception of the dire circumstances facing them while Williams was menacing them with the two-foot long poker.  Since the officers did not order the use of force for sadistic purposes, Plaintiff can not make out a claim of excessive force based on supervisor liability.  Second, as noted earlier in this Brief, Brian Williams rights were ***not violated*** by the police officers at any point in the chain of events that unfortunately led to his death.  Accordingly, Plaintiffs have no evidence of a subordinate actually committing a constitutional tort for which to hold any of the Defendant

supervisors responsible.  Id. at 320.  Third, to the extent that the officers were personally involved in the use of force, such as by Chief Ely and Chief Kreig tasering Williams, these facts would ***not*** give rise to supervisor liability, but are rather redundant and repetitive of the individual liability claims in Count I, and should be dismissed as such. Fourth, in light of Iqbal's apparent blanket termination of supervisor liability and the fact that the Third Circuit had ***not*** addressed Iqbal's "muddied waters" for supervisor liability by November 7, 2012, the Defendants are entitled to qualified immunity because any obligation as supervisors was not clearly established law when these events took place. Id. at 316 (noting that "we have in the past declined to wade into the muddied waters of post-Iqbal supervisory liability.'").  Accordingly,  Chief Fisher, Chief Ely, Chief Kreig, Chief Olszewski and Corporal Miller are entitled to summary judgment.

## C.    MONELL CLAIMS AGAINST THE MUNICIPALITIES

In Count V of the Amended Complaint, Plaintiff raises Section 1983 Monell claims against Overfield Township, Tunkhannock Township, Meshoppen Borough, and Tunkhannock Borough based upon the alleged excessive force used by the police officers of the respective municipalities.  Defendants are entitled to summary judgment on these claims, as Plaintiffs have failed to set forth sufficient evidence to establish a claim against the boroughs and townships.

"A municipality or other local government may be liable under Section 1983 if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such a deprivation."  Connick v. Thompson, 536 U.S. 51, 131 S.Ct. 1350, 1359 (2011) (citing Monell v. New York City Dept. Of Social Servs., 436 U.S. 658

21

(1978).  Under Section 1983, "local governments are responsible only for their *own* illegal acts."  <u>Connick</u>, 131 S.Ct at 1359 (emphasis in original).  Municipalities "are not vicariously liable under Section 1983 for their employees actions."  <u>Id.</u> at 1359.  Rather, "Plaintiffs who seek to impose liability on local governments under Section 1983 must prove that action pursuant to official municipal policy caused their injury."  <u>Id.</u>  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  <u>Id.</u>

The Third Circuit has noted three situations where a municipality may be held responsible for the actions of a government employee: (1) "where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy;" (2) "where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself;" and (3) where the policy maker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights that the policymaker can be said to have been deliberately indifferent to the need."  <u>Natale v. Camden Cnty Corr. Facility</u>, 318 F.2d 575, 584 (3rd Cir. 2004).

In this case, Plaintiff does not claim an excessive force violation based on some generally applicable statement of policy from the municipal defendants.   Rather, Plaintiff is proceeding under the second theory of <u>Monell</u> liability, namely that the actions of the police chiefs, as alleged final law enforcement policymakers for the respective municipalities, violated federal law.  Furthermore, with respect to Overfield Township,

22

they assert that it established a policy of inaction because its alleged highest law enforcement policymaker failed to act affirmatively at all by coming to the scene and taking charge prior to Brian Williams being shot. These claims fail.

First, it is well established that "a municipality may be liable under section 1983 only if it can be shown that its employees violated a plaintiff's civil rights as a result of a municipal policy or practice." Williams v. West Chester, 891 F.2d 458, 467 (3rd Cir. 1989). Consistently, "if a person has suffered no constitutional injury at the hands of any individual police officer, the fact that the departmental regulations might have authorized unconstitutional action is quite beside the point." Id. (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). In summary, when "the plaintiffs have no viable claim against any individual officer, they cannot have a Monell claim" against the municipality. Williams 891 F.3d at 467.

As demonstrated earlier in this Brief, no defendant police officer violated Brian Williams' constitutional right to be free from a seizure by excessive force. Rather, at all times the actions of the police officers was objectively reasonable in the situation in which they found themselves. In the absence of a viable constitutional claim against any individual officer of any of the municipalities, Plaintiff's Monell claim must fail on both grounds asserted in the Amended Complaint.

Second, Plaintiff's Monell claim fails against the municipalities because the respective police chiefs are not, as a matter of law, final policymakers for their townships and boroughs. "The identification of policymaking officials is a question of state law." St. Louis v. Praprotnik, 485 U.S. 112, 124 (U.S. 1988). Accordingly, "the identification of policymaking officials is not a question of federal law and it is not a question of fact in

the usual sense." Id.  Rather courts look to state law to provide the answers to two

inquiries: (1) "whether as a matter of state law, the official is responsible for making

policy ***in the particular area*** of municipal business in question; and (2) whether the

official's authority to make policy in that area is ***final and unreviewable***."  Hill v.

Borough of Kutztown, 455 F.3d 225, 245-46 (3rd Cir. 2006).  "However, if a municipal

employee's decision is subject to review, even discretionary review, it is not final and that

employee is therefore not a policymaker for purposes of imposing municipal liability

under § 1983." Brennan v. Norton, 350 F.3d 399, 428 (3rd Cir. 2003).  Additionally, "the

fact that a particular official -- even a policymaking official -- has discretion in the

exercise of particular functions does not, without more, give rise to municipal liability

based on an exercise of that discretion."  Pembaur v. City of Cincinnati, 475 U.S. 469,

481-482 (U.S. 1986).  Moreover, in construing Pennsylvania law it is firmly established

that a municipal police chief, whether borough or township, is ***not*** a final policymaker,

such that a municipality can be liable under Monell for his actions or his failure to act.

Santiago v. Warminster Twp., 629 F.3d 121, 135 (3d Cir. Pa. 2010) ("In any event, as a

matter of Pennsylvania state law, a township Police Chief is not a final policymaker" and

citing 53 Pa. C.S.A. §66902, which vests "authority over the 'organization and

supervision' of township police officers with the board of supervisors of the township);

Kocher v. Larksville Borough, 926 F. Supp.2d 579, 607 (M.D. Pa. 2013) ("[T]he relevant

portions of the Borough Code indicate that a borough police chief is not a final

policymaker," citing 53 Pa. C.S.A. §46123.1); *see also* Doe v. Old Forge Borough, 2015

U.S. Dist. LEXIS 85902, 26-30 (M.D. Pa. 2015).  Thus, as a matter of law, Chief Ely of

24

Tunkhannock Township, Chief Fisher of Overfield Township, Chief Kreig of Meshoppen Borough, and Chief Olszewski of Tunkhannock Borough were not final policymakers for their respective municipalities.  Therefore, Plaintiff has no viable basis to hold the municipalities liable under Monell, and summary judgment should be granted to the municipal defendants on Count V of the Amended Complaint.

### D.   ADA AND RA CLAIMS AGAINST THE MUNICIPALITIES

In Count VII (mislabeled Count VI) of the Amended Complaint, Plaintiff raises a claim of disability discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act (RA), 29 U.S.C. § 794 against Overfield Township, Tunkhannock Township, Meshoppen Borough, and Tunkhannock Borough. Plaintiff raises both a "wrongful arrest" theory and a "reasonable accommodations" theory in an attempt to state a claim under the ADA and RA.  Both claims fail.

"Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same."  McDonald v. Pennsylvania, 62 F.3d 92, 95 (3rd Cir. 1995).  Accordingly, "to make a prima facie case under ADA or the RA, the plaintiff must establish that:(1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."  Defreitas v. Montgomery County Corr. Facility, 525 Fed. Appx. 170, 178 (3rd Cir. 2013).  Additionally, "the Supreme Court has made clear that the remedies available under the ADA and the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964."  D.E. v. Cent. Dauphin Sch. Dist., 2013 U.S. Dist.

LEXIS 626, *14 (M.D. Pa. 2013).  "Under Title VI, a plaintiff may not recover

compensatory damages absent proof of intentional discrimination.  Id.  Thus, Plaintiff

must demonstrate intentional discrimination to recover monetary damages under the

ADA and RA for Count VII.  Id.  In this case, the undisputed record establishes that

Brian Williams was not a qualified person with a disability, that he was excluded from the

benefits of any program or discriminated against by any of the municipalities, or that

such actions were by reason of his disability.

First, under the ADA and the RA, "the term 'disability' means, with respect to an

individual– (A) a physical or mental impairment that substantially limits one or more

major life activities of such individual; (B) a record of such an impairment; or (C) being

regarded as having such an impairment.  42 U.S.C. §12102(1).  "Major life activities

include, but are not limited to, caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing,

learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C.

§12102(2).  Additionally, "a major life activity also includes the operation of a major

bodily function, including but not limited to, functions of the immune system, normal cell

growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine,

and reproductive functions."  42 U.S.C. §12102(2).  Notably, "transitory, temporary or

impermanent impairments are not considered an impairment that substantially limits a

major life activity."  Seibert v. Lutron Elecs, 408 Fed. Appx. 605, 607-08 (3rd Cir. 2010).

In this case, Plaintiff contends that Brian Williams was disabled by his "mental

illness."  No explanation is given in the Amended Complaint for how his mental illness

substantially limited one of his major life activities.  And, most importantly for summary

judgment, **_no evidence_** has been produced which indicates that any of his major life activities were substantially limited. Rather, the uncontested evidence demonstrates that he was fully functioning in his life, working a full time job, making decisions, caring for himself. And in fact, it is important to note that the mental health warrant itself was issued **_not_** because Brian Williams could not function but because Dr. Sharma believed he had homicidal intent towards his wife, the Plaintiff, Melinda Williams. Brian Williams threatened to kill his wife, Dr. Sharma was concerned enough to ensure that he was immediately hospitalized. Under these circumstances, it is clear that Brian Williams was not "disabled" under the ADA and RA.

Second, in an attempt to demonstrate "discrimination" Plaintiffs have advanced two theories, "wrongful arrest" and a failure to make "reasonable accommodations" for his alleged disability. Neither theory applies in this case.

"The 'wrongful arrest' theory derives from that part of the ADA which protects an individual from being 'subjected to discrimination' by a public entity." Schorr v. Borough of Lemoyne, 2002 U.S. Dist. LEXIS 25668, *16 (M.D. Pa. 2002). Generally speaking, "the wrongful arrest theory is based on a claim that police wrongly arrested someone with a disability because they misperceived the effects of a disability as criminal activity." Id. Crucially, however, "this theory only applies when the plaintiff was engaged in lawful conduct which was misperceived as being wrongful; **_it is not applicable when the plaintiff's actions were unlawful at the time of the arrest_**. Id. at 16-17 (emphasis added).

In this case, it is clear that Brian Williams was not engaged in lawful conduct at

the time that he was seized.  Rather, he had committed the crime of terroristic threats, 18 Pa. C.S.A. § 2706, by threatening to kill Melinda Williams while he was meeting with Dr. Sharma.  Furthermore, when police entered the home to take him into custody pursuant to the 302 warrant, he barricaded himself in his bedroom and attacked the officers with a two-foot long fireplace poker resisting arrest and committing the felony of aggravated assault, under 18 Pa. C.S.A. § 2702.  Since his conduct was unlawful, Plaintiff may not rely on the wrongful arrest theory to demonstrate discrimination.

The reasonable accommodation "arises when a qualified individual with a disability alleges that he or she was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity." Id. at 17-18. However, "Title II of the ADA does not apply to the actions of officers while affecting an arrest." Id. at 19.

Here, the officers were attempting to take Brian Williams into custody under the 302 warrant, when he attacked them with a two-foot long, sharpened, fireplace poker, even after officers repeatedly told him to put the weapon down.  Accordingly they tasered him three times in rapid sequence without effect, as Williams stepped up his advance on Officers Roberts and Papi, forcing Officer Papi to shoot in order to prevent grievous bodily harm.  But, even further in this case, the officers did make reasonable accommodations to Brian Williams by negotiating with him for almost two hours before entering the home to take him into custody, by letting his father talk to him personally on two occasions, by letting his wife talk to him over the phone on several occasions, and by constantly reasoning with him to surrender himself into their custody peacefully. Brian Williams was determined to not go peacefully with the officers, despite their

28

reasonable efforts to convince him to do so.  Thus, the ADA and RA do not apply to the actions of the officers who were taking Williams into custody, and by extension to the municipalities for which those officers worked.

Third, Plaintiff has no evidence indicating that the officers actions were caused by his disability, and it is important to note that since monetary damages are sought, intentional discrimination must be proven by Plaintiffs.  There is no evidence to support such a finding.

Brian Williams home was entered, he was tasered three times, and ultimately and unfortunately shot and killed by police, not because of any disability, but because he was engaged in criminal conduct by threatening his wife with death and resisting arrest and assaulting the police officers.  But, in the area of causation, it is crucial to note that Overfield Township's policies alone were in effect at the time of the incident, as that was the jurisdiction in which Brian Williams was found.  The municipal policies of Tunkhannock and Meshoppen Boroughs and Tunkhannock Township simply had no effect on the actions of the police officers, let alone could be construed to constitute intentional acts of discrimination.  Even the policy of Overfield Township, to rely on police training under MPOETC concerning dealing with individuals with disabilities can not be said to have risen to the level of intent as Plaintiffs have no evidence whatsoever that there was any notice to the Township that its policy could have been in any way insufficient.  And, indeed, the actions of the officers to accommodate Brian Williams demonstrate that the policy was not, in fact, insufficient.  Under these circumstances, Plaintiff can not carry her burden of proof to demonstrate a violation of the ADA and the RA, and Defendants are entitled to summary judgment.

29

E.       **INTENTIONAL TORT CLAIMS**

In Counts III (assault) and IV (battery), Plaintiffs raise state law claims against Officer Papi predicated on intentional torts.  "Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).  However, as noted earlier in this Brief, "a police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty. In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest."  Id.  Furthermore, "the reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery."  Id. at 294.  These principles are also embodied in 18 § 508(a)(1), "Use of Force in Law Enforcement."

In this case, Plaintiff has no evidence indicating that Officer Papi fired the shots that killed Brian Williams intending to harm him for any purpose other than to protect his life and those of the other officers as Williams was advancing upon them with the raised two-foot long, sharpened fireplace poker.  As indicated earlier in this Brief, Officer Papi's final resort to deadly force was reasonable and necessary, and thus, he is entitled to summary judgment on Counts III (assault) and IV (battery) of the Amended Complaint.

III.    **CONCLUSION**

WHEREFORE, in accord with the evidence of record, the statement of facts, this Motion for Summary Judgment, and the Brief in Support of the Motion for Summary

Judgment, Defendants respectfully request that this Honorable Court grant summary

judgment and enter judgment in their favor and against Plaintiff on all counts of the

Amended Complaint.


**SCHEMERY ZICOLELLO**


By:  /s/Michael J. Zicolello
        Michael J. Zicolello
        I.D. #65522
        Attorney for Defendants

333 Market Street
Williamsport, PA 17701
(570) 321-7554

31

**IN THE COURT OF COMMON PLEAS FOR THE**
**MIDDLE DISTRICT OF PENNSYLVANIA**

MELINDA WILLIAMS,                                    :
as Administrator of the Estate of                    :          No: 3:CV-13-1151
BRIAN P. WILLIAMS,                                   :
      Plaintiff                                      :
                                                     :
   v.                                             :
                                                     :          CIVIL ACTION - LAW
MARK PAPI, ROBERT ROBERTS,                           :
STANLEY ELY, PAUL MILLER,                            :
TERRANCE FISHER, SLADE PROFKA                        :
JOHN KREIG, ROGER HARDY,                             :
WILLIAM OLSZEWSKI,                                   :
TUNKHANNOCK TOWNSHIP,                                :
OVERFIELD TOWNSHIP,                                  :          JURY TRIAL DEMANDED
TUNKHANNOCK BOROUGH,                                 :
MESHOPPEN BOROUGH,                                   :
      Defendant                                      :

## CERTIFICATE OF SERVICE

     Michael J. Zicolello certifies that a copy of the foregoing Brief in Support of Motion for Summary Judgment has been served upon the following individual and in the manner indicated below on this 30th day of November, 2015:

VIA ELECTRONIC FILING

Shelley L. Centini, Esquire
The Dyller Law Firm
88 North Franklin Street
Wilkes-Barre, PA 18701

**SCHEMERY ZICOLELLO**

By:   /s/Michael J. Zicolello
      Michael J. Zicolello
      I.D. #65522
      Attorney for Defendants
333 Market Street
Williamsport, PA 17701
(570) 321-7554