UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA


MELINDA WILLIAMS,                    :
as Administrator of the Estate of
BRIAN P. WILLIAMS,                   :

    Plaintiff

                                     :      CIVIL ACTION–LAW

    V.

                                     :

MARK PAPI, ROBERT ROBERTS,
STANLEY ELY, PAUL MILLER,            :
TERRANCE FISHER, SLADE PROFKA,
JOHN KREIG, ROGER HARDY,
WILLIAM OLSZEWSKI,                   :
TUNKHANNOCK TOWNSHIP,
OVERFIELD TOWNSHIP,
TUNKHANNOCK BOROUGH, AND             :
MESHOPPEN BOROUGH,

                                     :      **JURY TRIAL DEMANDED**

    Defendants                       :      No: 3:CV-13-1151


## PLAINTIFF'S BRIEF IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT



                                        Respectfully Submitted,

                                        S/ Shelley L. Centini, Esq.
                                        S/ Barry H. Dyller, Esq.
                                        DYLLER LAW FIRM
                                        Attorneys for Plaintiff
                                        88 North Franklin Street
                                        Wilkes-Barre, PA 18701
                                        (570) 829-4860

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-iii

Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Law and Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Plaintiff is Entitled to Summary Judgment on Count One
of the Amended Complaint Under *Estate of Smith v. Marasco*
Because Defendants Papi, Roberts, Ely, Miller, Profka, Kreig,
Hardy and Olszewski Used Unreasonable Force in Entering
Plaintiff's Home and Bedroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

POINT TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Plaintiff is Entitled to Summary Judgment on Count Seven
of her Amended Complaint Against Tunkhannock Township,
Overfield Township, Tunkhannock Borough and Meshoppen Borough
for Violating Mr. Williams' Rights Under the ADA and RA . . . . . . . . . . . 21

Mr. Williams was a Qualified Individual with a Disability . . . . . . . . . . . . 22

Mr. Williams was Denied Services or Benefits
by Reason of his Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE PURSUANT TO LR 7.8(b) . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)..................................................................................8

*Broadwater v. Fow,*
945 F.Supp.2d 574 (M.D. Pa. 2013)..................................................25-26

*Brower v. County of Inyo,*
489 U.S. 593 (1989)................................................................................19

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)..................................................................................8

*Conoshenti v. Public Service Electric & Gas Co.,*
364 F.3d 135 (3d Cir. 2004) .....................................................................9

*Curley v. Klem,*
499 F.3d 199 (3d Cir. 2007) ...................................................................11

*Estate of Smith v. Marasco,*
318 F.3d 497 (3d Cir. 2003) ................................................. 11-12, 14, 16

*Gohier v. Enright,*
186 F.3d 1216 (10th Cir. 1999) ........................................................23-25

*Graham v. Connor,*
490 U.S. 386 (1989).................................................................. 10, 11, 19

i

*Hainze v. Richards*,
   207 F.3d 795 (5th Cir. 2000) ............................................................23-24

*Heckensweiler v. McLaughlin*,
   517 F.Supp.2d 707 (E.D. Pa. 2007) ......................................................28

*Helen L. v. DiDario*,
   46 F.3d 325 (3d Cir. 1995) ....................................................................30

*McDonald v. Pennsylvania*,
   62 F.3d 92 (3d Cir. 1995) .......................................................................21

*Mohney v. Pennsylvania*,
   809 F.Supp.2d 384 (W.D. Pa. 2011) ....................................................23

*Morais v. City of Philadelphia*,
   2007 WL 853811 (E.D. Pa. 2007) ......................................23-25, 26, 29

*Oritani Sav. and Loan Assn. v. Fidelity and Deposit Co.*,
   989 F.2d 635 (3d Cir. 1993) ...................................................................8-9

*Schorr v. Borough of Lemoyne*,
   243 F.Supp.2d 232 (M.D. Pa. 2003).........................................22, 23, 28

*Sharrar v. Felsing*,
   128 F.3d 810 (3d Cir. 1997) .......................................................11, 13, 17

*Sheehan v. City & County of San Francisco*,
   743 F.3d 1211 (9th Cir. 2014), *cert. dismissed as
improvidently granted on ADA claim*,
135 S.Ct. 1786 (2015).....................................................................23-24, 26

*Troy Chemical Corp. v. Teamsters Union Local No. 408*,
   37 F.3d 123 (3d Cir. 1994) ....................................................................8, 9

*Watson v. Abington Township,*
   478 F.3d 144 (3d Cir. 2007) ....................................................8

*Yeskey v. Com. Of Pa. Dep't of Corr.,*
   118 F.3d 168 (3d Cir. 1997)*, aff'd,*
Pa. Dep't of Correctons v. Yeskey,
524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) ...........................23

## Statutes

29 U.S.C. §794(a) ........................................................................21
42 U.S.C. §12101 ........................................................................21
42 U.S.C. §12132 ...............................................................22, 28

## Rules

*Fed.R.Civ.P.* 56(c) ......................................................................8
LR 56.1 ...........................................................................................1
LR 7 ...............................................................................................31

## Constitutional Provisions

Fourth Amendment ........................................10-13, 15-16, 19, 21

## Other Authorities

*Remedying a Particularized Form of Discrimination:  Why Disabled*
   *Individuals Can and Should Bring Claims for Police Misconduct Under the*
   *Americans with Disabilities Act,*
    Rachel E. Brodin, 154 U.Pa.L.Rev. 157 (2005) .................................29-30

Plaintiff, Melinda Williams, as Administrator of the Estate of Brian P. Williams, by her attorneys, the Dyller Law Firm, hereby submits her Brief in Support of Her Motion for Partial Summary Judgment pursuant to LR 56.1. Plaintiff moves for summary judgment on Count One of her Amended Complaint relating to the unreasonable use of force by defendants Papi, Roberts, Ely, Miller, Profka, Kreig, Hardy and Olszewski ("defendant officers") in entering plaintiff's home and bedroom and Count Seven (misnumbered as a second Count Six) of her Amended Complaint relating to her claim under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") against defendants Tunkhannock Township, Overfield Township, Tunkhannock Borough and Meshoppen Borough ("municipal defendants").[1]

## Relevant Facts

The tragic facts relevant to this Motion are stated at length in Plaintiff's Statement of Undisputed Material Facts ("Plaintiff's SOF"), and are summarized as follows:

---

[1] Plaintiff's Amended Complaint erroneously contains two causes of action titled "Count Six."  Plaintiff's partial summary judgment motion refers to the second of these two claims which relates to the ADA and the RA and can be found at paragraphs 174-188.  (Doc. 44).

On November 7, 2012, Mr. Williams' psychiatrist deemed him severely mentally disabled and in need of mental health treatment. (Plaintiff's SOF ¶¶ 1-2). The doctor issued a 302 involuntary mental health commitment warrant authorizing the police to seize Mr. Williams and take him to a hospital. (Plaintiff's SOF ¶ 17). Mr. Williams was diagnosed with adjustment disorder with depressed mood, major depression, and Mr. Williams' treatment providers were trying to rule out psychotic features. (Plaintiff's SOF ¶ 7).

Prior to receiving the warrant in-hand, various police agencies responded to Mr. Williams' home which is in Overfield Township and surrounded the house. (Plaintiff's SOF ¶¶ 12-17, 40, 124-125). Mr. Williams' wife, mother and father also assembled outside the home in the driveway. (Plaintiff's SOF ¶¶ 30, 37-39). Mr. Williams was inside the home alone and police knew there were no firearms in the home. (Plaintiff's SOF ¶¶ 31, 42).

Mr. Williams was willingly engaging in conversation with family and police, both over the phone and in person, who were encouraging him to come out of the house and permit police to take him to the hospital for an evaluation. (Plaintiff's SOF ¶¶ 30, 52-57, 59, 61-71, 96-97). Even though Mr. Williams stated he did not want to go to the hospital, Mr. Williams

showed signs that he planned to emerge from the home and was putting on boots and packing a bag.  (Plaintiff's SOF ¶¶ 32-33, 53, 65).

Mr. Williams wanted to talk to his wife and mother and stated he would come out if his wife could come up to the house.  (Plaintiff's SOF ¶¶ 34-36, 60).  Mr. Williams' wife and mother were both present and wished to speak to Mr. Williams but police would not permit it.  (Plaintiff's SOF ¶¶ 37-39). Mr. Williams never made any threats to police, nor did he display any weapons or state that he wished to harm himself.  (Plaintiff's SOF ¶¶ 29, 41, 43, 44, 97, 106). Police knew Mr. Williams was not a danger because they permitted Mr. Williams' father to go in the home twice to talk to Mr. Williams and his father emerged both times unharmed.  (Plaintiff's SOF ¶ 30).

No municipal defendant had policies or provided the defendant officers with training relating to dealing with the mentally ill, the Americans with Disabilities Act ("ADA") or the Rehabilitation Act ("RA").  (Plaintiff's SOF ¶¶ 20-21).  Although the municipal defendants did not provide training nor were there policies relating to these topics, some defendant officers had general knowledge of basic principles relating to dealing with the mentally ill.  (Plaintiff's SOF ¶¶ 22, 24). Tunkhannock Borough had policies on dealing with barricaded man situations. (Plaintiff's SOF ¶¶ 89-90).

Neither the basic principles of dealing with the mentally ill nor Tunkhannock Borough's policy on barricaded man situations were utilized. (Plaintiff's SOF ¶ 90-91, 112, 115, 124-127, 141).

The defendant officers chose to ignore available resources. (Plaintiff's SOF ¶¶ 77-84). The defendant officers refused to call the Pennsylvania State Police ("PSP") special emergency response ("SERT") team which had individual members within eight miles of the scene. (Plaintiff's SOF ¶¶ 79-82). They chose not speak to Mr. Williams' mental health counselor who delivered the warrant to the scene. (Plaintiff's SOF ¶ 77-78). The defendant officers hobbled the PSP troopers on the scene by relegating them to only "assist" the defendant officers and make no independent decisions even though the PSP has policies and training regarding the service of mental health warrants. (Plaintiff's SOF ¶¶ 83-84). Miller, who was "in charge," was unaware of the resources that existed because Overfield Township did not provide him with training regarding available resources in dealing with the mentally ill. (Plaintiff's SOF ¶ 81).

Instead, the defendant officers contrived a plan enter Mr. Williams' home using force to take him into custody, even though Mr. Williams was contained in the house and not a threat to anyone. (Plaintiff's SOF ¶¶ 40-44, 85, 93). The plan risked deadly force; the police defendants expected

violence. (Plaintiff's SOF ¶¶ 87-88, 94-95, 110-114, 132). The plan was not universally understood. (Plaintiff's SOF ¶ 86).

Chief Fisher of Overfield Township chose not to come to the scene and lead the operations, even though he personally knew Mr. Williams and knew what was going on at the home. (Plaintiff's SOF ¶¶ 13-16, 47-57, 73). Miller, who lacked experience, was left in charge of the scene. (Plaintiff's SOF ¶ 72). However, Miller did not view himself as being in charge and sought to cede responsibility. (Plaintiff's SOF ¶¶ 26-28). Miller thought Chief Fisher would come to the scene and the other chiefs thought Chief Fisher should have been there. (Plaintiff's SOF ¶¶ 75-76). The lack of clear leadership created a situation in which defendant officers took it upon themselves to make decisions and Miller was powerless to stop them. (Plaintiff's SOF ¶ 116).

As Mr. Williams willingly conversed with police at a basement door, other officers stormed the house with weapons drawn, contrary to the understanding of some of the police officers' understanding of the plan. (Plaintiff's SOF ¶¶ 96-101). Shooter Papi made the unauthorized decision to enter the home with the entry team and unilaterally designated himself "lethal cover" officer. (Plaintiff's SOF ¶¶ 129-137).

The defendant officers' act of storming the house caused Mr. Williams, who was unarmed while speaking to police at the basement door, to arm himself with a fireplace poker and take cover in a basement bedroom. (Plaintiff's SOF ¶¶ 41, 98-100, 102, 117). Mr. Williams made it clear he did not want police in his home. (Plaintiff's SOF ¶¶ 107-109).

Mr. Williams was now contained in his bedroom and was still no danger to himself, police or others. (Plaintiff's SOF ¶¶ 104-106). Police made the decision, contrary to what little they knew about dealing with the mentally ill, to break down the bedroom door and force a confrontation with the now-armed Mr. Williams. (Plaintiff's SOF ¶¶ 20-24, 110). Although Mr. Williams was contained and not a threat, a photograph of the broken bedroom door shows exactly what kind of force the defendant officers used to access Mr. Williams. (Plaintiff's SOF ¶¶ 104-106, 110).

The stage was set for the use of deadly force. Defendant Papi kept his .45 caliber firearm trained at Mr. Williams as police repeatedly shot Mr. Williams with tasers to no effect. (Plaintiff's SOF ¶¶ 114, 118-123). Mr. Williams frantically swung a fireplace poker in front of him to keep the ten police officers attempting to crowd into the small bedroom away from his personal space. (Plaintiff's SOF ¶¶ 103, 117). While swinging the poker, Mr. Williams made a motion that some defendants stated put them at risk

of being hit with the poker. (Plaintiff's SOF ¶¶ 120). In that moment, defendant Papi shot Mr. Williams twice and killed him. (Plaintiff's SOF ¶¶ 121-123).

From the initial call to the point when Papi shot and killed Mr. Williams, the defendant officers had spent a little over two hours at Mr. Williams' home. (Plaintiff's SOF ¶¶ 124-126). For the first 45 minutes, the defendant officers were simply waiting for the civil commitment warrant to arrive. (Plaintiff's SOF ¶ 125). It was only moments between the time the police defendants entered Mr. Williams' home and the time Mr. Williams was shot and killed. (Plaintiff's SOF ¶ 127). Only Papi drew his firearm inside the home. (Plaintiff's SOF ¶ 138). Other officers inside were armed with tasers, a shield or nothing. (Plaintiff's SOF ¶ 138). A PSP trooper transitioned from his taser to his baton upon learning that Mr. Williams was only armed with a poker. (Plaintiff's SOF ¶ 138j).

Plaintiff moves for partial summary judgment on Counts 1 and 7 of the Amended Complaint. Based on the undisputed material facts, the police defendants violated Mr. Williams Fourth Amendment rights when they used force to enter Mr. Williams' house and bedroom. The municipal defendants violated the ADA and the RA through their defendant officers' activities. Plaintiff is entitled to judgment as a matter of law.

## **Law and Argument**

### Summary Judgment Standard

The standard for grant of summary judgment is well-known. Summary judgment may only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* Pursuant to *Fed.R.Civ.P.* 56(c), summary judgment against a party is appropriate where that party fails to make a sufficient showing of an element for which that party will bear the burden of proof at trial, and which is an essential element of that party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township,* 478 F.3d 144, 147 (3d Cir. 2007); *Troy Chemical Corp. v. Teamsters Union Local No. 408,* 37 F.3d 123, 126 (3d Cir. 1994), *citing Oritani Sav. and Loan Assn. v.*

*Fidelity and Deposit Co.*, 989 F.2d 635, 637 (3d Cir. 1993). The burden is initially on the moving party to demonstrate that the evidence contained in the record does *not* create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.,* 364 F.3d 135, 140 (3d Cir. 2004); *Troy Chemical Corp. v. Teamsters Union Local No. supra* at 125-26.

If the moving party satisfies its burden that the record contains no genuine issue of material fact, the burden shifts to the non-moving party, who must go beyond his or her pleadings by the use of affidavits, depositions, admissions or answers to interrogatories, in order to demonstrate that there *is* a genuine issue of material fact for trial. *Id.* at 324.

<u>POINT ONE</u>

Plaintiff Is Entitled to Summary Judgment on Count One of the Amended
Complaint Under *Estate of Smith v. Marasco* Because Defendants Papi,
Roberts, Ely, Miller, Profka, Kreig, Hardy and Olszewski Used
<u>Unreasonable Force in Entering Plaintiff's Home and Bedroom[2]</u>

The decision to storm Mr. Williams' house using ten law enforcement

officers, most with weapons drawn, in order to execute a civil mental health

commitment warrant violated Mr. Williams' Fourth Amendment rights.  The

force used and the manner of entry were objectively unreasonable.

The seminal test for the reasonableness of use of force was

announced in *Graham v. Connor*, 490 U.S. 386 (1989).  That test is

whether, under the totality of the circumstances, "the officers' actions are

'objectively reasonable' in light of the facts and circumstances confronting

them, without regard to their underlying intent or motivations."  *Graham*,

490 U.S. at 397.  Factors to consider in making this determination include

severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, whether he is actively resisting

arrest or attempting to flee, the possibility that he may be violent or

---

[2] While the use of deadly force at the moment defendant Papi killed Mr.
Williams was constitutionally unreasonable, we do not move for judgment
as a matter of law on that issue at this time.  Instead, this limited summary
judgment motion concerns the unreasonable **entry** into Mr. Williams' home
and bedroom, which then led quickly to defendants killing Mr. Williams.
(This motion is also for summary judgment on plaintiff's claims under the
ADA and RA.  *See* Point Two, *infra*).

dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest and the number of persons with whom the police officers must contend at one time.  *See Graham*, 490 U.S. at 396; *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (in arrest of four men, one of whom had used a gun previously and all of whom were involved with drugs, court applied the *Graham* and related factors and determined that the circumstances of the seizure in this case did not rise to a Fourth Amendment violation by using these factors).[3]

Because the decision turns on a careful factual analysis, it is helpful to examine the facts underlying the precedential and persuasive authorities in comparison with the instant case.

The Third Circuit twice decided appeals in the case of *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003), and 430 F.3d 140 (3d Cir. 2005). *Smith* has distinct factual similarities to the instant case, and provides the legal framework for a Fourth Amendment unreasonable force entry claim.

In *Smith*, the litigation arose from the police response to a call from a neighbor of Mr. Smith accusing Mr. Smith of shining a bright light into his

---

[3] In *Curley v. Klem*, 499 F.3d 199, 209-210 (3d Cir. 2007), the Third Circuit observed that portions of *Sharrar* relating to qualified immunity had been abrogated by later precedents.  However, the principles of *Sharrar* plaintiff relies on in this brief remain precedential.

backyard.  *Smith*, 430 F.3d at 144-45. In attempting to speak with Mr.

Smith, police observed a red light in one of the windows of Mr. Smith's

house, and then a red dot on a trooper's clothing, which was assumed to

be a laser sight from a firearm.  *Id.*  Police requested assistance and a

perimeter was secured around Mr. Smith's house.  *Id.* Police then observed

a person leave Mr. Smith's house, enter a tool shed, return to the house

and leave the house a few minutes later.  *Id.*  When police called out to this

individual, there was no response.  *Id.*  Police called the SERT team, which

responded with 30 members in riot gear, armed with various weapons.  *Id.*

at 146.  Police obtained a warrant for Mr. Smith's arrest for the incident

involving the apparent laser sight pointed at police and also obtained a

search warrant for Mr. Smith's house.  *Id.*  After further failed attempts to

contact Mr. Smith, including using a phone, a public address system, and

breaking Mr. Smith's windows with rocks, SERT members entered Mr.

Smith's shed using tear gas and entered Mr. Smith's home using "flash-

bang distraction devices."  *Id.*  Police did not find Mr. Smith.  *Id.*  About one

week later, Mr. Smith was found dead in the woods behind his house from

heart failure allegedly brought on by the stress of the evening.  *Id.*

The Court found that the decision to storm Mr. Smith's shed and

house using the aforementioned devices violated Mr. Smith's Fourth

Amendment rights. *Id.* at 151. The Court stated that the police officers'

actions must be evaluated using the factors set forth in *Sharrar, supra.* In

*Smith*, the police officers were aware that Mr. Smith had significant medical

conditions and that he suffered from flashbacks to his military service in

Vietnam. *Id.* Given this understanding, the Court stated that "a reasonable

officer would have concluded that the physical force used 'was of such

extent to lead to injury.'" *Id. citing Sharrar*, 128 F.3d at 822. Further, "a

reasonable officer would have recognized that an assault on [Mr.] Smith's

house involving the use of flash-bang distraction devices, and a similar

assault on his shed using tear gas constituted an excessive use of force."

*Id.*

The Court ultimately concluded that a reasonable officer would have

concluded that, at the time the decision was made, Mr. Smith did not "pose

a threat that was sufficiently serious and immediate as to require storming

his house." *Id.* at 152. Additionally, "a reasonable officer would have

recognized the significant risk that [Mr.] Smith would suffer serious harm as

a result of the decision to do so." *Id.*

The *Smith* case presents several factual distinctions from the instant

case which are relevant under a *Sharrar* analysis: Mr. Smith was accused

of criminal conduct, had threatened officers, was not communicating at all

with police and was not ultimately directly killed by police officers' use of deadly force. The scenario in the instant case, wherein Mr. Williams had not committed a crime, did not threaten officers, was actively communicating with police and was directly killed by police use of deadly force makes for a more certain factual determination that the defendants' decision to enter Mr. Williams' home and bedroom was unreasonable.

However, the analysis remains the same. What is especially relevant is the emphasis the Court placed on what the police knew about Mr. Smith's mental condition. When the defendants' clear knowledge of Mr. Williams' mental health issues in the instant case is added to the analysis, *Smith* requires this Court to find summary judgment in plaintiff's favor.[4]

The facts and holding of *Morais v. City of Philadelphia*, 2007 WL 853811 (E.D. Pa. 2007) provide additional persuasive force. Mr. Morais was a chronic paranoid schizophrenic. *Morais*, 2007 WL 853811 *1. Mr. Morais deteriorated and his case manager obtained a civil commitment order requiring police to transport him to a hospital. *Id.* at *1. Police arrived and spoke with Mr. Morais at his apartment door. *Id.* Mr. Morais

---

[4] Defendants are not entitled to qualified immunity on this claim, as *Estate of Smith v. Marasco* established that it was a Fourth Amendment violation for officers to intrude on the mentally-ill Mr. Smith's house using force. Therefore, the right was clearly established as of at least 2003. *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003).

became hostile and refused to unlock his apartment door.  *Id.*  When police and the landlord attempted to open the apartment door with a key, Mr. Morais barricaded the door allowing it to open only inches and ran a knife along the narrow door opening.  *Id.*  (*See attached*).

Two hours into the standoff, Mr. Morais threw a jug containing an unknown liquid out of his window.  *Id.* at *2.  However, the Court noted that there was no information from any source that Mr. Morais intended to hurt himself, nor had he made any effort to come out of the apartment or to suggest he would harm police or negotiators on scene.  *Id.*  A short time later, SWAT officers used a battering ram to force Mr. Morais' apartment door open.  *Id.*  Although negotiators outside the door were protected by a shield and armed SWAT officers, nobody suggested waiting.  *Id.*

When police entered, a confrontation ensued.  *Id.*  Mr. Morais was armed with knives and cut one of the officers badly.  *Id.*  A taser was fired to no avail.  *Id.*  A police officer unsuccessfully attempted to wrestle the knives away from Mr. Morais.  *Id.*  Finally, an officer shot Mr. Morais in the head, killing him.  *Id.*

The Court in *Morais* found that the police decision to storm Mr. Morais' apartment was an unreasonable use of force under a Fourth

Amendment analysis.  *Id.* at *5.   The District Court noted the importance of considering whether a suspect poses an immediate threat to the safety of the officers or others in determining the reasonableness of law enforcement storming a residence of a barricaded subject, as is required by *Smith*.[5] *Id.* In finding the storming of the residence an unreasonable use of force, the *Morais* court stated that Mr. Morais did not pose an immediate threat to the safety of the officers or others.  *Id.*  Although Mr. Morais was armed with a knife, he did not have the ability to harm any individual outside of his apartment, unlike Mr. Smith who had a gun.  *Id.*

Further, the *Morais* court noted that the police "were attempting to involuntarily commit [Mr. Morais] for the purpose of a mental health evaluation, a purpose of which was to protect the well-being of [Mr. Morais]."  *Id.*  This factual parallel to the instant case is striking.

Mr. Williams posed less of a threat to anyone's safety than Mr. Morais because Mr. Williams did not throw objects from his window or display a knife or other weapon prior to defendants' decision to storm his home and bedroom.  This makes the defendants' decision to storm the house even

---

[5] In *Estate of Smith v. Marasco*, 318 F.3d 497, 516 (3d Cir. 2003) ("*Smith I*"), the Third Circuit reversed the district court for failing to properly consider whether the threat of harm to others was so immediate as to require storming the house.

more unreasonable in the instant case.  It was only when Mr. Williams

retreated into his bedroom armed with a poker **after** police decided to

storm his house that Mr. Williams was in a similar situation to Mr. Morais—

behind a closed door alone with a weapon.  Just as Mr. Morais did not have

the ability to harm any individuals outside his apartment, neither did Mr.

Williams have the ability to harm any individuals outside his bedroom door.

The defendants' decision to enter Mr. Williams' home and then enter his

bedroom was objectively unreasonable.

A comparison of the facts in the instant case to the *Graham/Sharrar*

factors shows that the force used to enter Mr. Williams' home and bedroom

was clearly unreasonable.  *See Graham*, 490 U.S. at 396; *Sharrar v.

Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).  The Court must consider:  1.

The severity of the crime at issue.  Mr. Williams had committed no crime at

all and was being seized on a civil commitment warrant; 2. Whether the

suspect posed an immediate threat to the safety of the officers or others.

Mr. Williams was no threat, especially contained in the home alone and,

later, contained in his bedroom; 3. Whether the suspect was actively

resisting arrest or attempting to flee.  Mr. Williams was not resisting arrest,

nor was he attempting to flee at the time his home was entered.  In fact, Mr.

Williams was actively engaged in negotiations with Ely at the basement

door; 4. Whether there was a possibility that the suspect may be violent or dangerous. Mr. Williams may have been "agitated" during discussions with Ely; however, no defendant present described Mr. Williams as either violent or dangerous prior to the defendants storming his home; 5. The duration of the action. Defendants were at Mr. Williams' home for little over two hours from arrival to the point in time Papi shoots Mr. Williams. For the first 45 minutes, defendants did not have a warrant and therefore had no authority to enter the home. Police were in the home only minutes before Mr. Williams was shot and killed. This was a very short time frame for police to attempt to secure the peaceful surrender of a mentally ill man who was not an imminent threat to anyone, including himself; 6. Whether the action takes place in the context of effecting an arrest. Again, this was not an "arrest" scenario—the defendants were at Mr. Williams' house to execute a mental health warrant; and 7. The number of persons with whom the police officers must contend at one time. Mr. Williams was outnumbered ten to one inside the home.

All factors resolve in Mr. Williams' favor. The law supports the conclusion that the defendants used unreasonable force in entering Mr. Williams' home and bedroom.

> \*                \*                \*                \*

Even where a seizure is authorized, as it was in Mr. Williams' case because there was a mental health warrant, the *manner* of the execution of the warrant must be conducted reasonably. The *manner* of execution of the warrant is the overarching constitutional problem with the defendants' entry into Mr. Williams' home and bedroom.

The Supreme Court's decision in *Brower v. County of Inyo,* 489 U.S. 593 (1989) identified the two elements of a Fourth Amendment claim of excessive force. First, a seizure must occur "through means intentionally applied"—that is, the officer must specifically intend his actions that terminate a citizen's freedom of movement. *Brower,* 489 U.S. at 597. Second, once an intentional seizure occurs, an officer is liable for unintended harm if the officer acted unreasonably in the *manner* in which the seizure was carried out. *Id.* at 599. Therefore, not only must a seizure in and of itself be reasonable, the *manner* in which a seizure is conducted must be reasonable. *Id.*

In *Brower*, the police set up a roadblock for the purpose of stopping and seizing Mr. Brower on a highway. *Brower* 489 U.S. at 594. The roadblock consisted of an 18-wheel tractor trailer placed behind a curve across a two-lane highway and a police car with its headlights positioned between Mr. Brower's approaching vehicle and the truck. *Id.* The

Supreme Court acknowledged that the police officers did not intend to kill Mr. Brower. *Id.* at 598. The Court stated that, "[i]t may well be that [the police] here preferred, and indeed earnestly hoped, that [Mr.] Brower would stop on his own, without striking the barrier. . . ." *Id.* However, the Court further stated that Mr. Brower's estate can make a claim that the manner of the seizure was unreasonable because the seizure was accomplished by setting up a roadblock in such a manner as to be likely to kill him. *Id.* at 598-99.

Similarly, it may be that the defendant officers in the instant case hoped that their entry into Mr. Williams' home would force Mr. Williams to acquiesce. It also may be that the defendant officers preferred that forcing the bedroom door open would lead them to capture Mr. Williams without killing him. However, police entering Mr. Williams' home with weapons drawn, without knocking and announcing, given Mr. Williams' known mental history, and then breaking down Mr. Williams' bedroom door is a manner of seizure which a reasonable police officer should know was likely to lead to the use of deadly force.

Indeed, Papi's designating himself "lethal cover officer" prior to entry and Olszewski's placing an "ambulance on standby" prior to execution of the "plan" are actions which prove the defendants' awareness that entry

into Mr. Williams' home was likely to, and in fact did, lead to the use of deadly force.

The undisputed facts and the clear, precedential case law compel the conclusion that the defendant officers' decision to enter Mr. Williams' home and bedroom and manner of entering Mr. Williams' home and bedroom constituted an unreasonable use of force in violation of Mr. Williams' rights under the Fourth Amendment. As such, plaintiff is entitled to summary judgment on Count One of the Amended Complaint.

<u>POINT TWO</u>

Plaintiff is Entitled to Summary Judgment on Count Seven of her Amended Complaint Against Tunkhannock Township, Overfield Township, Tunkhannock Borough and Meshoppen Borough for Violating Mr. Williams' <u>Rights Under the ADA and RA</u>

Plaintiff's claim under Count Seven (misnumbered as a second Count Six) of the Amended Complaint relates to the ADA, 42 U.S.C. §12101 et seq., and the RA 29 U.S.C. §794(a). "Whether the suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same." *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation

in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. To establish a violation of Title II of the ADA, plaintiff must show: 1. that he is a qualified individual with a disability; 2. that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against by the public entity; and 3. that such exclusion, denial of benefits, or discrimination was by reason of plaintiff's disability. 42 U.S.C. §12132. *See also Morais v. City of Philadelphia*, 2007 WL 853811 *33 (E.D. Pa. 2007).

Mr. Williams was a Qualified Individual with a Disability

It is beyond dispute that Mr. Williams was a "qualified individual with a disability" because there was a civil commitment warrant issued for Mr. Williams because he was "severely mentally disabled." (Plaintiff's SOF ¶¶ 1-2). The municipal defendants are public entities subject to the ADA. *See Schorr v. Borough of Lemoyne,* 243 F.Supp.2d 232, 235-39 (M.D. Pa. 2003) (police procedures, including proper execution of involuntary commitment warrants and making accommodations for subjects of warrants, are encompassed by the ADA); *Yeskey v. Com. Of Pa. Dep't of Corr.,* 118 F.3d 168 (3d Cir. 1997), *aff'd. Pa. Dep't. of Corrections v.*

*Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (applying the ADA to state prisons and holding the ADA should be construed broadly).[6] Therefore, the Court must determine whether Mr. Williams was denied services or benefits and whether the denial was by reason of his disability.

Mr. Williams was Denied Services or Benefits by Reason of His Disability

The Third Circuit Court of Appeals has not addressed the standard courts should apply in addressing arrests in the ADA context. The Pennsylvania district courts that have considered such claims agree there are two bases for liability which have emerged from other circuits. *See Morais,* 2007 WL 853811 at *34 *citing Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999) (surveying the case law relating to the applicability of the ADA to arrests); *Sheehan v. City & County of San Francisco*, 743 F.3d

---

[6] In *Schorr v. Borough of Lemoyne,* 243 F.Supp.2d 232, 238 (M.D. Pa. 2003) and *Mohney v. Pennsylvania,* 809 F.Supp.2d 384, 399-400 (W.D. Pa. 2011), the District Courts rejected the view that the ADA applies to arrest situations only when there is no exigency—a view adopted by the Fifth Circuit in *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000).

1211 (9th Cir. 2014), *cert. dismissed as improvidently granted on ADA claim*, 135 S.Ct. 1765 (2015).[7]

The first basis is the "wrongful arrest" theory under which the police wrongly arrest an individual with a disability because the police misperceived the effects of his or her disability as criminal activity. *See Morais,* 2007 WL 853811 at *35-36.

The second basis is the "reasonable accommodation" theory under which police properly investigate and arrest a person with a disability for a crime unrelated to that disability but fail to reasonably accommodate the disability in the course of investigation or arrest, "causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* at *36 *citing Gohier*, 186 F.3d at 1220.

---

[7] While the Supreme Court dismissed the grant of certiorari on the ADA claim as improvidently granted, the Court did address the Fourth Amendment issue in that case. While it is not relevant for plaintiff's present motion, we will address the Supreme Court's *Sheehan* opinion's Fourth Amendment or qualified immunity analysis in a subsequent brief opposing defendants' motion for summary judgment. As the Court will see, any similarity between *Sheehan*'s facts and the facts of the present case relating to the Fourth Amendment are superficial. The fundamental and crucial factual distinctions reveal that *Sheehan* does not apply to the Fourth Amendment or qualified immunity analyses in this case and in defendants' summary judgment motion.

Courts have held that when police have statutory authority to take a mentally ill individual into custody (such as on a mental health commitment warrant), it is "logically intermediate" between the "wrongful arrest" and "reasonable accommodation" archetypes. *Id.* at *37 *citing Gohier*, 186 F.3d at 1221. However, in *Morais*, the court stated that in a situation where there was a mental health commitment warrant, the "wrongful arrest" theory (which is premised on a police officer's improper belief he had the right to take plaintiff into custody) was less of a legal fit than the "reasonable accommodation" theory. *Id.* at *37 n. 15.[8]

The municipal defendants did not have any written policies relating to mentally ill individuals, the ADA or the RA, nor did those municipal defendants provide their officers with training relating to those topics. (Plaintiff's SOF ¶¶ 20-21). Failure to properly train police to have peaceful encounters with mentally disabled persons and failure to establish policies for handling such encounters are bases for liability under the ADA and RA. *Broadwater v. Fow,* 945 F.Supp.2d 574, 591 (M.D. Pa. 2013) (Where police

---

[8] Plaintiff pled facts relating to both theories in her Amended Complaint. The facts of record offer support for a "wrongful arrest" because the defendants mistakenly believed that Mr. Williams' conduct evidenced criminal intent when Mr. Williams was truly acting in accord with his mental health symptoms. However, plaintiff also believes the "reasonable accommodation" theory is the more fitting legal argument where there is a mental health commitment warrant.

used extreme physical force and referred to plaintiff as "retard" and "Mr. Crazy" while taking him into custody to undergo a mental health evaluation, court held that failure of Commonwealth and PSP to train and establish policies was sufficient allegation that plaintiff was discriminated against on the basis of his disability).

Some of the defendant officers understood the basic principles of dealing with mentally ill individuals, such as employing the passage of time to advantage, using non-threatening communication, respecting the individual's comfort zone, not unreasonably agitating or exciting the person and calming the situation.  (Plaintiff's SOF ¶¶ 22, 24).  *See Sheehan v. City & County of San Francisco, supra*, 743 F.3d at 1233. Utilizing these principles would have been reasonable accommodations.  Refraining from taking aggressive action against Mr. Williams unless he presented an immediate threat to human life would have been another reasonable accommodation.  *See Morais v. v. City of Philadelphia*, 2007 WL 853811 *40 (E.D. Pa. 2007).  Calling the SERT team for assistance, asking the PSP on the scene to take command of the scene, utilizing Mr. Williams' counselor and other community aids as resources or tools to assist negotiations with Mr. Williams and/or permitting Mr. Williams to simply

speak to his wife and mother would also have been reasonable accommodations.

Instead of making these reasonable accommodations, the defendant officers chose to force a deadly confrontation with Mr. Williams, who was contained in his home, was not threatening anyone, had no weapons and was engaging in conversation with police and his family. The defendant officers chose this course and knew that confronting Mr. Williams risked the use of deadly force. In fact, the defendant officers expected violence. The defendant officers' course of conduct was contrary to nationally recognized police practices and procedures for dealing with barricaded persons and persons who are mentally ill or experiencing a personal crisis. (Plaintiff's SOF ¶ 141(a)).

The defendant officers who did have some knowledge about basic principles regarding dealing with the mentally ill abandoned what they knew because their knowledge was not validated by training and policies. The municipal defendants failed to train and establish policies regarding making reasonable accommodations in the service of mental health warrants. Failure on the part of the municipal defendants to have such policies and training deprived Mr. Williams of his rights under the ADA and RA and resulted in the unnecessary use of deadly force. (Plaintiff's SOF ¶ 141(d)).

In *Schorr v. Borough of Lemoyne,* 243 F.Supp.2d 232 (M.D. Pa. 2003), the court found that "the plain language of the statute, other legislative materials, and case precedent all strongly indicate that properly executing §302 involuntary commitment warrants and modifying police practices to accommodate subjects of the warrants are included in 'programs, services, or activities of a public entity' under §12132 of the ADA." *Schorr*, 243 F.Supp.2d at 238-39.  *See also Heckensweiler v. McLaughlin,* 517 F.Supp.2d 707, 718 (E.D. Pa. 2007) (holding that service of an involuntary mental health commitment order in a safe manner is a service or activity covered by Title II of the ADA and mentally ill plaintiff was entitled to the benefit of that service).

The plaintiff's decedent in *Schorr* suffered from bipolar disorder and escaped from a hospital where he was taken for an involuntary mental health commitment.  *Id.* at 233.  When police defendants arrived at Schorr's apartment to return him to the hospital, a violent confrontation ensued and Schorr was shot and killed by police.  *Id.*

In analyzing plaintiff's failure to train claim under the ADA, the Court explained, "[t]he alleged non-compliance with the training requirements of the ADA did not occur the day that the officers shot Ryan Schorr; it occurred well before that day, when the Defendant policy makers failed to

institute policies to accommodate disabled individuals such as Schorr by giving the officers the tools and resources to handle the situation peacefully." *Id.* at 238.

The court's statement in *Schorr* illustrates the issue in the instant case exactly. Had the municipal defendants given the defendant officers the proper tools—i.e. policies and instruction—on making reasonable accommodations for the mentally ill, Mr. Williams would have been taken for a mental health commitment in a safe manner.

Mr. Williams was denied the benefit of the lawful exercise of police power by reason of his mental illness. As the court noted in *Morais*:

> Discrimination against disabled individuals during arrests is a particularly structural and embedded form of discrimination, and it often goes unrecognized. An officer who is taught to use force when confronted with what she perceives as a threat may apply that knowledge when responding to a mentally or physically disabled person, not realizing that by treating this person the same way that she treats others, she may in fact be failing to reasonably accommodate his disability and thereby discriminate against him.

*Morais v. City of Philadelphia*, 2007 WL 853811 *39 (E.D. Pa. 2007) *citing*

*Remedying a Particularized Form of Discrimination: Why Disabled Individuals Can and Should Bring Claims for Police Misconduct Under the Americans with Disabilities Act*, Rachel E. Brodin, 154 U.Pa.L.Rev. 157,

198-99 (2005).  *See also* *Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995) (holding that the "ADA attempts to eliminate the effects of benign neglect, apathy, and indifference").

Mr. Williams was a qualified individual with a disability under the ADA.  The municipal defendants denied Mr. Williams the benefit of the safe service of an involuntary mental health commitment warrant and the lawful exercise of police power because of his mental disability.  Plaintiff is entitled to summary judgment on Count Seven of her Amended Complaint against the municipal defendants.

## Conclusion

For the reasons stated above, plaintiff is entitled to summary judgment on Counts One and Seven of her Amended Complaint.

Respectfully submitted,

DYLLER LAW FIRM

S/ Shelley L. Centini, Esq.
Supreme Court ID # 085680
S/ Barry H. Dyller, Esq.
Supreme Court ID # 65084
88 North Franklin Street
Wilkes-Barre, PA  18701
(570) 829-4860

Attorneys for Plaintiff

## CERTIFICATE PURSUANT TO LR 7.8(b)

SHELLEY L. CENTINI, ESQ., hereby certifies pursuant to LR 7.8(b) that this brief contains 6,600 words.


/s/ Shelley L. Centini