UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA


MELINDA WILLIAMS,                          :
as Administrator of the Estate of
BRIAN P. WILLIAMS,                         :

        Plaintiff
                                           :       CIVIL ACTION–LAW
        V.
                                           :
MARK PAPI, ROBERT ROBERTS,
STANLEY ELY, PAUL MILLER,                  :
TERRANCE FISHER, SLADE PROFKA,
JOHN KREIG, ROGER HARDY,
WILLIAM OLSZEWSKI,                         :
TUNKHANNOCK TOWNSHIP,
OVERFIELD TOWNSHIP,
TUNKHANNOCK BOROUGH, AND                   :
MESHOPPEN BOROUGH,

                                           :       **JURY TRIAL DEMANDED**

        Defendants                         :       No: 3:CV-13-1151


**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN
SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT**



                                    Respectfully Submitted,

                                    S/ Shelley L. Centini, Esq.
                                    S/ Barry H. Dyller, Esq.
                                    DYLLER LAW FIRM
                                    Attorneys for Plaintiff
                                    88 North Franklin Street
                                    Wilkes-Barre, PA 18701
                                    (570) 829-4860

Plaintiff, Melinda Williams, as Administrator of the Estate of Brian P. Williams, by her attorneys, the Dyller Law Firm, hereby submits her Statement of Undisputed Material Facts in Support of Her Motion for Partial Summary Judgment pursuant to LR 56.1. Plaintiff moves for summary judgment on Count One of her Amended Complaint relating to the unreasonable use of force by defendants Papi, Roberts, Ely, Miller, Profka, Kreig, Hardy and Olszewski in entering plaintiff's home and Count Seven (misnumbered as a second Count Six) of her Amended Complaint relating to her claim under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") against defendants Tunkhannock Township, Overfield Township, Tunkhannock Borough and Meshoppen Borough.[1] These four defendants are referred to collectively herein as the "Municipal Defendants."

## Undisputed Material Facts

Brian Williams' Mental Health History

1.     On November 7, 2012, psychiatrist Rakesh Sharma, M.D. ("Dr. Sharma") filled out a 302 petition alleging that Brian Williams ("Mr.

---

[1] Plaintiff's Amended Complaint erroneously contains two causes of action titled "Count Six." Plaintiff's partial summary judgment motion refers to the second of these two claims which relates to the ADA and the RA and can be found at paragraphs 174-188. (Doc. 44).

Williams") was severely mentally disabled. (Sharma deposition "Exhibit 1" 45:25, 46:1-3, 46:16-20; 302 petition "Exhibit 2").

2. On November 7, 2012, Dr. Sharma alleged in the 302 petition that Brian Williams was in need of involuntary examination and treatment. (Sharma deposition "Exhibit 1" 45:25, 46:1-3; 302 petition "Exhibit 2").

3. The 302 involuntary commitment form was filled out by Dr. Sharma after an appointment with Mr. Williams earlier in the day. (Sharma deposition "Exhibit 1" 38:23-25, 39:1-3, 45:1-4).

4. Mr. Williams' mother accompanied him to an appointment with Dr. Sharma on November 7, 2012 and reported that Mr. Williams was having "increasing agitation." (Black deposition "Exhibit 3" 20:14-25, 21:1-5; Sharma deposition "Exhibit 1" 39:1-25, 40:1-3).

5. Anthony Black ("Mr. Black") is a licensed clinical social worker. Mr. Black and Dr. Sharma were the staff members at Community Counseling Services actively involved in Mr. Williams' mental health treatment. Mr. Black provided Mr. Williams with therapy. (Black deposition "Exhibit 3" 6:10, 46:12-47:16).

6. Mr. Williams had been in inpatient psychiatric treatment approximately two months earlier at First Hospital. (Black deposition "Exhibit 3" 21:21-25, 22:1, 64:1-6).

7.  Over the course of the month before November 7, 2012, Mr. Williams had been diagnosed with adjustment disorder with depressed mood, major depression.  Mr. Williams' treatment providers were trying to rule out psychotic features.  (Black deposition "Exhibit 3" 50:6-25, 51:1-25, 52:1-5, 59:1-25, 60:1-15, 64;1-6; Sharma deposition "Exhibit 1" 21:21-25, 22:1-4, 33:20-24).

8.  Adjustment disorder means that Mr. Williams had emotional or conduct issues occurring after an acute stressor which were disproportionate, and affected his psychosocial functioning.  (Sharma deposition "Exhibit 1" 33:20-25, 34:1-5).

9.  Mr. Williams reported to his mental health treatment provider that he suffered from depressed mood daily, angry outbursts two to three times per week, guilty feelings daily, sleep disturbances, mood swings daily, racing thoughts daily, anxiety, heart palpitations, heart racing and blackouts with episodes of violence, current and fleeting suicidal ideas, absent impulse control and coped with stress by throwing and hitting things.  (Black deposition "Exhibit 3" 54:17-25, 55:1-6, 65:12-14, 66:3-22, 67:3-25, 68:1-14, 77:9-25).

10. Mr. Williams' mental health treatment provider noted Mr. Williams' mood was anxious, his insight and judgment were fair/questionable,

he appeared tired during the month before November 7, 2012. (Black

deposition "Exhibit 3" 80:15-21, 81:1-12, 82:1-18, 83:3-23, 84:15-18,

86:1-20).

11.     In the month before November 7, 2012, Mr. Williams was prescribed

Zoloft, Klonopin and Xanax, which are antidepressant and anti-

anxiety medications. (Sharma deposition "Exhibit 1" 25:25-27:18).

**The Defendant Officers Arrived to Serve the 302 Civil Commitment and**
**Knew that Mr. Williams Was Mentally Ill**

12.     On November 7, 2012, Paul Miller ("Miller") was a Corporal and Slade

Profka ("Profka") was a patrolman working for the Overfield Township

police department. (Miller deposition "Exhibit 4" 5:2-10, 6:4-6; Profka

deposition "Exhibit 6" 5:6-14).

13.     On November 7, 2012, Terrance Fisher ("Fisher") was Chief of Police

in Overfield Township. (Fisher deposition "Exhibit 5" 5:4-10).

14.     On November 7, 2012, Stanley Ely ("Ely") was the Chief of Police,

and Mark Papi ("Papi") and Robert Roberts ("Roberts") were police

officers working for the Tunkhannock Township police department.

(Ely deposition "Exhibit 9" 5:5-10; Papi deposition "Exhibit 7" 5:6-17;

Roberts deposition "Exhibit 8" 5:10-12).

15.     On November 7, 2012, John Kreig ("Kreig") was Chief of Police of

Meshoppen Borough. (Kreig deposition "Exhibit 10" 5:25-6:5).

16. On November 7, 2012, Roger Hardy ("Hardy") was a Sergeant and William Olszewski ("Olszewski") was Chief of Police working for Tunkhannock Borough police department. (Hardy deposition "Exhibit 11" 7:20-8:7; Olszewski deposition "Exhibit 12" 4:13-15).

17. On November 7, 2012, defendants Overfield Township, Tunkhannock Township, Meshoppen Borough and Tunkhannock Borough, through their law enforcement employees-defendants, arrived at Mr. Williams' home at 1246 SR 307, Factoryville, PA in Overfield Township to serve Mr. Williams with the 302 civil commitment paperwork and take him into custody for a mental health evaluation. (Miller deposition "Exhibit 4" 19:11-20:15, 49:16-21; Fisher deposition "Exhibit 5" 29:23-30:13; Profka deposition "Exhibit 6" 15:6-17:22; Papi deposition "Exhibit 7" 22:24-23:4; Roberts deposition "Exhibit 8" 13:9-14, 17:15-22; Ely deposition "Exhibit 9" 27:5-19, 66:12-14; Kreig deposition "Exhibit 10" 20:1-14, 23:18-24; Hardy deposition "Exhibit 11" 29:18-30:4; Olszewski deposition "Exhibit 12" 12:18-13:3).

18. On November 7, 2012, the Municipal defendants, through their law enforcement employees-defendants, knew that Mr. Williams was mentally ill. (Miller deposition "Exhibit 4" 49:16-20; Profka deposition "Exhibit 6" 15:6-17:14; Papi deposition "Exhibit 7" 22:24-23:4;

Roberts deposition "Exhibit 8" 13:9-14; Ely deposition "Exhibit 9"

90:9-14; Kreig deposition "Exhibit 10" 20:1-14; Hardy deposition

"Exhibit 11" 25:1-18; Olszewski deposition "Exhibit 12" 12:18-21).

19. Defendant law enforcement officers were aware that Mr. Williams had

been at an appointment with his psychiatrist earlier in the day. (Miller

deposition "Exhibit 4" 19:11-17; Profka deposition "Exhibit 6" 19:12-

24; Roberts deposition "Exhibit 8" 17:13-18:6; Ely deposition "Exhibit

9" 39:21-40:9; Olszewski deposition "Exhibit 12" 12:23-13:3).

**The Municipal Defendants Did Not Have Policies or Provide Training on
Dealing With Mentally Ill, the Americans With Disabilities Act ("ADA") or the
Rehabilitation Act ("RA");  However, Some Defendant Officers Knew
General Principles of Dealing With the Mentally Ill**

20. Defendants Overfield Township, Tunkhannock Township and

Meshoppen Borough did not have any written policies relating to

mentally ill individuals, the ADA or the RA, nor did those municipal

defendants provide their officers with training relating to those topics.

(Miller deposition "Exhibit 4" 10:12-13:6 (relating to Overfield

Township); Fisher deposition "Exhibit 5" 22:3-7 (relating to Overfield

Township); Profka deposition "Exhibit 6" 14:21-15:5 (relating to

Overfield Township); Papi deposition "Exhibit 7" 24:1-12 (relating to

Tunkhannock Township); Roberts deposition "Exhibit 8" 14:8-19

(relating to Tunkhannock Township); Ely deposition "Exhibit 9" 91:4-8

(relating to Tunkhannock Township); Kreig deposition "Exhibit 10" 20:15-19 (relating to Meshoppen Borough)).

21.     Defendant Tunkhannock Borough does not recall, is not certain and cannot comment on whether it had any written policies or standard operating procedures relating to dealing with mentally ill individuals, the ADA or the RA.  (Hardy deposition "Exhibit 11" 23:18-24:19; Olszewski deposition "Exhibit 12" 13:4-13).  Inability of these Chiefs to recall or comment on the existence of policies is a tacit admission of the absence of such policies.

22.     Defendants Miller, Profka, Roberts and Hardy agree that there are generally accepted principles and/or best practices for police in dealing with the mentally ill and emotionally unstable including:

    a.     You should not overly or unreasonably excite or agitate the person. (Miller deposition "Exhibit 4" 11:7-16; Papi deposition "Exhibit 7" 11:9-16; Roberts deposition "Exhibit 8" 11:23-12:10; Hardy deposition "Exhibit 11" 17:7-22);

    b.     You are supposed to contain the person if you can. (Miller deposition "Exhibit 4" 11:17-19; Papi deposition "Exhibit 7" 11:17-19; Roberts deposition "Exhibit 8" 12:11-12; Hardy deposition "Exhibit 11" 17:23-18:5);

c.	You are supposed to respect that person's comfort zone. (Miller deposition "Exhibit 4" 11:20-22; Papi deposition "Exhibit 7" 11:20-22; Roberts deposition "Exhibit 8" 12:13-15; Hardy deposition "Exhibit 11" 18:6-12);

d.	You are supposed to use nonthreatening communication. (Miller deposition "Exhibit 4" 11:23-25; Papi deposition "Exhibit 7" 11:23-25; Roberts deposition "Exhibit 8" 12:16-17; Hardy deposition "Exhibit 11" 18:13-15);

e.	You are supposed to employ the passage of time to your advantage.  (Miller deposition "Exhibit 4" 12:1-3; Papi deposition "Exhibit 7" 12:1-3; Roberts deposition "Exhibit 8" 12:18-20; Hardy deposition "Exhibit 11" 18:16-20);

f.	You are supposed to calm the situation.  (Miller deposition "Exhibit 4" 12:4-6; Papi deposition "Exhibit 7" 12:4-6; Roberts deposition "Exhibit 8" 12:21-22; Hardy deposition "Exhibit 11" 18:20-24);

g.	You are supposed to assume a quiet and nonthreatening manner.  (Miller deposition "Exhibit 4" 12:7-9; Papi deposition "Exhibit 7" 12:7-9; Roberts deposition "Exhibit 8" 13:1-4; Hardy deposition "Exhibit 11" 19:4-6);

h.    You are supposed to take time to assess the situation and give the person time to calm down.  (Miller deposition "Exhibit 4" 12:10-13; Papi deposition "Exhibit 7" 12:10-13; Roberts deposition "Exhibit 8" 13:5-8; Hardy deposition "Exhibit 11" 19:10-14);

23.    Profka has never learned any basic principles or best practices for dealing with mentally ill or emotionally unstable individuals.  (Profka deposition "Exhibit 6" 12:22-13:4).

24.    Kreig does not know whether he has ever heard of the principles in ¶22 a-d above; however he "would believe" that it is best to employ the passage of time to advantage; that it is "absolutely" best for police to attempt to calm the situation and not escalate it; and he would "assume" it is best to use a quiet and nonthreatening manner.  (Kreig deposition "Exhibit 10" 15:13-19:2).

<u>Mr. Williams Was Confined in His House</u>

25.    When Miller first arrived at Mr. Williams' home, he saw Mr. Williams walking up his driveway and yelled to him, "Hey, Brian."  Mr. Williams ignored Miller and went into his residence.  (Miller deposition "Exhibit 4" 20:16-21:1).

Miller Failed to Take Charge

26.    All law enforcement officer defendants, except for Miller himself,

viewed Miller as being in charge of the scene.  (Profka deposition

"Exhibit 6" 31:15-21; Papi deposition "Exhibit 7" 17:5-18:2; Ely

deposition "Exhibit 9" 20:13-25; Kreig deposition "Exhibit 10" 21:20-

24; Hardy deposition "Exhibit 11" 28:3-9; Olszewski deposition

"Exhibit 12" 11:20-12:17).

27.    Only Miller did not view himself as being in charge of the scene.

Miller felt that no one person was in charge and they were all running

the scene "together."  (Miller deposition "Exhibit 4" 18:3-18).

28.    Miller knew he was "in over his head" regarding this incident and

asked Ely to "help him out." (Miller deposition "Exhibit 4" 18:10-18).

The Defendant Officers Knew Mr. Williams Was Not A Threat

29.    When Miller attempted to interact with Mr. Williams before Mr.

Williams entered the home, Mr. Williams simply ignored Miller, but did

not threaten Miller.  (Miller deposition "Exhibit 4" 20:16-21:25).

30.    Miller and Profka permitted Mr. Williams' father to go inside the home

twice to encourage Mr. Williams to come out of the home and neither

Miller nor Profka feared that Mr. Williams would do anything to harm

his father.  (Miller deposition "Exhibit 4" 22:15-23:24, 27:11-20;

Profka deposition "Exhibit 6" 24:5-26:1).

31.     Defendant law enforcement officers knew that Mr. Williams did not

have any guns in the house.  (Profka deposition "Exhibit 6" 26:2-22;

Miller deposition "Exhibit 4" 27:1-5; Papi deposition "Exhibit 7" 27:14-

19; Roberts deposition "Exhibit 8" 28:1-5; Ely deposition "Exhibit 9"

36:4-9; Hardy deposition "Exhibit 11" 40:5-9).

Miller and Profka Knew Mr. Williams Was
Packing a Bag and Putting on Boots

32.     Miller knew that Mr. Williams was packing a bag.  (Miller deposition

"Exhibit 4" 24:3-18).

33.     Miller and Profka knew that Mr. Williams was putting on boots.  (Miller

deposition "Exhibit 4" 23:9-17; Profka deposition "Exhibit 6" 25:1-14).

Mr. Williams Needed to Speak to His Wife Melinda and Mother Shirley
But the Defendant Officers Would Not Permit It

34.     Mr. Williams requested that police allow him to speak to his wife and

his mother.  (Miller deposition "Exhibit 4" 25:11-26:21, 35:18-25;

Profka deposition "Exhibit 6" 40:15-41:3; Papi deposition "Exhibit 7"

31:8; Roberts deposition "Exhibit 8" 28:24-29:3; Ely deposition

"Exhibit 9" 26:6-13, 28:16-22); Hardy deposition "Exhibit 11" 36:1-5;

Olszewski deposition "Exhibit 12" 17:20-23).

35. Mr. Williams assured Ely he would not hurt his wife or mother.  (Ely deposition "Exhibit 9" 31:8-16).

36. Defendant law enforcement officers would not permit Mr. Williams to speak in person to either his wife or mother. (Miller deposition "Exhibit 4" 35:1-7; Profka deposition "Exhibit 6" 41:2-42:20; Papi deposition "Exhibit 7" 31:1-33:14; Roberts deposition "Exhibit 8" 28:24-30:23; Ely deposition "Exhibit 9" 26:6-17, 30:1-8; Hardy deposition "Exhibit 11" 44:6-45:2; Olszewski deposition "Exhibit 12" 17:20-18:13).

Mr. Williams' Wife and Mother Wanted Speak to Mr. Williams
But the Defendant Officers Would Not Permit It

37. Mr. Williams' wife and mother were both outside the home. (Miller deposition "Exhibit 4" 29:11-15; Papi deposition "Exhibit 7" 31:1-34:10; Roberts deposition "Exhibit 8" 20:17-21:1; Ely deposition "Exhibit 9" 28:23-29:5; Hardy deposition "Exhibit 11" 38:13-16; Olszewski deposition "Exhibit 12"16:8-17:11).

38. Mr. Williams' wife requested to go to the driveway and speak to Mr. Williams, but Miller denied that request.  (Miller deposition "Exhibit 4" 25:20-25).

39. Mr. Williams' mother was in the driveway and wished to speak to her son, but that request was denied.  (Papi deposition "Exhibit 7" 33:2-20).

<u>Mr. Williams Was Contained In the Home and Was Not a Threat</u>

40.    Mr. Williams was contained in the home and defendant law
       enforcement officers had set up a perimeter around the home.  (Miller
       deposition "Exhibit 4" 21:18-19, 28:18-19; Profka deposition "Exhibit
       6" 23:18-24:12, 28:15-23; Papi deposition "Exhibit 7" 28:9-21;
       ""Exhibit 9" 23:4-6, 41:21-42:5).

41.    Defendant officers did not see Mr. Williams with any weapons prior to
       their entry into the home.  (Profka deposition "Exhibit 6" 37:21-38:2;
       Ely deposition "Exhibit 9" 36:1-3; Olszewski deposition "Exhibit 12"
       24:2-7).

42.    Defendants knew that Mr. Williams was in the home alone and did
       not believe he had any hostages. (Miller deposition "Exhibit 4" 27:6-
       12; Profka deposition "Exhibit 6" 39:21-23; Papi deposition "Exhibit 7"
       41:15-25; Roberts deposition "Exhibit 8" 41:25-42:6; Ely deposition
       "Exhibit 9" 29:22-25; Kreig deposition "Exhibit 10" 42:3-8; Hardy
       deposition "Exhibit 11" 34:18-25; Olszewski deposition "Exhibit 12"
       23:21-24:1).

43.    Prior to defendant law enforcement officers entering the home, Mr.
       Williams had not made any threats to any of the officers on the
       scene.  (Ely deposition "Exhibit 9" 65:14-18).

44. Mr. Williams had not done anything to suggest he wished to harm himself. (Roberts deposition "Exhibit 8" 48:6-10).

## Mr. Williams Spoke With Ely On the Phone

45. Mr. Williams talked with Ely on the phone. When Ely asked if he could speak to Mr. Williams at the house, Mr. Williams said yes. (Ely deposition "Exhibit 9" 23:10-24:13).

46. During the phone conversation with Ely, Mr. Williams was upset but not argumentative. (Ely deposition "Exhibit 9" 24:19-22).

## Mr. Williams Had an Existing Friendship With Fisher and Talked to Fisher On the Phone

47. Fisher is Chief of Overfield Township and was Chief in November of 2012. (Fisher deposition "Exhibit 5" 5:4-10).

48. Fisher was Mr. Williams' friend and had a good relationship with him. (Fisher deposition "Exhibit 5" 8:8-10).

49. Fisher knew Mr. Williams since 1999 through work, as Mr. Williams was a volunteer firefighter for Lake Winola. (Fisher deposition "Exhibit 5" 7:17-8:7).

50. Fisher knew Mr. Williams to be a peaceable, nonviolent man of good moral character. (Fisher deposition "Exhibit 5" 9:12-19).

51. When Fisher learned that Overfield Township officers were attempting to serve a 302 warrant at Mr. Williams' home, he called

Mr. Williams who did not answer and left a message on his machine. (Fisher deposition "Exhibit 5" 29:23-31:16).

52. Mr. Williams called Fisher back.  (Fisher deposition "Exhibit 5" 31:12-21).

53. In reference to the mental health warrant, Mr. Williams told Fisher he is not going.  (Fisher deposition "Exhibit 5" 31:25-32:8).

54. Mr. Williams' demeanor when talking to Fisher was calm and matter-of-fact.  Mr. Williams was not crying, screaming or yelling.  (Fisher deposition "Exhibit 5" 32:16-33:1).

55. Mr. Williams made no threats to Fisher, to the police, or to anybody during the conversation with Fisher.  (Fisher deposition "Exhibit 5" 32:9-15).

56. Fisher told Mr. Williams, "You know what is going to happen.  You need to go."  (Fisher deposition "Exhibit 5" 33:2-8).

57. Mr. Williams then terminated the conversation.  (Fisher deposition "Exhibit 5" 33:2-10).

State Police Arrived And Mr. Williams Spoke to Corporal Dunleavy

58. Non-defendants Corporal Dunleavy, Trooper Flynn and Trooper Lopez from the Pennsylvania State Police responded to the scene to assist after all other municipalities were there.  (Dunleavy deposition

"Exhibit 13" 19:18-22; Flynn deposition "Exhibit 14" 17:14-20:11; Lopez deposition "Exhibit 15" 13:7-20).

59. Corporal Dunleavy also had a conversation with Mr. Williams on the phone. Mr. Williams told Corporal Dunleavy that he enjoyed talking to Ely, and he would rather continue talking to Ely than Corporal Dunleavy. (Dunleavy deposition "Exhibit 13" 26:16-17, 39:16-40:6).

60. Mr. Williams told Corporal Dunleavy that he would come out of the house as long as his wife would come up to the house. (Dunleavy deposition "Exhibit 13" 41:14-21).

Mr. Williams Spoke To Ely Three Times In-Person At His Basement Door

61. Mr. Williams had three conversations through a basement door with Ely, in-person, before police entered the home. (Ely deposition "Exhibit 9" 25:11-26:20, 41:13-20, 53:6-22).

62. Each time, Mr. Williams would open the door about 8-10 inches and speak to Ely. (Ely deposition "Exhibit 9" 25:11-26:1, 41:13-16, 53:6-22).

63. Ely was within 15 feet of Mr. Williams. (Ely deposition "Exhibit 9" 26:2-3, 41:17-20).

64. Ely was trying to build a rapport and negotiate with Mr. Williams. (Ely deposition "Exhibit 9" 26:21-22).

65. Profka, who was approximately 15 feet away from Ely and Mr. Williams as they were talking at the basement door, described Mr. Williams as calm, but adamant that he was not coming out. (Profka deposition "Exhibit 6" 35:4-37:5).

66. Ely characterized Mr. Williams' demeanor during these conversations as "agitated." (Ely deposition "Exhibit 9" 35:6-7, 42:13-15, 54:10-11).

67. Mr. Williams was not yelling or screaming at Ely during these conversations. (Profka deposition "Exhibit 6" 37:2-5).

68. Miller heard Mr. Williams and Ely talking at the basement door and thought it was "going pretty well" and that Ely had developed a rapport with Mr. Williams. (Miller deposition "Exhibit 4" 31:23-32:8).

69. Mr. Williams continued to request from Ely that he talk to his mother and wife. (Ely deposition "Exhibit 9" 26:11-13, 38:16-20, 40:21-41:1).

70. Ely was the one to break off the conversation with Mr. Williams during the first two conversations at the door. (Ely deposition "Exhibit 9" 35:5-11, 42:13-19).

71. The conversations between Ely and Mr. Williams lasted only a few minutes. (Ely deposition "Exhibit 9" 37:19-23, 53:23-54:9; Profka deposition "Exhibit 6" 38:3-12).

Fisher Decided Not To Come To the Scene or Take Charge,
<u>Leaving Inexperienced Miller As Supervisor</u>

72. Miller had only been working for Overfield Township for three or four

   years at the time, had never been on a scene where deadly force was

   used, it was the first time he had been involved in something "like

   this," and he was in "over his head" during this incident. (Miller

   deposition "Exhibit 4" 17:10-11, 60:13-14, 64:3-22).

73. Despite the fact that Fisher was Chief of Overfield Township, was

   friends with Mr. Williams and already had an established rapport with

   him, Fisher chose not to come to the scene until after Mr. Williams

   was shot. (Fisher deposition "Exhibit 5" 35:18-37:5).

74. None of the defendant officers on the scene knew Mr. Williams

   personally before this incident. (Miller deposition "Exhibit 4" 16:14-

   17:1; Profka deposition "Exhibit 6" 18:4-10; Papi deposition "Exhibit 7"

   24:16-21; Roberts deposition "Exhibit 8" 14:20-22; Ely deposition

   "Exhibit 9" 29:6-9; Kreig deposition "Exhibit 10" 20:20-23; Hardy

   deposition "Exhibit 11" 27:1-3).

75. Miller notified Chief Fisher of the incident with Mr. Williams. Miller

   thought Chief Fisher would come to the scene. (Miller deposition

   "Exhibit 4" 13:20-14:8).

76.   Other defendant chiefs on the scene thought Fisher should have

been there. (Ely deposition "Exhibit 9" 19:1-20:6; Kreig deposition

"Exhibit 10" 32:3-33-17; Olszewski deposition "Exhibit 12" 20:1-21:5).

Defendant Officers Chose Not to Utilize Available Resources to Peacefully
Take Mr. Williams Into Custody On the Mental Health Warrant

77.   Mr. Black, who was Mr. Williams' social worker at Community

Counseling Services, personally delivered the 302 civil commitment

warrant for Mr. Williams to the defendant officers on the scene.

(Black deposition "Exhibit 3" 6:10, 46:12-47:16, 89:20-22, 91:5-12;

Profka depositon "Exhibit 6" 32:23-34:11).

78.   Mr. Black simply handed police the 302 petition and left.  Mr. Black

does not recall any dialogue between himself and police about the

situation with Mr. Williams.  (Black deposition "Exhibit 3" 91:13-24).

In other words, no police used the mental health professional with a

relationship with Mr. Williams as a resource.

79.   The Pennsylvania State Police Emergency Response Team ("SERT

Team") is a team of troopers with extra training who can be called to

come out to handle a situation in which law enforcement is

responding to a high-risk incident such as a barricaded person or

high-risk warrant service.  (Dunleavy deposition "Exhibit 13" 8:8-18).

80. Defendant officers considered calling the SERT Team to assist serving the warrant on Mr. Williams; however, this possibility was rejected because defendants decided (without basis) that it would take too long for the SERT Team to arrive. (Miller deposition "Exhibit 4" 36:22-37:4; Profka deposition "Exhibit 6" 53:22-54:9; Roberts deposition "Exhibit 8" 47:12-23; Ely deposition "Exhibit 9" 47:17-20).

81. Although Miller knew there were SERT Team members located in Tunkhannock, he did not think to call those members nor did he think to call a mental health professional to assist, nor did he think to call a trained negotiator because his chief, Fisher, never provided training regarding those possibilities. (Miller deposition "Exhibit 4" 40:6-42:7).

82. The SERT Team members in Tunkhannock were 8 miles from the scene. (Ely deposition "Exhibit 9" 47:21-48:6).

83. The State Police on the scene had policies, regulations, field operations guides and training on serving mental health warrants and dealing with barricaded individuals. However, the State Police on the scene were only asked to "assist" the defendant officers, not to take charge of the scene. (Dunleavy deposition "Exhibit 13" 6:17-8:3; 18:22).

84. When "assisting," State Police do not make decisions to affect or override the agency they are assisting. (Dunleavy deposition "Exhibit 13" 18:13-25).

**Although Mr. Williams Was Contained and Was Not a Threat,**
**A "Plan" That Was Not Clearly Understood Was Devised to**
<u>**Enter the Home and Seize Mr. Williams**</u>

85. Defendants devised a "plan" which involved Ely again approaching Mr. Williams at the basement door and officers taking Mr. Williams into custody, using force if necessary. (Miller deposition "Exhibit 4" 37:11-19; Roberts deposition "Exhibit 8" 35:23-36:3; Ely deposition "Exhibit 9" 51:23-52:6; Hardy deposition "Exhibit 11" 48:15-23).

86. No law enforcement officer on the scene had the same understanding of the details of the plan:

    a.    Miller testified that his understanding of the plan was that Ely was to get Mr. Williams to the basement door again. A trooper was supposed to stand on the side of the house. When Mr. Williams came to the door, the law enforcement defendants were supposed to deploy a Taser. A team was supposed to breach the front door, come down into the basement and take Mr. Williams into custody. A "go" signal was supposed to be given to the front door officers by the basement door officers.

Miller assumed that the signal would only be given to the front door officers if Mr. Williams could not be tasered. (Miller deposition "Exhibit 4" 37:11-38:16);

b.    Papi testified that either Hardy or Roberts explained to him that Ely and another officer were stationed on the opposite corner of the house. If the front door officers were told to go in or were going in, then they were supposed to clear out the bedrooms in an attempt to locate Mr. Williams. Papi did not know who was supposed to tell the front door officers to go in. (Papi deposition "Exhibit 7" 37:14-38:11);

c.    Roberts testified that Ely would attempt to communicate with Mr. Williams. During the communication, if Mr. Williams were to exit the house Corporal Dunleavy would attempt to deploy a taser to take him into custody. At the same time that Corporal Dunleavy and Ely were speaking with Mr. Williams, officers would enter the front door. These two events were to occur simultaneously, and upon the signal of Corporal Dunleavy. (Roberts deposition "Exhibit 8" 35:14-36:19);

d.    Ely testified that he was supposed to try to get Mr. Williams to come out of the basement door just far enough where Corporal

Dunleavy could deploy his Taser. Once the Taser was deployed, Ely, Corporal Dunleavy and another trooper would take control of Mr. Williams. If that did not work and Mr. Williams retreated into the house, officers at the front door were then supposed to go into the house and take control of Mr. Williams. The trooper behind Corporal Dunleavy was supposed to notify the officers at the front door if Ely's negotiation efforts failed. (Ely deposition "Exhibit 9" 51:12-52:21);

e.   Kreig testified that the only plan he knew of was that Ely was supposed to try to talk to Mr. Williams by the cellar door and if Mr. Williams came out yelling, the other officers were supposed to enter the home. Kreig knew nothing about any entry signal that was supposed to be given to the front door officers. (Kreig deposition "Exhibit 10" 33:18-35:5);

f.   Hardy testified that Ely was going to approach the basement door again to get Mr. Williams to talk as a diversionary tactic. Front door officers were going to use a key to enter the home and try to attempt to secure Mr. Williams. If the opportunity presented itself, Corporal Dunleavy or another officer would use a taser on Mr. Williams. Corporal Dunleavy was supposed to

give a predetermined signal for the front door officers to enter. However, Hardy does not know what the signal was. (Hardy deposition "Exhibit 11" 48:15-52:13);

g.   Olszewski testified that Ely was to engage Mr. Williams in conversation.  State troopers would take a position close to the home.  Ely would coax Mr. Williams out of the house.  Hopefully, it would come to a point where the troopers would be able to take physical custody of Mr. Williams.  As Ely was attempting to get Mr. Williams out of the house, the front door officers would simultaneously enter the house and sandwich Mr. Williams between both groups of officers upon a signal given by one of the troopers by the basement door.  (Olszewski deposition "Exhibit 12" 30:20-32:19);

h.   Corporal Dunleavy testified that Ely was supposed to talk to Mr. Williams at the basement door again to see if he could get him to just surrender.  If that didn't happen, Corporal Dunleavy would be in a position to use a Taser to take Mr. Williams into custody.  Other officers were to stage near the front door as a reaction team in case something were to go bad.  Corporal Dunleavy would be with Troopers Flynn and Lopez.  Trooper

Flynn was to give a signal to the team at the front door to let them know if the plan was going bad and it was time to go in. (Dunleavy deposition "Exhibit 13" 34:19-38:7);

i.    Trooper Flynn testified that Ely was going to attempt to talk to Mr. Williams in order to get him to come out. Corporal Dunleavy would be nearby and take Mr. Williams into custody. If need be, Corporal Dunleavy would use his taser on Mr. Williams. If things went worse, like if Mr. Williams had a weapon or something like that, then the front door officers were to go in the residence. Corporal Dunleavy would notify them somehow if they were going to go in. (Flynn deposition "Exhibit 14" 35:14-37:9);

j.    Trooper Lopez testified that Ely would approach the basement door and try to convince Mr. Williams to step out. Trooper Lopez, Trooper Flynn and Corporal Dunleavy were to approach from a particular corner of the structure, and Troopers Lopez and Flynn were going to be the officers to seize Mr. Williams. Corporal Dunleavy would provide cover with his Taser if things went awry. Trooper Lopez knew what he and the other state police were supposed to do. He also knew other officers had a

part to play but he did not know what everyone else's part was. (Lopez deposition "Exhibit 15" 19:9-20:14); and

k.    Profka had no knowledge of or details of the plan at all. (Profka deposition "Exhibit 6" 34:19-23).

## The "Plan" Risked the Use of Deadly Force

87.    Papi designated himself "lethal cover" officer prior to entry into the home. (Papi deposition "Exhibit 7" 38:18-40:11).

88.    Olszewski told one of the troopers nearby to place an ambulance on standby before they went into the house "in case something happens." (Olszewski deposition "Exhibit 12" 38:12-39:10).

## Tunkhannock Township's Training and Policies Were Not Utilized

89.    Tunkhannock Township provided training and had policies dealing with barricade situations. However, because Tunkhannock Township law enforcement defendants were simply assisting Overfield Township with this incident, the Tunkhannock Township law enforcement defendants made a deliberate choice not to follow their policies. (Ely deposition "Exhibit 9" 11:11-14:20, 16:22-17:3, 58:3-5; Tunkhannock Township Barricade Policy "Exhibit 16").

90. Tunkhannock Township policies, which were not followed, included:

   a. There is no need to rush into a solution to the situation. (Tunkhannock Township Barricade Policy "Exhibit 16"; Papi deposition "Exhibit 7" 13:4-14:14);

   b. The Supervisor should secure the inner perimeter, outer perimeter and decelerate the situation by maintaining status quo and any other stabilizing methodology. (Ely deposition "Exhibit 9" 15:14-17:23; Tunkhannock Township Barricade Policy "Exhibit 16");

   c. The Supervisor should establish a chronological log of the actions taken. (Ely deposition "Exhibit 9" 18:12-15; Tunkhannock Township Barricade Policy "Exhibit 16");

   d. In negotiations, every effort will be made to persuade the suspect to surrender before force is used. (Tunkhannock Township Barricade Policy "Exhibit 16");

   e. In negotiations, practically all demands are negotiable except supplying the actor with weapons and additional hostages or exchange of hostages. (Ely deposition "Exhibit 9" 29:16-30:8, 32-20:25; Tunkhannock Township Barricade Policy "Exhibit 16");

f.   The Incident Commander is responsible for authorizing the use of force.  (Tunkhannock Township Barricade Policy "Exhibit 16"); and

g.   Officers are not allowed to enter the structure or area controlled by the barricaded individual other than special response officers executing specific tactics.  (Ely deposition "Exhibit 9" 57:15-58:5).

91.   No Tunkhannock Township law enforcement defendant inquired whether Overfield Township had any policies regarding mentally ill or barricaded persons.  Tunkhannock Township and its Chief and officers chose not to inform Overfield Township or its officers that Tunkhannock Township had relevant policies or what those policies stated.  (Ely deposition "Exhibit 9" 34:9-22, 58:14-59:9; Roberts deposition "Exhibit 8" 10:5-11:22; Papi deposition "Exhibit 7" 19:13-22:25).

92.   Overfield Township had no policies regarding serving mental health warrants and had no training or policies regarding dealing with barricaded individuals. (Fisher deposition, "Exhibit 5" 16:6-9, 20:1-12).

Flawed Implementation of the Ambiguous "Plan"
to Seize Mr. Williams And the "First Entry"

93. Mr. Williams was contained in the house and all of the entry and exit
points to the home were covered prior to implementation of a plan to
either enter the home or coax Mr. Williams out. (Miller deposition
"Exhibit 4" 39:19-25).

94. At some point before the implementation of the plan, some defendant
law enforcement officers wielded long guns, rifles and shotguns.
Non-defendant Corporal Dunleavy suggested that they continue to
negotiate with Mr. Williams rather than approach the home. Upon
that suggestion, the defendant law enforcement officers put away
their long guns, rifles and shotguns. (Dunleavy deposition "Exhibit
13" 33:1-34:13; Flynn deposition "Exhibit 14" 60:7-61:3).

95. Mr. Williams' mother was highly upset and said to Miller, "Don't kill my
son." (Miller deposition "Exhibit 4" 29:11-22).

96. Ely began to speak with Mr. Williams at the basement door, in
implementation of the plan. (Ely deposition "Exhibit 9" 53:4-22).

97. During the conversation between Ely and Mr. Williams, it didn't seem
like anyone was "in any threat." (Flynn deposition "Exhibit 14" 34:20-
35:2).

98. During the conversation between Ely and Mr. Williams, Mr. Williams suddenly, in mid-sentence, stopped talking to Ely, broke off the conversation, slammed the door shut, locked the door and retreated back into the basement. (Ely deposition "Exhibit 9" 54:2-55:3).

99. Ely was "shocked at that point" because he saw red Taser indicators moving around inside the building and realized that the law enforcement defendants that were at the front door had entered the building. (Ely deposition "Exhibit 9" 55:10-20).

100. Non-defendant Corporal Dunleavy saw Ely speaking to Mr. Williams at the basement door and testified that the conversation lasted two minutes. The conversation seemed to be going fine, and although Corporal Dunleavy could not see Mr. Williams, Ely was calm and it did not seem that he was dealing with an aggravated person at the time. Mr. Williams cut off negotiations with Ely and retreated into the home because he heard the front door officers enter the home. (Dunleavy deposition "Exhibit 13" 35:18-36:15, 38:15-39:4).

101. Defendant officers believed the events that transpired were not in accordance with the "plan":

    a.    Miller testified that the basement door officers never gave the signal for the front door officers to enter. There was commotion

near the side of the house and inside of the residence, so someone told him to breach the door;  (Miller deposition "Exhibit 4" 38:17-39:11);

b.  Kreig testified that officers were crouched down by the front door and he heard Mr. Williams yelling at Ely.  Miller was by the door but was not entering the home.  Kreig did not think Miller heard the yelling, so Kreig went from the back of the line of officers to the front and told Miller, "That was your cue to enter the home," meaning that Mr. Williams came out yelling.  At that point Miller entered.  (Kreig deposition "Exhibit 10" 28:15-29:13);

c.  Roberts testified that he was at the front door while Ely began to speak or tried to speak to Mr. Williams at the basement door. The front door officers heard noises as if something was being placed against the door to barricade it.  Miller used a key to access the door.  Nobody at the front door said they saw the signal to enter from Corporal Dunleavy.  (Roberts deposition "Exhibit 8" 40:4-41:11);

d.    Hardy testified that Corporal Dunleavy gave the entry signal, and then Hardy followed other officers into the building.  (Hardy deposition "Exhibit 11" 52:3-53:6);

e.    Olszewski testified that front door officers advanced towards the house while Olszewski stayed behind to make sure an ambulance was placed on standby "in case something happens" before anyone went into the house.  By the time Olszewski caught up with the officers they were already in the house.  Olszewski does not know if any signal was actually given.  (Olszewski deposition "Exhibit 12" 38:12-39:21);

f.    Trooper Flynn testified that Ely was speaking with Mr. Williams for 3 or 4 minutes when Mr. Williams terminated the discussion by going back into the residence.  The front door officers went inside the home.  No signal was given by Corporal Dunleavy.  Trooper Flynn did not hear anybody tell the front door officers that it is time to go in.  (Flynn deposition "Exhibit 14" 33:20-34:10, 37:1-38:4);

g.    Ely testified that as he was speaking to Mr. Williams at the basement door, Mr. Williams stopped talking to him mid-sentence, slammed and locked the door and went back into the

basement.  Ely was shocked and taken by surprise.  Ely looked at Corporal Dunleavy who was simply standing there, and then when Ely looked back into the building he saw a red Taser indicator moving around in the building.  Ely realized that the front door officers were inside the building.  Ely does not know whether the troopers gave the front door officers a signal. (Ely deposition "Exhibit 9" 53:4-56:21);

h.  Corporal Dunleavy testified that he didn't even make it into his position when the front door team already went in.  Corporal Dunleavy was several feet away from his intended position when Trooper Flynn said to him, "Were they supposed to go in yet?"  Corporal Dunleavy stopped and said, "No."  (Dunleavy deposition "Exhibit 13" 35:5-8, 38:11-23);

i.  Trooper Lopez testified that there was a heated, loud exchange between Mr. Williams and Ely.  Trooper Lopez could see Mr. Williams' arm flailing and could hear him saying, "You're not coming in.  You're not taking me.  Get out of here."  Ely was trying to coax Mr. Williams out.  Trooper Lopez did not see Mr. Williams with any weapons.  The exchange between Ely and Mr. Williams lasted a matter of seconds.  Mr. Williams retreated

inside. Corporal Dunleavy stated to Trooper Lopez, "Those guys just went in," referring to the officers at the front door. Corporal Dunleavy told Trooper Lopez to "back them up." Trooper Lopez does not know if the front door officers were supposed to enter or if there was supposed to be a signal for them to enter. (Lopez deposition "Exhibit 15" 22:6-24:7).

Mr. Williams Barricaded Himself in a Basement Bedroom
In Response to Defendant Officers' Entry Into His Home

102. Mr. Williams retreated behind a closed basement bedroom door and barricaded himself inside the room. (Miller deposition "Exhibit 4" 46:6-25; Papi deposition "Exhibit 7" 42:1-24; Profka deposition "Exhibit 6" 49:2-12; Roberts deposition "Exhibit 8" 42:20-43:23; Ely deposition "Exhibit 9" 57:6-14, 61:3-19; Kreig deposition "Exhibit 10" 42:9-43:15; Hardy deposition "Exhibit 11" 57:3-58:6, 62:7-21; Olszewski deposition "Exhibit 12" 43:12-18).

103. Ten police officers were inside of the home, outside of the basement bedroom door. (Miller deposition "Exhibit 4" 46:6-14; Papi deposition "Exhibit 7" 42:1-11; Profka deposition "Exhibit 6" 49:11-50:4; Roberts deposition "Exhibit 8" 43:6-45:9; Ely deposition "Exhibit 9" 57:1-14, 61:13-19; Kreig deposition "Exhibit 10" 42:15-43:11; Hardy deposition "Exhibit 11" 57:3-58:6; Olszewski deposition "Exhibit 12" 43:1-20;

Lopez deposition "Exhibit 15" 31:11-24; Flynn deposition "Exhibit 14" 41:1-5).

104. Police were also still outside of the home near the window of the basement bedroom. (Dunleavy deposition "Exhibit 13" 44:10-45:1).

105. Mr. Williams was now contained in the room and had no means of escape from the room. (Miller deposition "Exhibit 4" 48:15-23; Papi deposition "Exhibit 7" 43:5-44:10; Roberts deposition "Exhibit 8" 44:25-45:13; Ely deposition "Exhibit 9" 64:15-65:13; Dunleavy deposition "Exhibit 13" 44:10-45:1; Flynn deposition "Exhibit 14" 48:3-16).

106. While contained in the room alone, Mr. Williams was not a danger to police. (Papi deposition "Exhibit 7" 44:11-14).

107. Mr. Williams was yelling from behind the door for the defendant law enforcement officers to get out of his house and leave him alone. (Kreig deposition "Exhibit 10" 45:10-19; Hardy deposition "Exhibit 11" 63:18-64:8; Olszewski deposition "Exhibit 12" 45:2-15).

108. Roberts testified that prior to the police forcing open the door, Mr. Williams told police, "You're going to be sorry.  Don't do this." (Roberts deposition "Exhibit 8" 44:4-11).

109. Papi testified that prior to the police forcing open the door, Mr.

    Williams said, "Don't come in here. You'll be sorry if you come in

    here." (Papi deposition "Exhibit 7" 43:2-14).

Mr. Williams Was Contained in the Basement Bedroom, Yet Defendant
Officers Chose to Make a Forcible "Second Entry" By Breaking the Door

110. Defendant law enforcement officers used force to enter the bedroom

    where Mr. Williams was located. (Photo "Exhibit 19"; Williams

    declaration "Exhibit 20"):

    a.    Miller testified that he observed a couple of officers including

          Kreig kicking on the door to open it. The door was forced open

          by police. (Miller deposition "Exhibit 4" 47:22-49:1);

    b.    Roberts testified that he saw Kreig kick the door. Roberts then

          leaned against the door with his shield and found that it was

          either blocked by something or propped shut. Papi then tucked

          in to Roberts' right side and the two of them opened the door.

          (Roberts deposition "Exhibit 8" 44:14, 49:23-50:6);

    c.    Olszewski testified that when he got into the basement, the

          officers were already in the process of forcing the door open by

          muscling, not using tools. He recalls Kreig pushing the door in.

          (Olszewski deposition "Exhibit 12" 43:24-45:25);

d.      Kreig testified that he did not kick the door.  One of the officers

had a shield, everybody was gathered outside the door and the

door was pushed open.  (Kreig deposition "Exhibit 10" 43:16-

21, 45:25-46:8);

e.      Profka testified that he learned that Roberts pushed through the

door with a shield.  (Profka deposition "Exhibit 6" 49:17-21);

f.      Papi testified that police forced the door open.  Roberts, himself

and probably somebody pushing on him muscled their way

through the door.  (Papi deposition "Exhibit 7" 44:15-17, 47:24-

48:5);

g.      Ely testified that he grabbed the door handle to try to open it, it

opened an inch or two and then Mr. Williams pushed it closed.

Mr. Williams did not want the door open.  Roberts placed the

shield against the door and tried to push it open.  Papi was

alongside Roberts.  As they pushed against the door there was

resistance and then the door flew open and officers fell into the

room.  (Ely deposition "Exhibit 9" 61:14-63:1);

h.      Hardy testified that several attempts were made to open the

door using the doorknob and having some officers push on it.

This did not work.  Ely turned the knob and the door was

opened by everyone pushing forward.  (Hardy deposition "Exhibit 11" 64:9-65:8);

i.  Trooper Lopez testified that as officers were trying to force the door open with their shoulders and hands, Mr. Williams was trying to force it closed.  (Lopez deposition "Exhibit 15" 31:20-32:5); and

j.  Trooper Flynn testified that the door was "busted open" and it seemed like it was kicked open.  (Flynn deposition "Exhibit 14" 46:5-14).

Defendant **Officers Expected Violence**
When They Needlessly Forced the Door Open
<u>But They Chose to Do So Anyway</u>

111.  Law enforcement officers did not believe Mr. Williams would have a rational or non-violent response to their forcible entry into the bedroom. (Miller deposition "Exhibit 4" 49:24-50:6; Papi deposition "Exhibit 7" 46:22-24; Ely deposition "Exhibit 9" 66:6-11; Kreig deposition "Exhibit 10" 53:4-24; Hardy deposition "Exhibit 11" 68:22-69:4; Flynn deposition "Exhibit 14" 46:21-47:2).

112.  Forcing the door open was forcing a confrontation with Mr. Williams. (Papi deposition "Exhibit 7" 47:5-8; Roberts deposition "Exhibit 8" 49:16-18; Flynn deposition "Exhibit 14" 48:3-6).

113.  Papi had formed a belief before the door was even opened that the situation was not going to end "easily" or with Mr. Williams voluntarily surrendering.  (Papi deposition "Exhibit 7" 47:2-16).

114.  Papi had his gun in the "high ready" position, pointing it directly in front of him with both hands, almost immediately upon entering the room.  (Papi deposition "Exhibit 7" 58:21-59:8).

115.  Non-Defendant Trooper Flynn testified that he did not believe there was a need to rush to open the bedroom door.  Mr. Williams was alone in the residence, as far as they knew there were no weapons in the residence and Mr. Williams was contained.  Because he was confined in the bedroom, there was no rush.  (Flynn deposition "Exhibit 14" 47:11-48:16).

Miller's Failure to Control the Scene Rendered Him Powerless
to Stop the Other Defendant Officers From Using Force

116.  Entry into the home and forced entry into the bedroom was not discussed or authorized by Miller, the law enforcement defendant in charge.  But Miller did not feel he was in a position to prevent other defendants from forcibly entering the room because other defendants were taking it upon themselves to do whatever they thought they needed to do without receiving any commands.  Miller felt like there was no way to stop what the other officers were doing.  Entry into the

home and bedroom was "off-plan." (Miller deposition "Exhibit 4"

48:24-51:12).

When Defendants Forced Open the Door
Even Though There Was No Need to Do So,
They Found Mr. Williams in Possession of a Fireplace Poker

117. When the bedroom door was forced open, law enforcement officers

found Mr. Williams in possession of a fireplace poker which he was

moving in front of his body.

a. Miller testified that Mr. Williams was moving the poker in a

figure-eight motion horizontally at about chest level. (Miller

deposition "Exhibit 4" 54:13-55:2);

b. Profka testified that Mr. Williams was moving the poker at

shoulder-level, back and forth, in a slashing motion. (Profka

deposition "Exhibit 6" 51:19-52:18);

c. Papi testified that Mr. Williams was swinging the poker wildly at

chest level, over his head, in all directions in slashing

movements. (Papi deposition "Exhibit 7" 52:20-53:3);

d. Roberts testified that Mr. Williams was waving the poker in a

horizontal figure-eight motion at upper chest level "to keep

people back." (Roberts deposition "Exhibit 8" 54:1-25);

e.  Ely testified that Mr. Williams was standing on the bed, swinging the poker from right to left down across his body.  (Ely deposition "Exhibit 9" 69:24-71:25);

f.  Hardy testified that Mr. Williams was swinging the poker back and forth and up and down all over in front of his body.  (Hardy deposition "Exhibit 11" 76:1-77:19); and

g.  Olszewski testified that Mr. Williams was coming down across the front of his body in a slicing motion and then going back up with the poker.  (Olszewski deposition "Exhibit 12" 47:15-48:19).

Predictably Force, Including Deadly Force, Was Used on Mr. Williams

118.  Several law enforcement defendants used force on Mr. Williams, shooting him multiple times with tasers. (Miller deposition "Exhibit 4" 55:3-6; Profka deposition "Exhibit 6" 52:23-53:2; Papi deposition "Exhibit 7" 54:11-21; Roberts deposition "Exhibit 8" 52:1-9, 55:2-56:12; Ely deposition "Exhibit 9" 70:3-18; Kreig deposition "Exhibit 10" 55:2-12; Hardy deposition "Exhibit 11" 73:16-74:16; Olszewski deposition "Exhibit 12" 49:23-50:23).

119. After being shot with tasers Mr. Williams was still moving the poker in a figure-eight motion horizontally at chest level. (Miller deposition "Exhibit 4" 54:13-55:11).

120. Some defendants testified that Mr. Williams changed the poker's position in his hand.

    a.    Miller testified that Mr. Williams was holding the poker with his arm in an "L" shape holding his fist to the ceiling. (Miller deposition "Exhibit 4" 56:18-57:7);

    b.    Papi testified that Mr. Williams was holding the poker by the handle, holding it vertically, extended almost fully above his head. (Papi deposition "Exhibit 7" 55:11-56:23);

    c.    Roberts testified that Mr. Williams now was holding the poker at a 90 degree angle like a spear with the point of the poker pointing at himself and/or Papi. (Roberts deposition "Exhibit 8" 56:22-57:13); and

    d.    Hardy testified that Mr. Williams moved his arm directly up behind him and started to lean forward and come forward at the same time in a straight manner. (Hardy deposition "Exhibit 11" 80:4-12).

121. Papi shot Mr. Williams twice with his firearm, killing Mr. Williams. (Papi deposition "Exhibit 7" 58:21-62:4).

122. Papi used a .45 caliber handgun to shoot and kill Mr. Williams. After the first shot, the gun takes a moment to chamber the next bullet. (Papi deposition "Exhibit 7" 61:9-18).

123. Papi did not warn Mr. Williams before he shot and killed him. (Papi deposition "Exhibit 7" 58:18-20).

Law Enforcement Defendants Spent Just Over Two Hours
At Mr. Williams' Home Before He Was Shot and Killed and Much of That
Time Was Spent Waiting for the 302 Civil Commitment Warrant

124. The initial call regarding Mr. Williams came into Overfield Township from 911 at 1:40 p.m. (Miller deposition "Exhibit 4" 14:17-15:5).

125. For the first 45 minutes to an hour on scene, defendant law enforcement officers did not possess any mental health warrant to take Mr. Williams into custody. (Profka deposition "Exhibit 6" 33:5-9).

126. Miller called Chief Fisher shortly after Papi shot Mr. Williams. This phone call was received at around 3:50 p.m. (Miller deposition "Exhibit 4" 60:12-16; Fisher deposition "Exhibit 5" 36:4-37:2).

127. It was a very short amount of time between the time the officers entered the home and the time Mr. Williams was shot and killed.

a. Papi testified that it was a "short period of time . . . I'd say minutes." (Papi deposition "Exhibit 7" 61:22-62:4);

b. Ely testified that it was "under five minutes, maybe shorter." (Ely deposition "Exhibit 9" 77:17-21); and

c. Corporal Dunleavy testified that it was "a minute, give or take." (Dunleavy deposition "Exhibit 13" 55:11-15).

Most Defendant Officers Had No Prior Experience
In a Deadly Force Situation

128. Defendants Miller, Kreig, Hardy, Ely, Roberts, and Papi had never been in a situation where they used deadly force before, nor had they been involved in any prior situation where any other officer used deadly force. (Miller deposition "Exhibit 4" 64:3-14; Kreig deposition "Exhibit 10" 61:22-62:3; Hardy deposition "Exhibit 11" 93:5-11; Ely deposition "Exhibit 9" 83:1-12; Roberts deposition "Exhibit 8" 64:24-65:4; Papi deposition "Exhibit 7" 66:16-23).

Papi, Mr. Williams' Killer, Was Insubordinate

129. Papi's role was to guard the perimeter of the house and make sure Mr. Williams did not come out the front door. (Papi deposition "Exhibit 7" 21:13-17; Miller deposition "Exhibit 4" 28:18-24, 43:8-11; Roberts deposition "Exhibit 8" 32:21-24; Ely deposition "Exhibit 9" 45:15-46:3, 53:1-3; Dunleavy deposition "Exhibit 13" 43:19-24).

130. Papi was not instructed by Miller to even enter the home. (Miller deposition "Exhibit 4" 43:8-23).

131. Papi testified that nobody told him to enter the house and nobody told him he was supposed to go in with the front door officers. (Papi deposition "Exhibit 7" 21:18-22:23).

132. Papi unilaterally designated himself the "lethal cover officer." (Papi deposition "Exhibit 7" 38:18-40:11).

133. Miller, who was in charge, did not tell Papi to be the "lethal cover" officer. (Miller deposition "Exhibit 4" 43:4-44:1; Papi deposition "Exhibit 7" 40:7-11).

134. The defendant in charge, Miller, testified that there actually was no "lethal cover" officer. (Miller deposition "Exhibit 4" 43:4-7).

135. Corporal Dunleavy also testified that there was no designated "lethal cover" officer. (Dunleavy deposition "Exhibit 13" 43:2-18).

136. Papi's chief, defendant Ely, did not tell Papi to be the "lethal cover" officer. (Papi deposition "Exhibit 7" 39:23-40:2).

137. Defendant Roberts testified that Kreig was the "lethal cover" officer. (Roberts deposition "Exhibit 8" 39:19-24).

No Defendant Except Papi Was Prepared to Use Deadly Force

138. Except Papi, no other law enforcement officer drew a firearm inside the home.

    a.    Miller had a gun and handcuffs with him but only took out his handcuffs. (Miller deposition "Exhibit 4" 51:21-52:8);

    b.    Profka had a .40 caliber Glock handgun and a Taser but did not feel the need to take out either weapon while in the home. (Profka deposition "Exhibit 6" 56:13, 59:18);

    c.    Roberts only had the shield when he entered the bedroom. At some point, Roberts reached for his firearm but did not draw it. (Roberts deposition "Exhibit 8" 68:2-12);

    d.    Ely had a firearm with him but did not draw it. (Ely deposition "Exhibit 9" 77:10-16);

    e.    Kreig had his Taser drawn. (Kreig deposition "Exhibit 10" 53:25-54:4);

    f.    Hardy had a baton, a .40 caliber Glock firearm, handcuffs and a Taser. He did not unholster his firearm and chose to have his Taser out. (Hardy deposition "Exhibit 11" 72:14-73:15);

g. Olszewski had a .40 caliber Glock firearm and handcuffs. He did not draw his handgun. (Olszewski deposition "Exhibit 12" 37:13-38:4);

h. Corporal Dunleavy had his Taser out initially. He holstered it as soon as the team went in and Mr. Williams retreated into the home. From that point on, Corporal Dunleavy displayed no weapons. (Dunleavy deposition "Exhibit 13" 37:16, 48:19-49:3);

i. Trooper Flynn did not arm himself with any weapon at any point in this encounter because he didn't feel he needed to. (Flynn deposition "Exhibit 14" 47:3-10); and

j. Trooper Lopez testified that although he initially entered the home with his firearm for cover, he transitioned down to his Taser when he descended downstairs. When hearing that Mr. Williams was in possession of a poker, he again de-escalated and transitioned to his ASP baton. (Lopez deposition "Exhibit 15" 34:19-36:5).

Expert Opinions of Dr. Lyman

139. Michael D. Lyman, Ph.D. ("Dr. Lyman") is a police procedures expert who authored a report at plaintiff's request on August 6, 2015. (Lyman report "Exhibit 17").

140. Dr. Lyman provided a declaration stating that his expert report is true and correct. (Lyman declaration "Exhibit 18").

141. Dr. Lyman formed several opinions and sub-opinions relating to the facts giving rise to the instant motion:

   a. Defendant officers needlessly escalated their encounter with Mr. Williams by ignoring nationally recognized police practices and procedures for dealing with barricaded persons and persons who are mentally ill or experiencing a personal crisis. (Lyman report "Exhibit 17" p. 9);

      1. Defendant officers needlessly escalated their encounter with Mr. Williams by taking actions that were contrary to calming the situation. (Lyman report "Exhibit 17" p. 15);

      2. Defendant officers failed to utilize available resources that would have likely resulted in a peaceful resolution to their encounter with Mr. Williams. (Lyman report "Exhibit 17" p. 15);

      3. Defendant officers unnecessarily escalated the encounter with Mr. Williams by entering his residence. (Lyman report "Exhibit 17" p. 17); and

4. Defendant officers unnecessarily escalated the encounter with Mr. Williams by forcefully entering the downstairs bedroom where Mr. Williams was located. (Lyman report "Exhibit 17" p. 17).

b. Chiefs Fisher, Ely, Kreig, Olszewski and Corporal Miller failed to provide proper supervision and direction to the field operation that resulted in the shooting death of Mr. Williams. (Lyman report "Exhibit 17" p. 18);

1. Miller, who was in charge of the scene, ignored his duty and responsibility to provide supervisory oversight. (Lyman report "Exhibit 17" p. 18);

2. Fisher, the Chief of Overfield Township where this incident occurred and who chose to remain at home, ignored his duty and responsibility to provide supervisory oversight. (Lyman report "Exhibit 17" p. 20);

3. Ely, Kreig and Olszewski ignored their responsibility to properly supervise their own subordinates. (Lyman report "Exhibit 17" p. 21);

4. Miller and the participating chiefs failed to formulate a reasonable and properly coordinated plan in which all

officers were aware of their individual roles.  (Lyman

report "Exhibit 17" p. 22);

c.    The forceful entry into Mr. Williams' bedroom by defendant

officers and the subsequent use of deadly force against him by

Papi was unnecessary, avoidable and unreasonable.  (Lyman

report "Exhibit 17" p. 24); and

d.    Overfield Township, Tunkhannock Township, Tunkhannock

Borough and Meshoppen Borough chose not to establish

written directives dealing with mentally ill persons, barricaded

suspects or compliance with the ADA and RA as they relate to

field operations dealing with persons experiencing a mental

health crisis.  Failure on the part of the municipalities to do so

not only deprived Mr. Williams of his rights under the ADA and

RA, but resulted in a deadly force situation that was completely

avoidable.  (Lyman report "Exhibit 17" p. 32).

Respectfully Submitted,
S/  Shelley L. Centini, Esq.
S/ Barry H. Dyller, Esq.
DYLLER LAW FIRM
Attorneys for Plaintiff
88 North Franklin Street
Wilkes-Barre, PA  18701
(570) 829-4860
