UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA


MELINDA WILLIAMS,                          :
as Administrator of the Estate of
BRIAN P. WILLIAMS,                         :

     Plaintiff

                             :     CIVIL ACTION–LAW

     V.

                             :

MARK PAPI, ROBERT ROBERTS,
STANLEY ELY, PAUL MILLER,                  :
TERRANCE FISHER, SLADE PROFKA,
JOHN KREIG, ROGER HARDY,
WILLIAM OLSZEWSKI,                         :
TUNKHANNOCK TOWNSHIP,
OVERFIELD TOWNSHIP,
TUNKHANNOCK BOROUGH, AND                   :
MESHOPPEN BOROUGH,

                             :     **JURY TRIAL DEMANDED**

     Defendants              :     No: 3:CV-13-1551

### **PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS (DOC. 73)[1]**

Plaintiff hereby submits her response to defendants' Statement of

Material Facts ("SOF") in support of defendants' Motion for Summary

Judgment.

    1.     Admitted.

---

[1] Many of defendants' purported "facts" are in dispute or are irrelevant to the issues in this case. The truly undisputed and material facts relating to this case can be found in plaintiff's Statement of Facts ("SOF") supporting her partial summary judgment motion, which plaintiff incorporates. (Doc. 79).

2.     Admitted in part, disputed in part.  It is admitted that plaintiff Melinda Williams told her husband Brian Williams ("Mr. Williams") she thought their marriage was done.  It is disputed that Melinda Williams testified that she told Mr. Williams this on November 7, 2012.  (M. Williams Deposition, Defendants' Exhibit 1, 11:6-13).  To the contrary, Mr. Williams' mother, Shirley Williams, testified that Melinda told Mr. Williams their marriage was done "a couple of weeks before" the appointment on November 7, 2012.  (S. Williams Deposition, Defendants' Exhibit 3, 9:21-10:7).

It is admitted that Shirley Williams described Mr. Williams as "crying and shaking" at one point before his counseling appointment on November 7, 2012.  However, it is disputed that Mr. Williams remained in this state throughout the day, or was "crying and shaking" during his encounter with the defendants.  No defendant described Mr. Williams as "crying and shaking" when they encountered him at his home.

3.     Admitted.

4.     Disputed.  While Mr. Williams' psychiatrist, Rakesh Sharma, M.D. ("Dr. Sharma") testified as stated in this paragraph of defendants' SOF, Shirley Williams testified that she also was present throughout the counseling session between Dr. Sharma and Mr. Williams.  (S. Williams

Deposition, Defendants' Exhibit 3, 6:5-7).  Shirley Williams testified that Mr. Williams told Dr. Sharma he was having thoughts that "someone" is going to die and is going to be put "six feet under."  When Dr. Sharma asked Mr. Williams who is going to die, Mr. Williams told Dr. Sharma "I do not know, it's just these thoughts and dreams I'm having."  Mr. Williams then asked Dr. Sharma to change his medication and Dr. Sharma refused.  (S. Williams Deposition, Defendants' Exhibit 3, 7:1-12).

Melinda Williams asked Mr. Williams if he had threatened to kill her during the session. Mr. Williams replied, "No, I would never do that.  I'm trying to get you back not hurt you."  (M. Williams' Deposition, Defendants' Exhibit 1, 13:25-15:5).

5.      Disputed.  Dr. Sharma did not testify that he recommended Mr. Williams enter inpatient psychiatric treatment for his "homicidal mindset" or that he made "earnest entreaties" for Mr. Williams to enter treatment. Instead, Dr. Sharma testified that he suggested Mr. Williams go back into the hospital because of a risk assessment wherein Mr. Williams' supposed threats towards his wife, obsessive thinking, legal separation papers, a note, and a supposed physical incident with Melinda Williams were factors Dr. Sharma considered.  (Sharma Deposition, Defendants' Exhibit 2, 42:2-24).

Plaintiff further disputes that Mr. Williams made any threats towards Melinda Williams and disputes that there was ever any incident wherein Mr. Williams grabbed Melinda Williams by the throat.  (M. Williams Declaration, Plaintiff's Exhibit 1).

Shirley Williams testified that Mr. Williams told Dr. Sharma he was having thoughts that "someone" is going to die and is going to be put "six feet under."  When Dr. Sharma asked Mr. Williams who is going to die, Mr. Williams told Dr. Sharma "I do not know, it's just these thoughts and dreams I'm having."  Mr. Williams then asked Dr. Sharma to change his medication and Dr. Sharma refused.  (S. Williams Deposition, Defendants' Exhibit 3, 7:1-12).

Melinda Williams asked Mr. Williams if he had threatened to kill her during the session. Mr. Williams replied, "No, I would never do that.  I'm trying to get you back not hurt you."  (M. Williams' Deposition, Defendants' Exhibit 1, 13:25-15:5).

Further, the 302 petition completed by Dr. Sharma states that he requested Mr. Williams' involuntary commitment because he deemed Mr. Williams "severely mentally disabled."  (302 Petition, Defendants' Exhibit 19).

6.     Disputed.  Dr. Sharma did not testify that he explained or discussed the factors he used in his risk assessment with Mr. Williams at all.  The testimony to which defendants refer does not support such a proposition.

7.     Disputed.  Shirley Williams, who was present throughout the counseling session between Dr. Sharma and Mr. Williams, testified that when Dr. Sharma suggested that Mr. Williams enter the hospital, Mr. Williams asked Dr. Sharma to change his medication and stated he cannot go into the hospital because he has a job, a family to take care of and bills to pay.  (S. Williams Deposition, Defendants' Exhibit 3, 7:11-20).  It is further disputed that Paul Williams testified as alleged by defendants relating to this topic, or that the testimony to which defendants refer supports such a proposition.

8.     Admitted.

9.     Admitted in part, disputed in part.  It is admitted that Dr. Sharma testified that he possessed information that Mr. Williams was a clear and present danger to others or that within the last 30 days he inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that the conduct would be repeated.  Dr. Sharma testified that the information he possessed was Mr. Williams'

report that he grabbed Melinda Williams by the throat and he expressed thoughts of harming his wife and said if she leaves, she will be six feet under.  Also, Dr. Sharma believed Mr. Williams was depressed.  (Sharma Deposition, Defendants' Exhibit 2, 46:21-47:7).

However, this information Dr. Sharma possessed is disputed. Shirley Williams testified that Mr. Williams told Dr. Sharma he was having thoughts that "someone" is going to die and is going to be put "six feet under."  When Dr. Sharma asked Mr. Williams who is going to die, Mr. Williams told Dr. Sharma "I do not know, it's just these thoughts and dreams I'm having."  Mr. Williams then asked Dr. Sharma to change his medication and Dr. Sharma refused.  (S. Williams Deposition, Defendants' Exhibit 3, 7:1-12).

Melinda Williams states that there was never an incident where Mr. Williams grabbed her by the throat.  (M. Williams Declaration, Plaintiff's Exhibit 1).

Melinda Williams asked Mr. Williams if he had threatened to kill her during the session. Mr. Williams replied, "No, I would never do that.  I'm trying to get you back not hurt you."  (M. Williams' Deposition, Defendants' Exhibit 1, 13:25-15:5).

The 302 petition completed by Dr. Sharma does state that he believed Mr. Williams was a "clear and present danger to others;" however, Dr. Sharma's belief was one factor supporting Dr. Sharma's ultimate conclusion that Mr. Williams was "severely mentally disabled." (302 Petition, Defendants' Exhibit 19).

10.     Admitted in part, disputed in part. It is admitted only that Mr. Black personally delivered the 302 civil commitment warrant for Mr. Williams to the defendant officers on the scene. (Black Deposition, Plaintiff's Exhibit 3, 6:10, 46:12-47:16, 89:20-22, 91:5-12; Profka Depositon, Defendants' Exhibit 5, 32:23-34:11). Mr. Black simply handed police the 302 petition and left. Mr. Black does not recall any dialogue between himself and police about the situation with Mr. Williams. (Black Deposition, Plaintiff's Exhibit 3, 91:13-24).

It is admitted that Mr. Black and a police officer contacted Melinda Williams and left messages for her informing her that Mr. Williams threatened her and advising her not to go home. It is disputed that Melinda Williams testified that anyone told her she should not go home "until [Mr. Williams] had been secured."

Admitted in part, disputed in part. It is admitted that Mr. Williams returned home to 1246 State Route 307, Factoryville, in Overfield Township, PA after his counseling session. It is also admitted that Mr. Williams resided at his home with his wife and two of his three children. It is disputed that Mr. Williams "stormed" out of the counseling session, or that plaintiff's Amended Complaint avers such a fact.

10.[2]    Admitted in part, disputed in part. It is admitted that on November 7, 2012, Profka was an on-duty police officer in Overfield Township and that he testified as stated in this paragraph. However, plaintiff disputes that Mr. Williams actually threatened to "go home and kill his wife" during the counseling appointment.

To the contrary, Shirley Williams testified that Mr. Williams told Dr. Sharma he was having thoughts that "someone" is going to die and is going to be put "six feet under." When Dr. Sharma asked Mr. Williams who is going to die, Mr. Williams told Dr. Sharma "I do not know, it's just these thoughts and dreams I'm having." Mr. Williams then asked Dr. Sharma to change his medication and Dr. Sharma refused. (S. Williams Deposition, Defendants' Exhibit 3, 7:1-12).

---

[2] This paragraph and those following are misnumbered in defendants' SOF. Plaintiff follows defendants' misnumbering for ease of reference.

Melinda Williams asked Mr. Williams if he had threatened to kill her during the session. Mr. Williams replied, "No, I would never do that. I'm trying to get you back not hurt you." (M. Williams' Deposition, Defendants' Exhibit 1, 13:25-15:5).

11.     Disputed. A police officer called Melinda Williams and left her a message. When she returned the call, the police officer told her Mr. Williams had threatened her and not to come home. (M. Williams Deposition, Defendants' Exhibit 1, 12:5-13:3). Melinda Williams did not go directly home. She went to the firehouse which is located near her home. (M. Williams Deposition, Defendants' Exhibit 1, 13:6-8). Subsequently, police requested that Melinda Williams come closer to the home and call Mr. Williams to ask him to come out of the house. (M. Williams Deposition, Defendants' Exhibit 1, 16:4-17:5).

12.     Admitted in part, disputed in part. It is admitted that Miller was working for Overfield Township police department. It is admitted that when Miller first arrived at Mr. Williams' home, he saw Mr. Williams walking up his driveway and yelled to him, "Hey, Brian." Mr. Williams ignored Miller and went into his residence. (Miller Deposition, Defendants' Exhibit 6, 20:16-21:1). However, Profka testified that he did not see Mr. Williams outside his home, did not hear Miller speak with Mr. Williams and did not

knock on the front door. (Profka Deposition, Defendants' Exhibit 5, 23:18-25).

It is admitted that Miller and Profka were the first officers on the scene.

It is disputed that Miller was the "commanding officer" on the scene throughout the incident. Although Miller should have been in command, all law enforcement officer defendants, except for Miller himself, viewed Miller as being in charge of the scene. (Profka Deposition, Defendants' Exhibit 5, 31:15-21; Papi Deposition, Defendants' Exhibit 9, 17:5-18:2; Ely Deposition, Defendants' Exhibit 8, 20:13-25; Kreig Deposition, Defendants' Exhibit 11, 21:20-24; Hardy Deposition, Defendants' Exhibit 13, 28:3-9; Olszewski Deposition, Defendants' Exhibit 12, 11:20-12:17).

Miller felt that no one person was in charge and they were all running the scene "together." (Miller Deposition, Defendants' Exhibit 6, 18:3-18).

Miller knew he was "in over his head" regarding this incident and asked Ely to "help him out." (Miller Deposition, Defendants' Exhibit 6, 18:10-18).

13.      Admitted in part, disputed in part.  This paragraph is admitted, except for the statement that Paul Williams "approached the unlocked door and spoke with Williams."  Paul Williams, Mr. Williams' father, testified that he went inside Mr. Williams' home and spoke with Mr. Williams inside of the home, not at the door.  (P. Williams Deposition, Defendants' Exhibit 4, 10:19-25).

14.      Admitted.

15.       Admitted in part, disputed in part.  This paragraph is admitted, except for the statement that Paul Williams informed the police that Mr. Williams told him, "There's no way I'm coming out without a problem."  Paul Williams did not testify that Mr. Williams said this to him or that he informed defendants that Mr. Williams made this statement.

16.      Admitted in part, disputed in part.  It is admitted that Paul Williams and Fisher had a conversation on the phone.

It is disputed that Fisher was "off-duty and unable to be present." Fisher was Chief of Overfield Township, was friends with Mr. Williams and already had an established rapport with him. Yet Fisher chose not to come to the scene until after Mr. Williams was shot dead.  (Fisher Deposition, Defendants' Exhibit 7, 35:18-37:5).

Miller (Fisher's subordinate) had only been working for Overfield Township for three or four years at the time, had never been on a scene where deadly force was used, it was the first time he had been involved in something "like this," and he was in "over his head" during this incident.  (Miller Deposition, Defendants' Exhibit 6, 17:10-11, 60:13-14, 64:3-22).

Miller thought Chief Fisher would come to the scene.  (Miller Deposition, Defendants' Exhibit 6, 13:20-14:8). Other defendant chiefs on the scene thought Fisher should have been there. (Ely Deposition, Defendants' Exhibit 8, 19:1-20:6; Kreig Deposition, Defendants' Exhibit 11, 32:3-33-17; Olszewski Deposition, Defendants' Exhibit 12, 20:1-21:5).

It is further disputed that Paul Williams told Fisher that Mr. Williams  "was very upset, and he was not going to come out of the house." Paul Williams did not testify as such during his deposition.

17.     Admitted in part, disputed in part.  It is admitted that approximately 10-15 minutes later, Paul Williams approached Mr. Williams' home a third and final time and found the door locked.

It is disputed that Mr. Williams "would not admit him to the home."  There is no testimony in the record that Paul Williams and Mr. Williams had any discussion wherein Mr. Williams refused Paul Williams' request to enter.

18.     Admitted in part, disputed in part.  It is admitted that Mr. Williams and Fisher spoke on the phone.  However, the statements in this paragraph do not accurately summarize the conversation Fisher had with Mr. Williams on the phone.

In reference to the mental health warrant, Mr. Williams told Fisher he is not going.  (Fisher Deposition, Defendants' Exhibit 7, 31:25-32:8).

Mr. Williams' demeanor when talking to Fisher was calm and matter-of-fact.  Mr. Williams was not crying, screaming or yelling.  (Fisher Deposition, Defendants' Exhibit 7, 32:16-33:1).

Mr. Williams made no threats to Fisher, to the police, or to anybody during the conversation with Fisher.  (Fisher Deposition Defendants' Exhibit 7, 32:9-15).

Fisher told Mr. Williams, "You know what is going to happen. You need to go."  (Fisher Deposition, Defendants' Exhibit 7, 33:2-8).  Mr. Williams then terminated the conversation.  (Fisher Deposition, Defendants'

Exhibit 7, 33:2-10).

19.     Admitted in part, disputed in part.  It is admitted that Mr. Williams and Melinda Williams spoke on the phone.  However, the statements in this paragraph do not accurately summarize the conversation Melinda Williams had with Mr. Williams on the phone.

Mr. Williams stated to Melinda Williams that he told Dr. Sharma he needed different medications because of the dreams he was having. (M. Williams Deposition, Defendants' Exhibit 1, 14:11-14).

Melinda Williams asked Mr. Williams if he had threatened to kill her during the counseling session. Mr. Williams replied, "No, I would never do that.  I'm trying to get you back not hurt you."  (M. Williams' Deposition, Defendants' Exhibit 1, 13:25-15:5).

Mr. Williams said he did not want to go back to the hospital because he has a family to take care of.  (M. Williams' Deposition, Defendants' Exhibit 1, 15:15-17).

20.     Admitted in part, disputed in part.  It is admitted that defendants were informed that that Mr. Williams did not have any guns in the house. (Profka Deposition, Defendants' Exhibit 5, 26:2-22; Miller Deposition, Defendants' Exhibit 6, 27:1-5; Papi Deposition, Defendants' Exhibit 9, 27:14-19; Roberts Deposition, Defendants' Exhibit 10, 28:1-5; Ely

Deposition, Defendants' Exhibit 8, 36:4-9; Hardy Deposition, Defendants' Exhibit 13, 40:5-9).

It is disputed that defendants were unable to verify if Mr. Williams was armed or not and that he remained out of sight in the home. Defendant officers did not see Mr. Williams with any weapons prior to their entry into the home. (Profka Deposition, Defendants' Exhibit 5, 37:21-38:2; Ely Deposition, Defendants' Exhibit 8, 36:1-3; Olszewski Deposition, Defendants' Exhibit 12, 24:2-7).

Mr. Williams spoke with his father inside the home twice and Mr. Williams' father emerged unharmed. (Miller Deposition, Defendants' Exhibit 6, 22:15-23:24, 27:11-20;  Profka Deposition, Defendants' Exhibit 5, 24:5-26:1).

Mr. Williams spoke with family members and police on the phone and was not refusing to communicate. (Ely Deposition, Defendants' Exhibit 8, 23:10-24:13; Fisher Deposition, Defendants' Exhibit 7, 31:12-21; Dunleavy Deposition, Defendants' Exhibit 14, 26:16-17, 39:16-40:6).

Mr. Williams was preparing to emerge from the home by putting on boots and packing a bag. (Miller Deposition, Defendants' Exhibit 6, 23:9-17, 24:3-18; Profka Deposition, Defendants' Exhibit 5, 25:1-14).

Mr. Williams told both his wife and mother on the phone he was packing a bag and coming out and Shirley Williams told the defendants this a number of times. (M. Williams Deposition, Defendants' Exhibit 1, 20:25-21:2; S. Williams Deposition, Defendants' Exhibit 3, 11:23-13:13).

Additionally, Mr. Williams was clearly not "out of sight" while he was engaging in three in-person conversations through a basement door with Ely prior to and during the defendants' entry into his home. (Ely Deposition, Defendants' Exhibit 8, 25:11-26:20, 41:13-20, 53:6-22).

It was "verified" that Mr. Williams was not armed because Ely testified that Mr. Williams did not possess a weapon while speaking with him at the basement door. (Ely Deposition, Defendants' Exhibit 8, 54:17-20). During the conversations between Ely and Mr. Williams, it didn't seem like anyone was "in any threat." (Flynn Deposition, Defendants' Exhibit 16, 34:20-35:2).

21. Disputed. Non-defendant Corporal Dunleavy testified that he was advised that Mr. Williams' father had removed weapons from Mr. Williams' house in the past, and that he was concerned Mr. Williams could have brought the weapons back into the home in between the time they were removed and the day of this incident. (Dunleavy Deposition, Defendants' Exhibit 14, 19:18-20:12).

Despite that concern, Mr. Williams was not in possession of any weapons, was not a threat to anyone and was communicating with police and others.  *See* Response to Defendants' SOF at ¶ 20, *supra*.

22.     Admitted.

23.     Admitted in part, disputed in part.  It is admitted that additional law enforcement officers arrived (including Dunleavy, Olszewski, and Hardy) and Miller briefed them about what was going on and the defendants set up a perimeter around the home.

It is disputed that the purpose of the perimeter was to "monitor" Mr. Williams' "whereabouts."  Rather, the purpose of the perimeter was to contain Mr. Williams in the home and apprehend him if he came out.

(Profka Deposition, Defendants' Exhibit 5, 28:15-23).

24.     Admitted in part, disputed in part.  Roberts and Profka saw Mr. Williams emerge from the back door of his home.  Roberts testified that Mr. Williams was carrying an unknown square red object in his hand.  When Roberts yelled at Mr. Williams to stop, Mr. Williams looked at Roberts, turned and ran back into the house.  (Roberts Deposition, Defendants' Exhibit 10, 21:21-23:11; Profka Deposition, Defendants' Exhibit 5, 38:15-39:20).

Defendants' characterization of this event as an attempt by Mr. Williams to "sneak" out of the house is disputed.

25.    Admitted in part, disputed in part.  It is admitted that Mr. Williams' four dogs were loose outside during this incident.  It is disputed that the police did not spray the dogs with pepper spray.

Melinda Williams testified that she observed officers running around chasing her dogs and spraying them with pepper spray.  (M. Williams Deposition, Defendants' Exhibit 1, 19:20-20:5).  Melinda Williams testified that Mr. Williams was screaming at the officers to stop spraying the dogs.  (M. Williams Deposition, Defendants' Exhibit 1, 27:24-28:1).

Shirley Williams testified that she observed officers spray the dogs with pepper spray three times.  (S. Williams Deposition, Defendants' Exhibit 3, 15:24-16:4).

26.    Admitted.

27.    Admitted in part, disputed in part.  It is admitted that Melinda Williams testified that she spoke with Mr. Williams three or four additional times on the phone.  Miller and Ely wanted her to make the calls.

However, the statements in this paragraph do not accurately summarize the conversations between Mr. Williams and Melinda Williams.

During the phone calls, Mr. Williams denied making threats regarding Melinda Williams during the counseling session, stated he did not want to go back to the hospital because he wanted to take care of his family and that he wanted to have his medication changed. During the last call, Mr. Williams said he had a bag packed and was coming out of the house because he wanted to stay with his mom and dad. (M. Williams Deposition, Defendants' Exhibit 1, 19:2-7; 20:14-21:2).

28. Admitted in part, disputed in part. It is admitted that the mental health warrant arrived approximately 45 minutes to an hour after the first officers arrived on the scene. It is admitted only that the other defendants and the non-defendant Pennsylvania State Police troopers also arrived.

It is disputed that Ely arrived after the warrant. At the time the warrant arrived, Ely was already at the scene. (Profka Deposition, Defendants' Exhibit 5, 32:13-33:9). Ely arrived around the same time as Hardy and Olszewski. Miller, Profka, Roberts and Papi were already at the scene. (Hardy Deposition, Defendants' Exhibit 13, 32:19-33:21).

29. Admitted in part, disputed in part. It is admitted that Melinda Williams testified that she provided the defendants with a key to the front door of the house. Melinda Williams did not testify that she provided a

drawing of the floorplan of the home during her deposition, as is alleged by the defendants. (M. Williams Deposition, Defendants' Exhibit 1, 21:15-17).

30.    Admitted in part, disputed in part. It is admitted that Ely testified as summarized in this paragraph. However, plaintiff disputes Ely's testimony regarding Melinda Williams' conversation on the phone with Mr. Williams.

Melinda Williams testified that during the phone calls, Mr. Williams denied making threats regarding Melinda Williams during the counseling session, stated he did not want to go back to the hospital because he wanted to take care of his family and that he wanted to have his medication changed. During the last call, Mr. Williams said he had a bag packed and was coming out of the house because he wanted to stay with his mom and dad. (M. Williams Deposition, Defendants' Exhibit 1, 19:2-7; 20:14-21:2).

Plaintiff disputes that Melinda Williams "berated" her husband during any of these phone calls. Miller and Ely wanted Melinda Williams to make these phone calls and stood next to her during the calls. (M. Williams Deposition, Defendants' Exhibit 1, 19:3-7).

31.     Admitted in part, disputed in part.  Mr. Williams had three conversations through a basement door with Ely, in-person, before police entered the home. (Ely Deposition, Defendants' Exhibit 8, 25:11-26:20, 41:13-20, 53:6-22).  It is disputed the door was "cracked" open slightly.  Mr. Williams had the door open about 8-10 inches while speaking with Ely. (Ely Deposition, Defendants' Exhibit 8, 25:11-26:1, 41:13-16, 53:6-22).

It is admitted that Mr. Williams was approximately 15 feet away from Ely during these discussions. It is admitted the conversation regarded the warrant and Mr. Williams going to the hospital.  It is also admitted that Mr. Williams requested he speak to his wife and mother, and assured Ely he would not hurt them.  However, Ely's characterization of the rest of the conversation between Mr. Williams and himself is disputed.

Profka, who was approximately 15 feet away from Ely and Mr. Williams as they were talking at the basement door, described Mr. Williams as calm, but adamant that he was not coming out.  (Profka Deposition, Defendants' Exhibit 5, 35:4-37:5).

Ely characterized Mr. Williams' demeanor during these conversations as "agitated."  (Ely Deposition, Defendants' Exhibit 8, 35:6-7, 42:13-15, 54:10-11).

Mr. Williams was not yelling or screaming at Ely during these conversations. (Profka Deposition, Defendants' Exhibit 5, 37:2-5).

Miller heard Mr. Williams and Ely talking at the basement door and thought it was "going pretty well" and that Ely had developed a rapport with Mr. Williams. (Miller Deposition, Defendants' Exhibit 6, 31:23-32:8).

Mr. Williams continued to request from Ely that he talk to his mother and wife. (Ely Deposition, Defendants' Exhibit 8, 26:11-13, 38:16-20, 40:21-41:1).

Ely was the one to break off the conversation with Mr. Williams during the first two conversations at the door. (Ely Deposition, Defendants' Exhibit 8, 35:5-11, 42:13-19).

The conversations between Ely and Mr. Williams lasted only a few minutes. (Ely Deposition, Defendants' Exhibit 8, 37:19-23, 53:23-54:9; Profka Deposition, Defendants' Exhibit 5, 38:3-12).

32. Admitted in part, disputed in part. It is admitted that Shirley Williams arrived at the scene around 2:20 p.m. It is admitted that Mr. Williams wanted to speak in-person with his wife, Melinda, and mother, Shirley. Melinda and Shirley Williams were both outside the home. Melinda and Shirley also requested to speak to Mr. Williams. However, the defendants denied Mr. Williams', Melinda's, and Shirley's requests. (Miller

Deposition, Defendants' Exhibit 6, 25:11-26:21, 29:11-15, 35:1-25; Profka Deposition, Defendants' Exhibit 5, 40:15-42:20; Papi Deposition, Defendants' Exhibit 9, 31:1-34:10; Roberts Deposition, Defendants' Exhibit 10, 20:17-21:1, 28:24-30:23; Ely Deposition, Defendants' Exhibit 8, 26:6-17, 28:16-29:5; Hardy Deposition, Defendants' Exhibit 13, 36:1-5, 38:13-16, 44:6-45:2; Olszewski Deposition, Defendants' Exhibit 12, 16:8-17:11, 17:20-18:13).

It is disputed that Miller was the "commanding officer" on the scene throughout the incident. Although Miller should have been in command, all law enforcement officer defendants, except for Miller himself, viewed Miller as being in charge of the scene. (Profka Deposition, Defendants' Exhibit 5, 31:15-21; Papi Deposition, Defendants' Exhibit 9, 17:5-18:2; Ely Deposition, Defendants' Exhibit 8, 20:13-25; Kreig Deposition, Defendants' Exhibit 11, 21:20-24; Hardy Deposition, Defendants' Exhibit 13, 28:3-9; Olszewski Deposition, Defendants' Exhibit 12, 11:20-12:17).

Miller felt that no one person was in charge and they were all running the scene "together." (Miller Deposition, Defendants' Exhibit 6, 18:3-18). Miller knew he was "in over his head" regarding this incident and asked Ely to "help him out." (Miller Deposition, Defendants' Exhibit 6,

18:10-18).

It is disputed that Mr. Williams' request to speak to his wife and mother and Melinda's and Shirley's requests to speak to Mr. Williams were declined in case Mr. Williams had a weapon or tried to make good on his threat to shoot Melinda.   Defendants were informed that Mr. Williams did not have any guns in the house.  (Profka Deposition, Defendants' Exhibit 5, 26:2-22; Miller Deposition, Defendants' Exhibit 6, 27:1-5; Papi Deposition, Defendants' Exhibit 9, 27:14-19; Roberts Deposition, Defendants' Exhibit 10, 28:1-5; Ely Deposition, Defendants' Exhibit 8, 36:4-9; Hardy Deposition, Defendants' Exhibit 13, 40:5-9).

Additionally, defendants did not see Mr. Williams with any weapons prior to their entry into the home.  (Profka Deposition, Defendants' Exhibit 5, 37:21-38:2; Ely Deposition, Defendants' Exhibit 8, 36:1-3; Olszewski Deposition, Defendants' Exhibit 12, 24:2-7).

Mr. Williams spoke with his father inside the home twice and Mr. Williams' father emerged unharmed.  (Miller Deposition, Defendants' Exhibit 6, 22:15-23:24, 27:11-20;  Profka Deposition, Defendants' Exhibit 5, 24:5-26:1).

Mr. Williams assured Ely he would not hurt his wife or mother. (Ely Deposition, Defendants' Exhibit 8, 31:8-16).

Mr. Williams did not ever threaten to shoot Melinda Williams. Shirley Williams testified that Mr. Williams told Dr. Sharma he was having thoughts that "someone" is going to die and is going to be put "six feet under." When Dr. Sharma asked Mr. Williams who is going to die, Mr. Williams told Dr. Sharma "I do not know, it's just these thoughts and dreams I'm having." Mr. Williams then asked Dr. Sharma to change his medication and Dr. Sharma refused. (S. Williams Deposition, Defendants' Exhibit 3, 7:1-12).

Melinda Williams asked Mr. Williams if he had threatened to kill her during the session. Mr. Williams replied, "No, I would never do that. I'm trying to get you back not hurt you." (M. Williams' Deposition, Defendants' Exhibit 1, 13:25-15:5).

33. Admitted in part, disputed in part. It is admitted that Ely's purpose in talking to Mr. Williams was to get him to leave the home peacefully. It is admitted that if Mr. Williams was refusing to leave the home it was because the defendants would not permit him to talk to his wife and mother. (Ely Deposition, Defendants' Exhibit 8, 26:11-20).

It is disputed that Mr. Williams refused to show Ely his hands. To the contrary, Mr. Williams was talking with Ely face-to-face, through an open door and was approximately 15 feet away from Ely. Mr. Williams had

the door open about 8-10 inches while speaking with Ely.  (Ely Deposition, Defendants' Exhibit 8, 25:11-26:1, 41:13-16, 53:6-22).

It is admitted that the first exchange between Ely and Mr. Williams ended in under five minutes.  It is disputed that the exchange ended because Mr. Williams was becoming agitated.  Both Profka and Miller also testified regarding Ely's exchange with Mr. Williams at the basement door.  While Ely characterized Mr. Williams as "agitated," Profka, who was approximately 15 feet away from Ely and Mr. Williams as they were talking at the basement door, described Mr. Williams as calm, but adamant that he was not coming out.  (Profka Deposition, Defendants' Exhibit 5, 35:4-37:5).

Mr. Williams was not yelling or screaming at Ely during these conversations.  (Profka Deposition, Defendants' Exhibit 5, 37:2-5).

Miller heard Mr. Williams and Ely talking at the basement door and thought it was "going pretty well" and that Ely had developed a rapport with Mr. Williams.  (Miller Deposition, Defendants' Exhibit 6, 31:23-32:8).

Mr. Williams did not break off either of the first two conversations with Ely at the basement door.  Instead, Ely was the one to break off the conversation with Mr. Williams during the first two

conversations at the door. (Ely Deposition, Defendants' Exhibit 8, 35:5-11, 42:13-19).

34. Admitted in part, disputed in part. It is admitted that non-defendant Dunleavy of the Pennsylvania State Police overheard Melinda Williams talking to Mr. Williams on the phone.

It is disputed that Melinda Williams was "arguing" with Mr. Williams or aggravating the situation.

Initially, Dunleavy testified several times that he does not recall what exactly he overheard between Melinda Williams and Mr. Williams on the phone; however, Dunleavy recalled Melinda Williams encouraging Mr. Williams to come out of the house. (Dunleavy Deposition, Defendants' Exhibit 14, 26:15-27:8).

Melinda Williams testified that Miller and Ely wanted her to call Mr. Williams and during the phone calls Mr. Williams denied making threats regarding Melinda Williams during the counseling session, stated he did not want to go back to the hospital because he wanted to take care of his family and that he wanted to have his medication changed. During the last call, Mr. Williams said he had a bag packed and was coming out of the house because he wanted to stay with his mom and dad. (M. Williams Deposition, Defendants' Exhibit 1, 19:2-7; 20:14-21:2).

It is admitted that Dunleavy also spoke to Mr. Williams on the phone. However, plaintiff disputes defendants' summary of the content of the conversation. Mr. Williams told Corporal Dunleavy that he would come out of the house as long as his wife would come up to the house. (Dunleavy Deposition, Defendants' Exhibit 14, 41:14-21). Dunleavy told Mr. Williams, "We can't do that." (Dunleavy Deposition, Defendants' Exhibit 14, 27:24). Dunleavy did not testify that he explained to Mr. Williams that Melinda Williams could not come to the driveway to talk to Mr. Williams due to "concerns over her personal safety" as is alleged by the defendants.

During the conversation with Dunleavy, Mr. Williams also expressed concern about how he was going to be able to move out of the home. (Dunleavy Deposition, Defendants' Exhibit 14, 27:25-28:1). Ultimately, Mr. Williams told Dunleavy that he enjoyed talking to Ely, and he would rather continue talking to Ely than Dunleavy. (Dunleavy Deposition, Exhibit 14, 39:16-40:6).

35. Admitted in part, disputed in part. Mr. Williams had three conversations through a basement door with Ely, in-person, before police entered the home. (Ely Deposition, Defendants' Exhibit 8, 25:11-26:20, 41:13-20, 53:6-22).

It is disputed the door was "cracked" and Mr. Williams would not show his hands. To the contrary, Mr. Williams was talking with Ely face-to-face, through an open door and was approximately 15 feet away from Ely. Mr. Williams had the door open about 8-10 inches while speaking with Ely. (Ely Deposition, Defendants' Exhibit 8, 25:11-26:1, 41:13-16, 53:6-22).

It is admitted that Mr. Williams requested he speak to his wife and mother.

It is disputed that Mr. Williams was a threat to his wife or mother's safety. To the contrary, Mr. Williams assured Ely he would not hurt his wife or mother. (Ely Deposition, Defendants' Exhibit 8, 31:8-16).

Additionally, defendants were informed that that Mr. Williams did not have any guns in the house. (Profka Deposition, Defendants' Exhibit 5, 26:2-22; Miller Deposition, Defendants' Exhibit 6, 27:1-5; Papi Deposition, Defendants' Exhibit 9, 27:14-19; Roberts Deposition, Defendants' Exhibit 10, 28:1-5; Ely Deposition, Defendants' Exhibit 8, 36:4-9; Hardy Deposition, Defendants' Exhibit 13, 40:5-9).

The defendants did not see Mr. Williams with any weapons prior to their entry into the home. (Profka Deposition, Defendants' Exhibit 5, 37:21-38:2; Ely Deposition, Defendants' Exhibit 8, 36:1-3; Olszewski Deposition, Defendants' Exhibit 12, 24:2-7).

Mr. Williams spoke with his father inside the home twice and Mr. Williams' father emerged unharmed.  (Miller Deposition, Defendants' Exhibit 6, 22:15-23:24, 27:11-20;  Profka Deposition, Defendants' Exhibit 5, 24:5-26:1).

36.    Disputed.   While Ely characterized Mr. Williams as "agitated," Profka, who was approximately 15 feet away from Ely and Mr. Williams as they were talking at the basement door, described Mr. Williams as calm, but adamant that he was not coming out.  (Profka Deposition, Defendants' Exhibit 5, 35:4-37:5).

Mr. Williams was not yelling or screaming at Ely during these conversations.  (Profka Deposition, Defendants' Exhibit 5, 37:2-5).

Miller heard Mr. Williams and Ely talking at the basement door and thought it was "going pretty well" and that Ely had developed a rapport with Mr. Williams.  (Miller Deposition, Defendants' Exhibit 6, 31:23-32:8).

Mr. Williams did not break off either of the first two conversations with Ely at the basement door.  Instead, Ely was the one to break off the conversation with Mr. Williams during the first two conversations at the door.  (Ely Deposition, Defendants' Exhibit 8, 35:5-11, 42:13-19).

37.     Admitted in part, disputed in part.  It is admitted that after the second conversation with Mr. Williams, Ely had a discussion with Miller.  It is disputed that three Pennsylvania State Police troopers (Dunleavy, Flynn, and Lopez) and defendants Kreig, Olszewski and Hardy arrived after the second conversation between Ely and Mr. Williams at the basement door.

None of these individuals testified that they arrived after Ely already had two conversations with Mr. Williams at the basement door, as is alleged by the defendant.  Dunleavy testified that when Pennsylvania State Police arrived, the municipal defendants were already there.  (Dunleavy Deposition, Defendants' Exhibit 14, 19:18-20:15).  Dunleavy did not testify that Ely had any discussions yet with Mr. Williams.  Kreig testified he saw Olszewski, Miller, Hardy, Ely, and possibly Roberts on the scene when he arrived.  (Kreig Deposition, Defendants' Exhibit 11, 23:7-13). Similarly, Kreig did not testify that Ely had any discussions yet with Mr. Williams.  Hardy testified he arrived with Olszewski and Miller, Profka, Roberts and Papi were already there.   Hardy further testified that Ely either arrived at the same time as he and Olszewski, or shortly thereafter.  (Hardy Deposition, Defendants' Exhibit 13, 32:19-33:21).

It is admitted that the defendants devised a "plan."  Even though Mr. Williams was contained and not a threat, defendants devised a

"plan" that was not universally understood and which involved the use of force and illegal entry into Mr. Williams' home. This is explained in detail in plaintiff's motion for partial summary judgment in her favor, and its supporting statement of facts and brief. (Docs. 77-79).

38.     Disputed. Papi testified he was stationed on the side of the house covering "two corners" of the home. (Papi Deposition, Defendants' Exhibit 9, 21:13-17). Papi did not testify he was covering a "back wall." Profka testified he was posted approximately 15 to 20 feet from the basement door of the home, watching and covering that door to make sure that if Mr. Williams came out he could grab him. (Profka Deposition, Defendants' Exhibit 5, 28:16-23).

39.     Admitted in part, disputed in part. It is admitted that the defendants discussed and rejected several options, including calling the Pennsylvania State Police Special Emergency Response Team ("SERT").[3] It is disputed that calling the SERT team was "rejected as futile." No defendant or other law enforcement officer on the scene testified in that manner. The possibility of calling the SERT team was rejected because defendants decided (without basis) that it would take too long for the SERT

---

[3] SERT is a team of troopers with extra training who can be called to come out to handle a situation in which law enforcement is responding to a high-risk incident such as a barricaded person or high-risk warrant service. (Dunleavy Deposition, Defendants' Exhibit 14, 8:8-18).

Team to arrive.  (Miller Deposition, Defendants' Exhibit 6, 36:22-37:4;

Profka Deposition, Defendants' Exhibit 5, 53:22-54:9; Roberts Deposition,

Defendants' Exhibit 10, 47:12-23; Ely Deposition, Defendants' Exhibit 8,

47:17-20).

It is further disputed that Dunleavy advised or instructed the

defendants that calling the SERT team would be "futile."  Again, no

defendant or other law enforcement officer on the scene testified in that

manner.   Ely testified that one of the State Police on the scene said it

could take up to four hours for a full SERT team to assemble.  (Ely

Deposition, Defendants' Exhibit 8, 48:25-49:11).

Dunleavy testified that when the issue of the SERT team arose,

he stated they would have to be certain that Mr. Williams did not want to

continue negotiations and barricaded himself, cutting off all communication.

Because Mr. Williams was still willing to talk and because the defendants

were "adamant" they could keep talking to him, the situation did not yet

meet the criteria to make the call to the SERT team.  (Dunleavy Deposition,

Defendants' Exhibit 14, 46:19-47:2).

Other options were available and not discussed.  Although

Miller knew there were SERT Team members located in Tunkhannock, he

did not think to call those members nor did he think to call a mental health

professional to assist, nor did he think to call a trained negotiator because his chief, Fisher, never provided training regarding those possibilities. (Miller Deposition, Defendants' Exhibit 6, 40:6-42:7). The SERT Team members in Tunkhannock were 8 miles from the scene. (Ely Deposition, Defendants' Exhibit 8, 47:21-48:6).

The State Police on the scene had policies, regulations, field operations guides and training on serving mental health warrants and dealing with barricaded individuals. However, the State Police on the scene were only asked to "assist" the defendant officers, not to take charge of the scene. (Dunleavy Deposition, Exhibit 14, 6:17-8:3; 18:22).

It is disputed that a determination was made that Ely's negotiations with Mr. Williams were also "futile." Again, no defendant testified in this manner. Mr. Williams spoke with family members and police on the phone and was not refusing to communicate. (Ely Deposition, Defendants' Exhibit 8, 23:10-24:13; Fisher Deposition, Defendants' Exhibit 7, 31:12-21; Dunleavy Deposition, Defendants' Exhibit 14, 26:16-17, 39:16-40:6).

It is also disputed that Mr. Williams was "out of sight" with the doors closed and the curtains drawn. Although Miller testified in this manner, Mr. Williams was clearly not "out of sight" while he was engaging

in three in-person conversations through a basement door with Ely prior to and during the defendants' entry into his home. (Ely Deposition, Defendants' Exhibit 8, 25:11-26:20, 41:13-20, 53:6-22). Mr. Williams did not possess a weapon while speaking with Ely at the basement door. (Ely Deposition, Defendants' Exhibit 8, 54:17-20). During the conversations between Ely and Mr. Williams, it didn't seem like anyone was "in any threat." (Flynn Deposition, Defendants' Exhibit 16, 34:20-35:2).

40.     Admitted in part, disputed in part. It is admitted only that defendants devised a "plan" which involved Ely again approaching Mr. Williams at the basement door and officers taking Mr. Williams into custody, using force if necessary. (Miller Deposition, Defendants' Exhibit 6, 37:11-19; Roberts Deposition, Defendants' Exhibit 10, 35:23-36:3; Ely Deposition, Defendants' Exhibit 8, 51:23-52:6; Hardy Deposition, Defendants' Exhibit 13, 48:15-23).

The details of the plan are disputed because no law enforcement officer on the scene had the same understanding of the details of the plan:

a.     Miller testified that his understanding of the plan was that Ely was to get Mr. Williams to the basement door again. A trooper was supposed to stand on the side of the

house.  When Mr. Williams came to the door, the law enforcement defendants were supposed to deploy a Taser.  A team was supposed to breach the front door, come down into the basement and take Mr. Williams into custody.  A "go" signal was supposed to be given to the front door officers by the basement door officers.  Miller assumed that the signal would only be given to the front door officers if Mr. Williams could not be tasered.  (Miller Deposition, Defendants' Exhibit 6, 37:11-38:16);

b.      Papi testified that either Hardy or Roberts explained to him that Ely and another officer were stationed on the opposite corner of the house.  If the front door officers were told to go in or were going in, then they were supposed to clear out the bedrooms in an attempt to locate Mr. Williams.  Papi did not know who was supposed to tell the front door officers to go in.  (Papi Deposition, Defendants' Exhibit 9, 37:14-38:11);

c.      Roberts testified that Ely would attempt to communicate with Mr. Williams.  During the communication, if Mr. Williams were to exit the house Corporal Dunleavy would

attempt to deploy a taser to take him into custody. At the same time that Corporal Dunleavy and Ely were speaking with Mr. Williams, officers would enter the front door. These two events were to occur simultaneously, and upon the signal of Corporal Dunleavy. (Roberts Deposition, Defendants' Exhibit 10, 35:14-36:19);

d.    Ely testified that he was supposed to try to get Mr. Williams to come out of the basement door just far enough where Corporal Dunleavy could deploy his Taser. Once the Taser was deployed, Ely, Corporal Dunleavy and another trooper would take control of Mr. Williams. If that did not work and Mr. Williams retreated into the house, officers at the front door were then supposed to go into the house and take control of Mr. Williams. The trooper behind Corporal Dunleavy was supposed to notify the officers at the front door if Ely's negotiation efforts failed. (Ely Deposition, Defendants' Exhibit 8, 51:12-52:21);

e.    Kreig testified that the only plan he knew of was that Ely

was supposed to try to talk to Mr. Williams by the cellar door and if Mr. Williams came out yelling, the other officers were supposed to enter the home.  Kreig knew nothing about any entry signal that was supposed to be given to the front door officers.  (Kreig Deposition, Defendants' Exhibit 11, 33:18-35:5);

f.    Hardy testified that Ely was going to approach the basement door again to get Mr. Williams to talk as a diversionary tactic.  Front door officers were going to use a key to enter the home and try to attempt to secure Mr. Williams.  If the opportunity presented itself, Corporal Dunleavy or another officer would use a taser on Mr. Williams.  Corporal Dunleavy was supposed to give a predetermined signal for the front door officers to enter.  However, Hardy does not know what the signal was. (Hardy Deposition, Defendants' Exhibit 13, 48:15-52:13);

g.    Olszewski testified that Ely was to engage Mr. Williams in conversation.  State troopers would take a position close to the home.  Ely would coax Mr. Williams out of the house.  Hopefully, it would come to a point where the

troopers would be able to take physical custody of Mr. Williams. As Ely was attempting to get Mr. Williams out of the house, the front door officers would simultaneously enter the house and sandwich Mr. Williams between both groups of officers upon a signal given by one of the troopers by the basement door. (Olszewski Deposition, Defendants' Exhibit 12, 30:20-32:19);

h.  Corporal Dunleavy testified that Ely was supposed to talk to Mr. Williams at the basement door again to see if he could get him to just surrender. If that didn't happen, Corporal Dunleavy would be in a position to use a Taser to take Mr. Williams into custody. Other officers were to stage near the front door as a reaction team in case something were to go bad. Corporal Dunleavy would be with Troopers Flynn and Lopez. Trooper Flynn was to give a signal to the team at the front door to let them know if the plan was going bad and it was time to go in. (Dunleavy Deposition, Defendants' Exhibit 14, 34:19-38:7);

i.  Trooper Flynn testified that Ely was going to attempt to

talk to Mr. Williams in order to get him to come out.

Corporal Dunleavy would be nearby and take Mr.

Williams into custody.  If need be, Corporal Dunleavy

would use his taser on Mr. Williams.  If things went worse,

like if Mr. Williams had a weapon or something like that,

then the front door officers were to go in the residence.

Corporal Dunleavy would notify them somehow if they

were going to go in.  (Flynn Deposition, Defendants'

Exhibit 16, 35:14-37:9);

j. Trooper Lopez testified that Ely would approach the

basement door and try to convince Mr. Williams to step

out.  Trooper Lopez, Trooper Flynn and Corporal

Dunleavy were to approach from a particular corner of the

structure, and Troopers Lopez and Flynn were going to

be the officers to seize Mr. Williams.  Corporal Dunleavy

would provide cover with his Taser if things went awry.

Trooper Lopez knew what he and the other state police

were supposed to do.  He also knew other officers had a

part to play but he did not know what everyone else's part

was.  (Lopez Deposition, Defendants' Exhibit 15, 19:9-20:14); and

k.    Profka had no knowledge of or details of the plan at all. (Profka Deposition, Defendants' Exhibit 5, 34:19-23).

41.    Admitted in part, disputed in part.  The details of the plan are disputed because no law enforcement officer on the scene had the same understanding of the details of the plan.  *See* Response to Defendants' SOF at ¶ 40, *supra.*

It is admitted that Papi volunteered to provide lethal cover. Papi was insubordinate by unilaterally designating himself "lethal cover" officer prior to entry into the home, although his assigned role was to guard the perimeter of the house and make sure Mr. Williams did not come out the front door.  (Papi Deposition, Defendants' Exhibit 9, 21:13-17, 38:18-40:11; Miller Deposition, Defendants' Exhibit 6, 28:18-24, 43:8-11; Roberts Deposition, Defendants' Exhibit 10, 32:21-24; Ely Deposition, Defendants' Exhibit 8, 45:15-46:3, 53:1-3; Dunleavy Deposition, Defendants' Exhibit 14, 43:19-24).).

It is disputed that lethal cover is a standard tactic when officers deploy tasers to apprehend an individual.  According to some versions of the "plan," Dunleavy was prepared to use his taser if Mr.   Williams

emerged far enough out of the home while talking to Ely at the basement door.  (Miller Deposition, Defendants' Exhibit 6, 37:11-38:16; Roberts Deposition, Defendants' Exhibit 10, 35:14-36:19; Ely Deposition, Defendants' Exhibit 8, 51:12-52:21; Hardy Deposition, Defendants' Exhibit 13, 48:15-52:13; Dunleavy Deposition, Defendants' Exhibit 14, 34:19-38:7; Flynn Deposition, Defendants' Exhibit 16, 35:14-37:9; Lopez Deposition, Defendants' Exhibit 15, 19:9-20:14);

However, officers Ely, Flynn and Lopez (who were also at the basement door with Dunleavy) did not draw their firearms to provide "lethal cover" for Dunleavy, who had his taser drawn to apprehend Mr. Williams if the opportunity presented itself during Ely's final encounter with Mr. Williams at the basement door. (Dunleavy Deposition, Defendants' Exhibit 14, 34:19-23, 37:7-38:10; Ely Deposition, Defendants' Exhibit 8, 77:10-16; Flynn Deposition, Defendants' Exhibit 16, 47:3-10; Lopez Deposition, Defendants' Exhibit 15, 34:19-36:5.)

Profka, who was also at the basement door with Ely, Dunleavy, Flynn and Lopez, testified that he alternated drawing his taser and firearm and he drew his firearm momentarily when he could not see Mr. Williams' hands at the basement door and kept the firearm by his side pointing it at the ground.  (Profka Deposition, Defendants' Exhibit 5, 56:21-58:6).

Profka did not testify that his purpose in drawing his firearm was to provide "lethal cover" for Dunleavy because his taser was drawn.

Additionally, plaintiff's expert, Michael D. Lyman, Ph.D. ("Dr. Lyman") rendered a report and declaration stating, *inter alia*, that Papi displaying a firearm was an unreasonable escalation of this incident contrary to both Papi's awareness of de-escalation techniques and nationally recognized law enforcement guidelines. (Dr. Lyman Report and Declaration, Plaintiff's Exhibits 4 & 5, pp. 9-15).

42. Admitted in part, disputed in part. It is admitted that Ely approached the basement door a third and final time and spoke to Mr. Williams. It is disputed what was said during the conversation. Ely testified that he could not recall what was said, but it was very short. (Ely Deposition, Defendants' Exhibit 8, 53:23-25). During the conversation, Mr. Williams suddenly, in mid-sentence, stopped talking to Ely, broke off the conversation, slammed the door shut, locked the door and retreated back into the basement. (Ely Deposition, Defendants' Exhibit 8, 54:2-55:3).

Ely was "shocked at that point" because he saw red Taser indicators moving around inside the building and realized that the law enforcement defendants that were at the front door had entered the building. (Ely Deposition, Defendants' Exhibit 8, 55:10-20).

It is disputed whether Mr. Williams was "upset" during the conversation.  While Ely testified that Mr. Williams was "upset," Dunleavy testified that the conversation seemed to be going fine, and although Dunleavy could not see Mr. Williams, Ely was calm and it did not seem that he was dealing with an aggravated person at the time.  Dunleavy further testified that Mr. Williams cut off negotiations with Ely and retreated into the home because he heard the front door officers enter the home.  (Dunleavy Deposition, Defendants' Exhibit 14, 35:18-36:15, 38:15-39:4).

43.    Admitted in part, disputed in part.  It is admitted that Kreig, Olszewski, Miller, Hardy, Roberts and Papi entered the home through the locked front door, cleared the first floor and proceeded down stairs to the basement.  It is admitted that Roberts was the first to enter the home with a ballistic shield.

It is disputed that Papi was the last officer to enter the home through the front door.  Flynn and Lopez followed the defendants into the home through the front door as back up.  (Flynn Deposition, Defendants' Exhibit 16, 35:9-13, 39:14-17; Lopez Deposition, Defendants' Exhibit 15, 23:13-24:14).[4]

---

[4] Regardless of how this entry was accomplished, this entry was in violation of the Fourth Amendment as is further explained in Plaintiff's motion for partial summary judgment and supporting papers.  (Docs. 77-79).

44.     Admitted. Mr. Williams was now contained in the room and had no means of escape from the room. (Miller Deposition, Defendants' Exhibit 6, 48:15-23; Papi Deposition, Defendants' Exhibit 9, 43:5-44:10; Roberts Deposition, Defendants' Exhibit 10, 44:25-45:13; Ely Deposition, Exhibit 8, 64:15-65:13; Dunleavy Deposition, Exhibit 14, 44:10-45:1; Flynn Deposition, Exhibit 16, 48:3-16).

While contained in the room alone, Mr. Williams was not a danger to police. (Papi Deposition, Defendants' Exhibit 9, 44:11-14).

45.     Admitted.

46.     Admitted in part, disputed in part. While plaintiff admits the defendants forcibly opened the bedroom door, defendants have differing versions of how this was accomplished and therefore these facts are disputed:[5]

a.     Miller testified that he observed a couple of officers including Kreig kicking on the door to open it. The door was forced open by police. (Miller Deposition, Defendants' Exhibit 6, 47:22-49:1);

---

[5] Regardless of how the entry was accomplished, this entry was in violation of the Fourth Amendment as is further explained in Plaintiff's motion for partial summary judgment and supporting papers. (Docs. 77-79).

b.      Roberts testified that he saw Kreig kick the door.  Roberts then leaned against the door with his shield and found that it was either blocked by something or propped shut.  Papi then tucked in to Roberts' right side and the two of them opened the door. (Roberts Deposition, Defendants' Exhibit 10, 44:14, 49:23-50:6);

c.      Olszewski testified that when he got into the basement, the officers were already in the process of forcing the door open by muscling, not using tools.  He recalls Kreig pushing the door in. (Olszewski Deposition, Defendants' Exhibit 12, 43:24-45:25);

d.      Kreig testified that he did not kick the door.  One of the officers had a shield, everybody was gathered outside the door and the door was pushed open.  (Kreig Deposition, Defendants' Exhibit 11, 43:16-21, 45:25-46:8);

e.      Profka testified that he learned that Roberts pushed through the door with a shield.  (Profka Deposition, Defendants' Exhibit 5, 49:17-21);

f.      Papi testified that police forced the door open.  Roberts, himself and probably somebody pushing on him muscled their way

through the door.  (Papi Deposition, Defendants' Exhibit 9, 44:15-17, 47:24-48:5);

g.    Ely testified that he grabbed the door handle to try to open it, it opened an inch or two and then Mr. Williams pushed it closed. Mr. Williams did not want the door open.  Roberts placed the shield against the door and tried to push it open.  Papi was alongside Roberts.  As they pushed against the door there was resistance and then the door flew open and officers fell into the room.  (Ely Deposition, Defendants' Exhibit 8, 61:14-63:1);

h.    Hardy testified that several attempts were made to open the door using the doorknob and having some officers push on it. This did not work.  Ely turned the knob and the door was opened by everyone pushing forward.  (Hardy Deposition, Defendants' Exhibit 13, 64:9-65:8);

i.    Trooper Lopez testified that as officers were trying to force the door open with their shoulders and hands, Mr. Williams was trying to force it closed.  (Lopez Deposition, Defendants' Exhibit 15, 31:20-32:5); and

j.　Trooper Flynn testified that the door was "busted open" and it seemed like it was kicked open.  (Flynn Deposition, Defendants' Exhibit 16, 46:5-14).[6]

It is disputed that Roberts pitched forward into the room and stumbled, bumping into Mr. Williams and knocking him into a seated position on the bed from which he immediately rebounded to his feet. Roberts testified that the momentum pushed him into the bedroom quickly and he nearly tripped over something in the room.  Roberts used the shield to knock Mr. Williams back onto the bed.  (Roberts Deposition, Defendants' Exhibit 10, 50:11-23).  Hardy testified that Mr. Williams was knocked backward against the bed.  (Hardy Deposition, Defendants' Exhibit 13, 71:1-10).

It is admitted that Papi, Hardy, Kreig and Roberts entered the bedroom.

47.　Admitted in part, disputed in part.  It is admitted that when the defendants busted down Mr. Williams' bedroom door, law enforcement officers found Mr. Williams in possession of a fireplace poker which he was moving in front of his body.  Defendants have

---

[6] Flynn's testimony is closest to the truth.  Plaintiff's Exhibit 6 is a photograph of the door, in its broken, or "busted" state.

differing versions of what Mr. Williams was doing with the poker. Therefore, these facts are disputed:

a.	Miller testified that Mr. Williams was moving the poker in a figure-eight motion horizontally at about chest level.  (Miller Deposition, Defendants' Exhibit 6, 54:13-55:2);

b.	Profka testified that Mr. Williams was moving the poker at shoulder-level, back and forth, in a slashing motion.  (Profka Deposition, Defendants' Exhibit 5, 51:19-52:18);

c.	Papi testified that Mr. Williams was swinging the poker wildly at chest level, over his head, in all directions in slashing movements.  (Papi Deposition, Defendants' Exhibit 9, 52:20-53:3);

d.	Roberts testified that Mr. Williams was waving the poker in a horizontal figure-eight motion at upper chest level "to keep people back."  (Roberts Deposition, Defendants' Exhibit 10 54:1-25);

e.	Ely testified that Mr. Williams was standing on the bed, swinging the poker from right to left down across his body.  (Ely Deposition, Defendants' Exhibit 8, 69:24-71:25);

f.    Hardy testified that Mr. Williams was swinging the poker back and forth and up and down all over in front of his body.  (Hardy Deposition, Defendants' Exhibit 13, 76:1-77:19); and

g.    Olszewski testified that Mr. Williams was coming down across the front of his body in a slicing motion and then going back up with the poker.  (Olszewski Deposition, Defendants' Exhibit 12, 47:15-48:19).

It is disputed that Mr. Williams was trying to strike the defendants with the poker.  Only Olszewski testified that Mr. Williams was trying to strike officers with the poker and Olszewski admits his view was obstructed by Kreig, Hardy, Miller, Papi and Roberts who were in front of him.  (Olszewski Deposition, Defendants' Exhibit 12, 47:6-21).  The movements described by most of the defendants is simply Mr. Williams' trying to hold the officers who broke his door at bay.  Those movements are inconsistent with the idea that Mr. Williams was using the poker as a lethal weapon.

Plaintiff admits Ely and Roberts testified that Mr. Williams was approximately 4 feet away from them.  However, Ely also testified that Mr. Williams was standing on top of the bed.  (Ely Deposition, Defendants' Exhibit 8, 70:4-21).

Plaintiff admits defendants told Mr. Williams to drop the poker.

48.     Admitted in part, disputed in part.  It is admitted that Kreig and Hardy fired tasers at Mr. Williams and the tasers failed to have effect.  Ely also testified that he fired a taser at Mr. Williams which also had no effect.  (Ely Deposition, Defendants' Exhibit 8, 70:8-15).

However, it is disputed that any of the tasers actually struck Mr. Williams.  Ely only testified that he fired a taser at Mr. Williams which also had no effect.  (Ely Deposition, Defendants' Exhibit 8, 70:8-15).  If both of a taser's two barbs do not hit the target or embed in skin, a taser has no effect.  (Miller Deposition, Defendants' Exhibit 6, 53:18-23; Profka Deposition, Defendants' Exhibit 5, 53:10-16).  If the barbs embed too close to each other, they also will not be effective.  (Hardy Deposition, Defendants' Exhibit 13, 74:22-75:6).

While it is admitted that Mr. Williams was making it clear the defendants were unwelcome in his home, it is disputed as to what Mr. Williams was actually saying because the defendants have given differing testimony.  For example, Papi testified that Mr. Williams was just yelling but not speaking any actual words that he could make out.  (Papi Deposition, Defendants' Exhibit 9, 54:7-10).  Miller testified that Mr. Williams was not saying anything at all and was not speaking any threats to the police.

(Miller Deposition, Defendants' Exhibit 6, 56:5-11). Ely testified that Mr. Williams was screaming, "Get out. Get out." (Ely Deposition, Defendants' Exhibit 8, 70:4-5).

It is disputed Mr. Williams was continuing to swing the poker at defendants' heads. Defendants have differing versions of what Mr. Williams was doing with the poker, most of which are inconsistent with the idea that Mr. Williams was using the poker as a deadly weapon. *See* Response to Defendants' SOF at ¶ 47. Therefore, these facts are disputed.

Miller testified that after being shot with tasers Mr. Williams was still moving the poker in a figure-eight motion horizontally at chest level. (Miller Deposition, Defendants' Exhibit 6, 54:13-55:11).

Some defendants testified that Mr. Williams then changed the poker's position in his hand:

a.   Miller testified that Mr. Williams was holding the poker with his arm in an "L" shape holding his fist to the ceiling. (Miller Deposition, Defendants' Exhibit 6, 56:18-57:7);

b.   Papi testified that Mr. Williams was holding the poker by the handle, holding it vertically, extended almost fully above his head. (Papi Deposition, Defendants' Exhibit 9, 55:11-56:23);

c.  Roberts testified that Mr. Williams now was holding the poker at a 90 degree angle like a spear with the point of the poker pointing at himself and/or Papi.  (Roberts Deposition, Defendants' Exhibit 10, 56:22-57:13); and

d.  Hardy testified that Mr. Williams moved his arm directly up behind him and started to lean forward and come forward at the same time in a straight manner.  (Hardy Deposition, Defendants' Exhibit 13, 80:4-12).

It is disputed that Roberts was wedged against Papi with the Shield into the corner of the room and unable to move or to raise the shield to defend himself.  Papi testified that Roberts was directly next to him on his left hand side and he does not know if Roberts was able to move or not. (Papi Deposition, Defendants' Exhibit 9, 57:14-58:9).

49.  Admitted in part, disputed in part.  It is admitted that Mr. Williams possessed a fireplace poker.  However, what Mr. Williams was doing with the poker is disputed because defendants have given differing testimony.  *See* Response to Defendants' SOF at ¶¶ 47 & 48.

It is disputed that the poker had a pointed end and was like an "ice pick."  Only Roberts described the poker as an "ice pick."

While it is admitted that Mr. Williams was making it clear the defendants were unwelcome in his home, it is disputed as to what Mr. Williams was actually saying because the defendants have given differing testimony. For example, Papi testified that Mr. Williams was just yelling but not speaking any actual words that he could make out. (Papi Deposition, Defendants' Exhibit 9, 54:7-10). Miller testified that Mr. Williams was not saying anything at all and was not speaking any threats to the police. (Miller Deposition, Defendants' Exhibit 6, 56:5-11). Ely testified that Mr. Williams was screaming, "Get out. Get out." (Ely Deposition, Defendants' Exhibit 8, 70:4-5).

50. Admitted in part, disputed in part. It is admitted Ely deployed a third taser at Mr. Williams. However, it is disputed that there was any real delay in the timing of Ely's taser deployment following Kreig's and Hardy's. From the point in time that the defendants broke down Mr. Williams' bedroom door to the point in time Papi shot and killed Mr. Williams, it was a "split second." (Kreig Deposition, Defendants' Exhibit 11, 54:15-19).

Additionally, it is disputed that Ely's taser actually struck Mr. Williams. Ely only testified that he fired a taser at Mr. Williams which also had no effect. (Ely deposition, Defendants' Exhibit 8, 70:8-15). If both of a taser's two barbs do not hit the target or embed in skin, a taser has no

effect. (Miller Deposition, Defendants' Exhibit 6, 53:18-23; Profka Deposition, Defendants' Exhibit 5, 53:10-16). If the barbs embed too close to each other, they also will not be effective. (Hardy Deposition, Defendants' Exhibit 13, 74:22-75:6).

It is disputed that Mr. Williams "resumed menacing the police" after Ely shot his taser. What Mr. Williams was doing with the poker is disputed because defendants have given differing testimony. *See* Response to Defendants' SOF at ¶¶ 47 & 48.

It is disputed that the poker had a "sharp end" as is represented by the defendants. No defendant testified that the poker was "sharp."

It is admitted that Papi testified he was 3 to 4 feet away from Mr. Williams.

51. Admitted in part, disputed in part. It is admitted that some defendants told Mr. Williams to put down the poker. However, what Mr. Williams was doing with the poker is disputed because defendants have given differing testimony. *See* Response to Defendants' SOF at ¶¶ 47 & 48.

It is disputed that Mr. Williams had the poker raised over his head. Mr. Williams was six feet two inches tall. (M. Williams Declaration, Plaintiff's Exhibit 1). It is seven feet and nine inches from the floor in the

bedroom where Mr. Williams was shot and killed to the rafters of the ceiling. (M. Williams Declaration, Plaintiff's Exhibit 1;  Photos, Plaintiff's Exhibit 2).  The poker was approximately 2 feet long.  (Defendants' SOF Doc. 73 ¶ 47).  Therefore, Papi's self-serving claim that Mr. Williams was holding the poker by the handle, vertically, extended almost fully above his head just before he shot Mr. Williams is impossible given the clearance of the ceiling in the room.  (Plaintiff's SOF Doc. 79 ¶¶ 120(b), 121; M. Williams Declaration, Plaintiff's Exhibit 1).

It is disputed that Papi positioned his firearm at the "high ready" position only at the time Mr. Williams started to move forward with the poker and advanced it down and toward Papi and Roberts.  Papi testified that he had his gun at the "high ready" position pointed directly in front of him with both hands almost immediately upon entry into the home.  (Papi Deposition, Defendants' Exhibit 9, 58:21-59:8).

52.     Admitted in part, disputed in part.  It is admitted that Papi told Mr. Williams to put down the poker.  However, what Mr. Williams was doing with the poker is disputed because defendants have given differing testimony.  *See* Response to Defendants' SOF at ¶¶ 47 & 48.

It is admitted that Papi shot Mr. Williams twice with his firearm, killing Mr. Williams. (Papi Deposition, Defendants' Exhibit 9, 58:21-62:4).

It is admitted that the mortally wounded Mr. Williams then fell back onto the bed.

53.     It is admitted that Papi removed the poker from the bed where Mr. Williams lay mortally wounded and dropped it off the foot of the bed. (Papi Deposition, Defendants' Exhibit 9, 63:8-23).

It is admitted that some of the defendants assisted Miller in handcuffing Mr. Williams as he lay mortally wounded on the bed prior to performing any lifesaving measures or summoning an ambulance.  (Miller Deposition, Defendants' Exhibit 6, 57:12-58:6;  Lopez Deposition, Defendants' Exhibit 15, 39:1-8).

54.     Admitted in part, disputed in part.  It is disputed the shooting occurred at 4:14 p.m.  Miller called Chief Fisher shortly after Papi shot Mr. Williams.  This phone call was received at around 3:50 p.m. (Miller Deposition, Defendants' Exhibit 6, 60:12-16; Fisher Deposition, Defendants' Exhibit 7, 36:4-37:2).

Shirley Williams testified that her recollection was that the shooting occurred at approximately 4:00 p.m.;  however, Mr. Williams' death certificate states the time of injury was 4:14 p.m.  (S. Williams Deposition, Defendants' Exhibit 3, 18:3-5, 21:14-19).

It is admitted the police were on the scene for approximately two hours prior to the shooting.

55.     Disputed.  Dunleavy testified that he heard gunshots and made his way into the house.  He saw Mr. Williams being dragged out into the hallway, handcuffed behind his back.  Dunleavy told everybody to get out and he remained behind with Lopez and Kreig attending to Mr. Williams.  Mr. Williams was still making breath sounds for a few minutes and when an ambulance arrived he was still making those sounds and the ambulance personnel attempted to put a monitor on him.  (Dunleavy Deposition, Defendants' Exhibit 14, 49:4-51:2).

56.     It is admitted that Roberts testified in this manner, although plaintiff disputes the credibility of this statement.  Roberts testified he was pinned in a corner behind the shield when Mr. Williams was shot and killed by Papi, unable to move the shield or himself.  (Roberts Deposition, Defendants' Exhibit 10, 52:12-20, 58:6-18).

57.     It is admitted that Hardy testified in this manner;  however, plaintiff disputes the credibility of this statement and notes that due to defendants' actions, Mr. Williams is unavailable to dispute testimony.

58.     It is admitted that Miller testified from his vantage point and an officer safety issue he believes the right thing was done.  However, Miller also testified that he could not answer whether the shooting of Mr. Williams was necessary.  (Miller Deposition, Defendants' Exhibit 6, 63:15-23).  Miller's testimony is simply a self-serving conclusion.

59.     It is admitted that Ely testified in this manner.  However, it is disputed that police opened the door to the basement because they had no idea what Mr. Williams was doing and he could be committing suicide.

Ely observed Mr. Williams while he was engaging in three in-person conversations through a basement door with him prior to and during the defendants' entry into his home. (Ely Deposition, Defendants' Exhibit 8, 25:11-26:20, 41:13-20, 53:6-22).  Mr. Williams did not possess a weapon while speaking with Ely at the basement door.  (Ely Deposition, Defendants' Exhibit 8, 54:17-20).  During the conversations between Ely and Mr. Williams, it didn't seem like anyone was "in any threat."  (Flynn Deposition, Defendants' Exhibit 16, 34:20-35:2).  Ely did not testify that Mr. Williams threatened to harm himself during these conversations in any way.

The illegal actions of the defendants in entering Mr. Williams' home caused Mr. Williams to retreat behind a bedroom door where he was out of sight.

Ten police officers were inside of the home, outside of the basement bedroom door. (Miller Deposition, Defendants' Exhibit 6, 46:6-14; Papi Deposition, Defendants' Exhibit 9, 42:1-11; Profka Deposition, Defendants' Exhibit 5, 49:11-50:4; Roberts Deposition, Defendants' Exhibit 10, 43:6-45:9; Ely Deposition, Defendants' Exhibit 8, 57:1-14, 61:13-19; Kreig Deposition, Defendants' Exhibit 11, 42:15-43:11; Hardy Deposition, Defenants' Exhibit 13, 57:3-58:6; Olszewski Deposition, Defendants' Exhibit 12, 43:1-20; Lopez Deposition, Defendants' Exhibit 15, 31:11-24; Flynn Deposition, Defendants' Exhibit 16, 41:1-5).  Police were also still outside of the home near the window of the basement bedroom.  (Dunleavy Deposition, Defendants' Exhibit 14, 44:10-45:1).

Therefore, Mr. Williams was now contained in the bedroom with no means of escape. (Miller Deposition, Defendants' Exhibit 6, 48:15-23; Papi Deposition, Defendants' Exhibit 9, 43:5-44:10; Roberts Deposition, Defendants' Exhibit 10, 44:25-45:13; Ely Deposition, Defendants' Exhibit 8, 64:15-65:13; Dunleavy Deposition, Defendants' Exhibit 14, 44:10-45:1; Flynn Deposition, Defendants' Exhibit 16, 48:3-16).

While contained in the room alone, Mr. Williams was not a danger to police.  (Papi Deposition, Defendants' Exhibit 9, 44:11-14).

Roberts testified that prior to the police forcing open the door, Mr. Williams told police, "You're going to be sorry.  Don't do this."  (Roberts Deposition, Defendants' Exhibit 10, 44:4-11).

Papi testified that prior to the police forcing open the door, Mr. Williams said, "Don't come in here.  You'll be sorry if you come in here." (Papi Deposition, Defendants' Exhibit 9, 43:2-14).

Law enforcement officers did not believe Mr. Williams would have a rational or non-violent response to their forcible entry into the bedroom. (Miller Deposition, Defendants' Exhibit 6, 49:24-50:6; Papi Deposition, Defendants' Exhibit 9, 46:22-24; Ely Deposition, Defendants' Exhibit 8, 66:6-11; Kreig Deposition, Defendants' Exhibit 11, 53:4-24; Hardy Deposition, Defendants' Exhibit 13, 68:22-69:4; Flynn Deposition, Defendants' Exhibit 16, 46:21-47:2).

Forcing the door open was forcing a confrontation with Mr. Williams.  (Papi Deposition, Defendants' Exhibit 9, 47:5-8; Roberts Deposition, Defendants' Exhibit 10, 49:16-18; Flynn Deposition, Defendants' Exhibit 16, 48:3-6).  That confrontation (which the defendants anticipated) with the contained Mr. Williams was unnecessary.

Defendants busted down the door to the bedroom to force a confrontation with the mentally ill Mr. Williams.  Ely's self-serving statement

that Mr. Williams may have been attempting suicide is wholly without evidence or support.

60.    It is admitted Hardy testified in this manner.  However, Hardy's belief was illogical and contrary to Mr. Williams' actions and it is disputed that Mr. Williams was not going to follow verbal commands, was not going to leave the house, and intended to injure "someone or anyone."

Hardy's belief is the result of a lack of training and policies regarding dealing with the mentally ill and the choices the defendants made on the scene to ignore available resources, as is discussed *supra*.

If Mr. Williams refused to leave the home, it was because the defendants would not permit him to talk to his wife and mother.  (Ely Deposition, Defendants' Exhibit 8, 26:11-20).

Miller knew that Mr. Williams was packing a bag.  (Miller Deposition, Defendants' Exhibit 6, 24:3-18).  Miller and Profka knew that Mr. Williams was putting on boots.  (Miller Deposition, Defendants' Exhibit 6 23:9-17; Profka Deposition, Defendants' Exhibit 5, 25:1-14).

Mr. Williams told both his wife and mother on the phone he was packing a bag and coming out and Shirley Williams told the defendants this a number of times.  (M. Williams Deposition, Defendants' Exhibit 1, 20:25-21:2;  S. Williams Deposition, Defendants' Exhibit 3, 11:23-13:13).

Mr. Williams spoke with family members and police on the phone and was not refusing to communicate. (Ely Deposition, Defendants' Exhibit 8, 23:10-24:13; Fisher Deposition, Defendants' Exhibit 7, 31:12-21; Dunleavy Deposition, Defendants' Exhibit 14, 26:16-17, 39:16-40:6).

Additionally, Mr. Williams was actively engaged in his third in-person conversation with Ely when the defendants illegally entered his home. (Ely Deposition, Defendants' Exhibit 8, 25:11-26:20, 41:13-20, 53:6-22, 54:2-55:3, 55:10-20).

Mr. Williams had not threatened the police at any point before the defendants broke down his bedroom door, and Mr. Williams made no threat to police during any discussions with Ely. (Ely Deposition, Defendants' Exhibit 8, 65:14-24). In fact, Mr. Williams had no guns in the house and was not a threat to anyone. *See* Response to Defendants' SOF at ¶ 20.

61.    Admitted. Lopez de-escalated by transitioning from a taser to his expandable baton as the incident between the defendants and Mr. Williams unfolded inside the home. (Lopez Deposition, Defendants' Exhibit 15, 34:23-35:5).

62.     Disputed.  The defendants only cite to their expert reports of Emanuel Kapelsohn and Mark Keeler for support.  These reports are the subject of a motion to strike filed by plaintiff simultaneously with plaintiff's response papers to defendants' motion for summary judgment because the reports were not ever included in any party's pleadings and were never utilized as an exhibit during any deposition and are not a part of the "record" in this case and are not sworn affidavits or declarations.

Additionally, the "facts" contained in this paragraph are contrary to the defendants' testimony.  Defendants Overfield Township, Tunkhannock Township and Meshoppen Borough did not have any written policies relating to mentally ill individuals, the ADA or the RA, nor did those municipal defendants provide their officers with training relating to those topics.  (Miller Deposition, Defendants' Exhibit 6, 10:12-13:6 (relating to Overfield Township); Fisher Deposition, Defendants' Exhibit 7, 22:3-7 (relating to Overfield Township); Profka Deposition, Defendants' Exhibit 5, 14:21-15:5 (relating to Overfield Township); Papi Deposition, Defendants' Exhibit 9, 24:1-12 (relating to Tunkhannock Township); Roberts Deposition, Defendants' Exhibit 10, 14:8-19 (relating to Tunkhannock Township); Ely Deposition, Defendants' Exhibit 8, 91:4-8 (relating to Tunkhannock Township); Kreig Deposition, Defendants' Exhibit 11, 20:15-19 (relating to

Meshoppen Borough)).

Defendant Tunkhannock Borough does not recall, is not certain and cannot comment on whether it had any written policies or standard operating procedures relating to dealing with mentally ill individuals, the ADA or the RA. (Hardy Deposition, Defendants' Exhibit 13, 23:18-24:19; Olszewski Deposition, Defendants' Exhibit 12, 13:4-13). Inability of these Chiefs to recall or comment on the existence of policies is a tacit admission of the absence of such policies.

Additionally, plaintiff's expert Dr. Lyman stated in his expert report that Overfield Township, Tunkhannock Township, Tunkhannock Borough and Meshoppen Borough chose not to establish written directives dealing with mentally ill persons, barricaded suspects or compliance with the ADA and RA as they relate to field operations dealing with persons experiencing a mental health crisis. Failure on the part of the municipalities to do so not only deprived Mr. Williams of his rights under the ADA and RA, but resulted in a deadly force situation that was completely avoidable. (Dr. Lyman report and declaration, Plaintiff's Exhibits 4 & 5 at p. 32).

63.     Admitted in part, disputed in part.[7]  It is disputed that Overfield

Township's, Tunkhannock Township's, Meshoppen Borough's or

Tunkhannock Borough's policies were not defective prior to November 7,

2012.  In fact, as discussed throughout this document, those municipalities'

policies were defective prior to November 7, 2012.  Those defective

policies which pre-existed the events of November 7, 2012 were a cause of

the death of Brian Wiliams.  It is admitted that those pre-existing

unconstitutional policies and customs did not result in a death prior to

November 7, 2012.  However, such unconstitutional policies and/or

customs inevitably would lead to a tragedy, as occurred when these

municipalities' police officers, untrained and unguided by constitutional

policies, encountered the November 7, 2012 situation.  Because these

municipalities' police officers were untrained and unguided, pursuant to the

municipalities' policies and/or customs, they were unprepared and caused

Mr. Williams' death.  With regard to defendants' statement that such

unconstitutional policies were not previously "demonstrated," plaintiff

admits that she is unaware of a prior lawsuit in which such unconstitutional

policies were the issue.

---

[7] The "facts" in this paragraph are wholly unsupported by any citation to the
record in this case, in violation of Fed.R.Civ.P. 56(c).

Respectfully Submitted,
S/  Shelley L. Centini, Esq.
S/ Barry H. Dyller, Esq.
DYLLER LAW FIRM
Attorneys for Plaintiff
88 North Franklin Street
Wilkes-Barre, PA  18701
(570) 829-4860