IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MELINDA WILLIAMS,                          :
As Administratrix of the Estate of          :
Brian P. Williams,                          :
                                           :
                  Plaintiff,               :    3:13-CV-01151
                                           :    (JUDGE MARIANI)
        v.                                  :
                                           :
MARK PAPI, ROBERT ROBERTS,                  :
STANLEY ELY, PAUL MILLER,                   :
TERRANCE FISHER, SLADE PROFKA,  :
JOHN KREIG, ROGER HARDY,                    :
WILLIAM OLSZEWSKI,                          :
TUNKHANNOCK TOWNSHIP,                       :
OVERFIELD TOWNSHIP,                         :
TUNKHANNOCK BOROUGH,                        :
MESHOPPEN BOROUGH,                          :
                                           :
                  Defendants.              :

## MEMORANDUM OPINION

Presently before the Court are cross-motions for summary judgment. For the reasons

that follow, the Court will deny both motions in their entirety.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

On April 30, 2013, Plaintiff Melinda Williams in her capacity as Administratrix of the

Estate of Brian P. Williams, filed a Complaint against Defendant Mark Papi. (Doc. 1). The

Complaint asserted three counts: (1) a claim under 42 U.S.C. § 1983 alleging unreasonable

force and unreasonable seizure in violation of the Fourth and Fourteenth Amendments to

the United States Constitution, (2) a claim for assault; and (3) a claim for battery. Defendant

Papi moved to dismiss the Complaint on June 27, 2013. (Doc. 9). On July 3, 2014, the Court issued a memorandum opinion denying Defendant's motion to dismiss in its entirety. (Doc. 41).

After the Court's memorandum opinion denying Defendant's motion to dismiss, (Doc. 41), Plaintiff filed an Amended Complaint. (Doc. 44). The Amended Complaint asserts seven counts and was brought against Defendants Mark Papi, Robert Roberts, Stanley Ely, Paul Miller, Terrance Fisher, Slade Profka, John Kreig, Roger Hardy, William Olszewski, Tunkhannock Township, Overfield Township, Tunkhannock Borough, and Meshoppen Borough (collectively, "Defendants"). In Count I, Plaintiff asserts a Section 1983 claim alleging unreasonable force and unreasonable seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution against Defendants Papi, Roberts, Ely, Krieg, Miller, Profka, Hardy, and Olszewski. (*Id.* at ¶¶ 134-137). Count II also asserts a Section 1983 claim and alleges unreasonable deadly force and unreasonable seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution solely against Defendant Papi. (*Id.* at ¶¶ 138-141). Counts III and IV of the Amended Complaint assert Pennsylvania state law claims for assault and battery against Defendant Papi. (*Id.* at ¶¶ 142-149). Count V asserts a Section 1983 claim against Defendants Overfield Township, Tunkhannock Township, Meshoppen Borough, and Tunkhannock Borough, asserting a *Monell* claim for municipal liability. (*Id.* at ¶¶ 150-159). In Count VI Plaintiff asserts a Section 1983 claim against Defendants Fisher, Miller, Ely,

2

Kreig, and Olszewski alleging supervisory liability under Section 1983. (*Id.* at ¶¶ 160-173). Finally, Count VII of the Amended Complaint asserts claims under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act (the "RA") against Defendants Overfield Township, Tunkhannock Township, Meshoppen Borough, and Tunkhannock Borough. (*Id.* at ¶¶ 174-188).

On November 30, 2015, Defendants filed a Motion for Summary Judgment on all counts. (Doc. 72). Plaintiff thereafter filed a Motion for Partial Summary Judgment with respect to Counts I and VII of the Amended Complaint. (Doc. 77).

## II.    STATEMENT OF FACTS[1]

In September 2012, Brian Williams "became suicidal and required the intervention of police because he was threatening to kill himself with a gun and he believed if his wife, Melinda Williams, left him 'then there was no sense of living.'" (Doc. 73, at ¶ 1). Mr. Williams voluntarily committed himself to inpatient psychiatric treatment for 72 hours and thereafter followed up with regular counseling sessions at Community Counseling Services in Tunkhannock, Pennsylvania. (*Id.*). At this time, Mr. Williams was continually having "dreams" in which "somebody was going to die but he didn't know who, and it scared him." (*Id.*). Mr. Williams also reported to his mental health treatment provider that he suffered from depressed mood daily, angry outbursts two to three times per week, guilty feelings,

---

[1] The parties have both submitted Statements of Material Facts as to which they submit there is no genuine issue or dispute for trial. (Docs 73, 79). The parties have also submitted Counter Statements of Material Facts. (Docs. 89, 94).

3

sleep disturbances, daily mood swings and racing thoughts, as well as anxiety, heart palpitations, blackouts with episodes of violence, current and fleeting suicidal ideations, low impulse control, and that he coped with stress by throwing and hitting things. (Doc. 79, at ¶ 9). In the month leading up to November 7, 2012, Mr. Williams was prescribed the antidepressant and anti-anxiety medications Zoloft, Klonopin, and Xanax. (Id. at ¶ 11).

On November 7, 2012, Mr. Williams had an appointment at Community Counseling Services. Just prior to that appointment, Plaintiff Melinda Williams informed Mr. Williams that their marriage was over, leaving Mr. Williams "crying and shaking." (Doc. 73, at ¶ 2); (Doc. 94, at ¶ 2). At approximately 1:30 p.m., Mr. Williams attended a pre-scheduled counseling session at Community Counseling Services with Dr. Rakesh Sharma, M.D., a board certified psychiatrist. (Doc. 73, at ¶ 3). The parties dispute what Mr. Williams said to Dr. Sharma at the counseling session. Dr. Sharma testified that Mr. Williams informed him that "he was going to put her six feet under" and that "he was talking about his wife" and he reported to him that "he had received legal separation papers from his wife, and . . . that he had grabbed her by the throat and he had also written a note where he had said that he was going to put her six feet under." (Id. at ¶ 4). In contrast, Shirley Williams—Mr. Williams' mother who was also present at the counseling session with Dr. Sharma—testified that Mr. Williams told Dr. Sharma that he was having thoughts that "someone" is going to die and is going to be put "six feet under." (Doc. 94, at ¶ 4). According to Shirley Williams, when

4

asked by Dr. Sharma who is going to die, Mr. Williams told him "I do not know, it's just these thoughts and dreams I'm having." (Id.).

Dr. Sharma suggested that, based on his risk assessment, Mr. Williams should return to the hospital, as he had two months prior. (Doc. 73, at ¶ 5); (Doc. 94, at ¶ 5). Mr. Williams refused Dr. Sharma's recommendation, causing Dr. Sharma to fill out certain paperwork to initiate Mr. Williams' involuntary commitment to a psychiatric facility. (Doc. 73, at ¶ 8). The petition completed by Dr. Sharma stated that he believed Mr. Williams was a "clear and present dangers to others." (Doc. 94, at ¶ 9). The petition further identified Mr. Williams as severely mentally disabled.[2] (Doc. 79, at ¶ 1).

Following the counseling session, Mr. Williams returned to his home in Overfield Township, Pennsylvania, which he shared with his wife and two of their three children. (Doc. 73, at ¶ 11); (Doc. 94, at ¶ 11). Around this time Slade Profka—an on-duty police officer in Overfield Township—received a call advising him to contact the communications center. When he did, he was informed that "Williams had made a threat to go home and kill his wife" to his doctor.[3] (Doc. 73, at ¶ 10). Officer Profka testified that he then called

---

[2] At some point following the counseling session, an individual named Tony Black personally delivered a 302 civil commitment warrant for Mr. Williams to the police. (Doc. 73, at ¶ 10); (Doc. 94, at ¶ 10). Mr. Black and Officer Slade Profka contacted Plaintiff Melinda Williams and left messages for her informing her that Mr. Williams threatened her and advised her not to return home. (Id.). Melinda Williams testified that she called Mr. Williams while she was travelling to the scene and when asked if he had threatened to kill her during the counseling session, Mr. Williams replied "No, I would never do that. I'm trying to get you back not hurt you." (Doc. 94, at ¶ 19).

[3] Plaintiff disputes that Mr. Williams actually threatened to "go home and kill his wife" during his counseling appointment. (Doc. 94, at ¶ 10).

Plaintiff and advised her of the threat from her husband and told her not to return home. (Id. at ¶ 11). Soon after, Officer Profka and Corporal Paul Miller (also from the Overfield Township Police Department) were the first officers to arrive at Mr. Williams' house. (Id. at ¶ 12).

Upon arriving at Mr. Williams' home, Corporal Miller observed Mr. Williams in his driveway and called out to him "Hey, Brian."[4] (Id.). Mr. Williams ignored Corporal Miller and went into his residence. (Id.); (Doc. 94, at ¶12). When Corporal Miller again attempted to interact with Mr. Williams, Mr. Williams again ignored him, but at no point did he threaten Corporal Miller. (Doc. 79, at ¶ 29). Soon after, Paul Williams, Mr. Williams' father, approached the officers who informed him that they were receiving a mental health commitment warrant to commit Mr. Williams and wanted to talk with him before the warrant arrived. (Doc. 73, at ¶ 13). Paul Williams advised the officers that he would enter the home and discuss the issue with Mr. Williams. (Id.). Miller and Profka permitted Mr. Williams' father to go inside the home to encourage Mr. Williams to come out and neither Miller nor Profka feared that Mr. Williams would do anything to harm his father. (Doc. 79, at ¶ 30). Paul Williams then informed Mr. Williams, who was wearing jeans, a tee shirt, a work shirt, and putting on work boots that "the police were there and they had a 302 warrant coming for him." (Doc. 73, at ¶ 14). In response, Mr. Williams told Paul Williams to "tell them to get off

---

[4] All law enforcement officers considered Miller to be in charge on November 7, 2012. (Doc. 79, at ¶ 26); (Doc. 89, at ¶ 26). The parties dispute whether Miller himself viewed himself as being in charge of the scene. (Doc. 79, at ¶ 27); (Doc. 89, at ¶ 27). Corporal Miller testified that he feared that he was "in over [his] head" and asked for assistance from the other officers present at the scene. (Doc. 89, at ¶ 28).

6

my property." (*Id.*). Paul Williams then relayed this message to Officer Profka and Corporal

Miller who "backed down off, down in toward[s]" Paul Williams' property. (*Id.*). Mr. Williams

also requested that police allow him to speak to his wife and mother, but law enforcement

officers would not permit Mr. Williams to speak in person to either his wife or mother. (Doc.

79, at ¶¶ 34, 36).

Approximately ten to fifteen minutes later, Paul Williams re-entered Mr. Williams's house

and spoke with Mr. Williams again about coming out and going voluntarily with the police.

According to Paul Williams, Mr. Williams told him that "I want them to rescind the warrant; I

am not going to the hospital. . . . All I want to do is get rid of these thoughts and bad dreams

I'm having that somebody is going to get hurt or killed." (*Id.* at ¶ 15). Around this time Paul

Williams also spoke briefly over the phone with Overfield Township Police Chief Terry

Fisher. The content of that conversation is disputed by the parties. (Doc. 73, at ¶ 16); (Doc.

94, at ¶ 16). What is undisputed is that at some point in the conversation Paul Williams

informed the Overfield Township Police that he believed that all weapons had been

removed from the house following Mr. Williams' September 2012 hospitalization.[5] (Doc. 73,

at ¶ 20). After another ten to fifteen minutes had elapsed Paul Williams approached Mr.

Williams' home a third and final time and found the door locked. (Doc. 73, at ¶ 17). Chief

---

[5] Corporal Dunleavy of the Pennsylvania State Police testified that the officers remained concerned about the status of weapons within the home because there was a concern that "he took weapons from the home and then there was a point where he could have gone back and brought the weapons back into the home, because it was my [his] understanding that there was a delay in between those two time frames." (Doc. 73, at ¶ 21).

7

Fisher then called and spoke to Mr. Williams over the phone, and Mr. Williams informed Chief Fisher (referencing the mental health warrant) that he was not going.[6] (Id. at ¶ 18); (Doc. 94, at ¶ 18).

Soon after, Officer Robert Roberts of Tunkhannock Township arrived as the third officer on the scene, while Officer Mark Papi, also of Tunkhannock Township, arrived as the fourth officer. Both came in response to a request for assistance from the Overfield Township Police. (Doc. 73, at ¶ 22). Other police officers soon arrived on the scene, including Corporal James Dunleavy of the Pennsylvania State Police, Chief William Olszewski and Sergeant Hardy of Tunkhannock Borough, all of whom were briefed on the situation by Corporal Miller. (Id. at ¶ 23).

At some point, Mr. Williams attempted to leave through the back door of his home, but retreated into his home after the officers told him to stop.[7] (Id. at ¶ 24); (Doc. 94, at ¶ 24). Plaintiff Melinda Williams then arrived at the scene and spoke with Corporal Miller, who

---

[6] Mr. Fisher is the Chief of Police of Overfield Township and was Chief in November of 2012. (Doc. 79, at ¶ 47). Fisher was Mr. Williams' friend and had a good relationship with him. (Id. at ¶ 48). Fisher knew Mr. Williams since 1999 through work, as Mr. Williams was a volunteer firefighter for Lake Winola. (Id. at ¶ 49). Fisher knew Mr. Williams to be a peaceable, nonviolent man of good moral character. (Id. at ¶ 50). When Fisher learned that Overfield Township officers were attempting to serve a 302 warrant at Mr. Williams' home, he called Mr. Williams, who did not answer, and left a message on his machine. (Id. at ¶ 51). Mr. Williams called Fisher back and they spoke, with Mr. Fisher describing Mr. Williams' demeanor as calm and matter-of-fact (and that he was not crying, screaming, or yelling). (Id. at ¶ 54). Mr. Williams made no threats to Fisher, to the police, or anybody during the conversation. (Id. at ¶ 55). Chief Fisher was off duty at the time of the incident and did not come to the scene. (Id. at ¶ 73). Miller and the other Defendants on the scene all thought Fisher should have been there. (Id. at ¶¶ 75-76).

[7] Around this time Mr. Williams' four dogs were loose outside. The parties dispute whether the police officers pepper sprayed the dogs. (Doc. 73, at ¶ 25); (Doc. 94, at ¶ 25).

8

asked her to call Mr. Williams and convince him to come out. (Doc. 73, at ¶ 26). Mrs. Williams called Mr. Williams and had a brief conversation in which "he just kept saying he wasn't coming out, he has work, providing for his family." (Id.). Mrs. Williams thereafter called and spoke with Mr. Williams three to four additional times that afternoon. The parties dispute the content of those conversations. (Doc. 73, at ¶ 27); (Doc. 94, at ¶ 27).

Approximately forty-five minutes to one hour after the first officers arrived on the scene, the mental health warrant arrived.[8] (Doc. 73, at ¶ 28); (Doc. 94, at ¶ 28). Plaintiff Melinda Williams thereafter provided a key to the front door to the police officers.[9] (Doc. 73, at ¶ 29); (Doc. 94, at ¶ 29). Chief Ely, the Chief of Police for Tunkhannock Township, thereafter approached the home and began to speak with Mr. Williams through a side door to the home at a distance of approximately fifteen feet. (Doc. 73, at ¶ 31); (Doc. 94, at ¶ 31). Chief Ely and Mr. Williams thereafter had a conversation about the warrant and he informed Mr. Williams that he needed to come out and go to the hospital voluntarily. (Id.). At this point, Mr. Williams again requested to speak with his wife and mother. (Id.). Although both Mr. Williams' mother and his wife were on the scene, the police officers refused to permit either to speak with Mr. Williams. (Doc. 73, at ¶ 32); (Doc. 94, at ¶ 32).

---

[8] The parties dispute whether Defendant Chief Stanley Ely from Tunkhannock Township arrived before or after the warrant. Plaintiff maintains that "[a]t the time the warrant arrived, Ely was already at the scene," (Doc. 94, at ¶ 28), whereas Defendants imply that Chief Ely arrived around the same time as the warrant. (Doc. 73, at ¶ 28).

[9] Defendants also maintain that Mrs. Williams provided the officers with a drawing of the floorplan of the home, an allegation which Mrs. Williams disputes. (Doc. 94, at ¶ 29).

9

Approximately ten minutes later, Chief Ely again spoke with Mr. Williams from the side door.[10] (Doc. 73, at ¶ 35). Around this time the Defendant police officers began to develop a plan to try and get Mr. Williams to come out of the house.[11] (Doc. 73, at ¶ 37); (Doc. 94, at ¶ 37). The police officers discussed, and rejected, several options, including calling the Pennsylvania State Police Special Emergency Response Team.[12] (Doc. 73, at ¶ 39); (Doc. 94, at ¶ 39). The Defendants thereafter devised a plan which involved Chief Ely again approaching Mr. Williams at the basement door and officers taking Mr. Williams into custody, using force if necessary. (Doc. 73, at ¶ 40); (Doc. 93, at ¶ 40). According to the Plaintiff, no law enforcement officer on the scene had the same understanding of the details of the plan—a proposition that the Defendants contest. (Doc. 79, at ¶ 86); (Doc. 89, at ¶ 86). The parties agree that Officer Mark Papi volunteered to provide "lethal cover" should

---

[10] The parties dispute whether during the conversation—which took place through a basement door—the basement door was ajar. (Doc. 73, at ¶35); (Doc. 94, at ¶ 35). They also dispute Mr. Williams' demeanor—specifically, whether Mr. Williams was calm or agitated. (Doc. 73, at ¶36); (Doc. 94, at ¶ 36).

[11] None of the police officers saw Mr. Williams with any weapons prior to their entry into the home. (Doc. 73, at ¶ 41). The police officers also knew that Mr. Williams was in the home alone and did not believe he had any hostages. (Id. at ¶ 42). In addition, it is undisputed that Mr. Williams did not make any threats to any of the officers on the scene, (Id. at ¶ 43), nor had he done anything to suggest to the officers that he wished to harm himself. (Id. at ¶ 44). All of the Defendants knew that Mr. Williams was mentally ill. (Doc. 79, at ¶ 18).

[12] The Pennsylvania State Police Emergency Response Team is a team of troopers with extra training who can be called to come out to handle a situation where law enforcement is responding to a high-risk incident, such as a barricaded person or high-risk warrant service. (Doc. 79, at ¶ 79). In addition, the State Police on the scene had policies, regulations, field operation guides and training on serving mental health warrants and dealing with barricaded individuals. (Id. at ¶ 83). However, the State Police on the scene were only asked to 'assist' the defendant officers, not to take charge of the scene. (Id.). When 'assisting,' State Police do not make decisions to affect or override the agency they are assisting. (Id. at ¶ 84).

the group of officers need to advance into the home.[13]  (Doc. 73, at ¶ 41); (Doc. 94, at ¶ 41).

Defendant Olszewski told one of the troopers nearby to place an ambulance on standby

before they went into the house "in case something happens."[14]  (Doc. 79, at ¶ 88).

Soon after, Chief Ely approached the basement door a third and final time and spoke

with Mr. Williams.[15]  (Doc. 73, at ¶ 42).  The parties dispute what was said during that

conversation but agree that, as a result, Mr. Williams shut and locked the basement door.[16]

(Doc. 94, at ¶ 42).  It is undisputed that, at this time, Mr. Williams was contained in the

house and all of the entry and exit points to the home were covered prior to implementation

of a plan to either enter the home or coax Mr. Williams out.  (Doc. 79, at ¶ 93).  It is also

undisputed that, prior to the implementation of the plan, some of the Defendant law

enforcement officers wielded long guns, rifles and shotguns.  (Id. at ¶ 94).

---

[13] The parties dispute whether Officer Papi's conduct and the plan for lethal cover was a "standard tactic when officers deploy Tasers to apprehend an individual." (Doc. 73, at ¶ 41); (Doc. 93, at ¶ 41).

[14] The parties dispute whether the municipalities' policies that were in place at the time of the incident were followed. (Doc. 79, at ¶¶ 89-92); (Doc. 89, at ¶ 89-92).  They also dispute whether Defendant Overfield Township had policies regarding serving mental health warrants, and the specific training regarding barricaded individuals.  (Doc. 79, at ¶ 92); (Doc. 89, at ¶ 92).

[15] Each time Mr. Williams and Chief Ely spoke, Mr. Williams would open the door approximately 8-10 inches in order to speak to Ely.  (Doc. 79, at ¶ 62).

[16] The parties agree that Mr. Williams continued to ask to talk to his mother and wife.  (Doc. 79, at ¶ 69).  Officer Profka, who was approximately fifteen feet away from Chief Ely and Mr. Williams as they were talking through the basement door, described Mr. Williams as calm, but adamant that he was not coming out.  (Id. at ¶ 65).  Chief Ely characterized Mr. Williams' demeanor during these conversations as agitated, (Id. at ¶ 66), but noted that Mr. Williams was not yelling or screaming at him during these conversations. (Id. at ¶ 67).  Defendant Miller also overheard Mr. Williams and Chief Ely talking at the basement door and thought it was "going pretty well" and that Chief Ely had developed a rapport with Mr. Williams.  (Id. at ¶ 68).

Thereafter, Defendants Krieg, Olszewski, Miller, Hardy, Roberts, and Papi entered Mr. Williams' home through the locked front door, cleared the first floor, and proceeded down the stairs into the basement.[17]  (Doc. 73, at ¶ 43); (Doc. 94, at ¶ 43).  As the officers searched the basement, they observed Mr. Williams retreat into the bedroom at the far end of the hall, slamming the door as they approached.  (Doc. 73, at ¶ 44).  Chief Krieg opened the basement door to the outside and Chief Ely and Officer Profka joined the other officers outside the bedroom door, repeatedly ordering Mr. Williams to open the door, which he refused to do.[18]  (Id.).  Mr. Williams then yelled at the officers "You're going to be sorry. Don't do this," and "Don't come in here," or the officers would be "sorry." (Id.).  At this point, there were ten police officers inside Mr. Williams' home, standing outside of the basement bedroom door.  (Doc. 79, at ¶ 103).  Mr. Williams was contained in the basement bedroom and had no means of escape from the room.  (Id. at ¶ 105).  Moreover, the officers did not believe that Mr. Williams would have a rational or non-violent response to their forcible entry into the bedroom.  (Id. at ¶ 111).

What happened next is the subject of much dispute between the parties and highlights why this case cannot be resolved at the summary judgment stage.  According to the

---

[17] John Krieg was Chief of Police of Meshoppen Borough.  (Doc. 79, at ¶ 15).  Roger Hardy was a Sergeant at the Tunkhannock Borough police department and William Olszewski was the Chief of Police for Tunkhannock Borough.  (Id. at ¶¶ 15-16).

[18] Chief Ely testified that the police opened the door because "we had no idea at that point what he was doing inside.  For all we know, he could have been attempting to commit suicide." (Doc. 73, at ¶ 59). Plaintiff disputes that the "police opened the door to the basement because they had no idea what Mr. Williams was doing and he could be committing suicide." (Doc. 94, at ¶ 59).

Defendants, when the door did not open, Officer Roberts pushed his shield against the door but was unable to budge it until Officer Papi also pushed on the door, thereby breaching it. (Doc. 73, at ¶ 46). Officer Roberts pitched forward into the room and stumbled, bumping into Mr. Williams and knocking him into a seated position on the bed from which he immediately rebounded to his feet, while Officer Papi, Sergeant Hardy, and Chief Krieg also entered the bedroom. (Id.). As Mr. Williams immediately rebounded off the bed to his feet, he began to wildly slash and swing, in his right hand, a two foot long fireplace poker in the direction of the officers at shoulder to head level, trying to strike them as the officers yelled at him, from about four feet away, to "Drop it, Drop it." (Id. at ¶ 47). Chief Krieg and Sergeant Hardy then each fired a Taser at Mr. Williams, but the Taser failed to have any effect on him. Mr. Williams continued to shout at the officers to get out of the room while continuing to swing the poker at the officers' heads while Officer Roberts was wedged against Officer Papi with the shield into the corner of the room and unable to move or to raise the shield to defend himself. (Id. at ¶ 48). The officers continued to command Mr. Williams to get down and to drop the poker, which, according to the Defendants had a pointed end like an ice pick. Mr. Williams also continued to menace the officers by waving the poker at them in a figure-eight motion and yelling at them aggressively to "Get the fuck out of here," and to "Leave me the fuck alone." (Id. at ¶ 49). Chief Ely then fired a third Taser at Mr. Williams, striking him, but after an instantaneous hesitation he resumed menacing the officers, and proceeded to raise the poker over his head and pointing the

13

sharp end like a spear towards Office Roberts and Papi, who were only 3-4 feet away. (Id. at ¶ 50). As the officers continued to command Mr. Williams to put the poker down, he instead started moving forward and advanced down and toward Officers Papi and Roberts by closing the gap and making a pitching motion over his head. At this time, Officer Papi had his firearm at the "high ready" and was commanding Mr. Williams repeatedly to "put the poker down, put the poker down." (Id. at ¶ 51). Officer Papi gave Mr. Williams two verbal commands to put it down and, since he felt that he and Officer Roberts were going to be the target of Mr. Williams' attack, he fired two shots and Mr. Williams thereafter fell back on the bed. (Id. at ¶ 52). It is undisputed that Officer Papi did not warn Mr. Williams about his use of force before he shot and killed him.[19] (Doc. 79, at ¶ 123).

Plaintiff disputes many of the statements in the preceding paragraph. While Plaintiff admits that the Defendants forcibly opened the bedroom door, she notes that many of the Defendants have differing versions of how this was accomplished. (Doc. 94, at ¶ 46). Plaintiff also admits that when the Defendants broke down the door, the officers found Mr. Williams in possession of a fireplace poker which he was moving in front of his body. (Id. at ¶ 47). However, Plaintiff notes that the Defendants all have differing versions of what Mr. Williams was doing with the poker and therefore claims that these facts are disputed. (Id.).

---

[19] The parties agree that Officer Papi shot Mr. Williams twice with his firearm and that, as a result, Mr. Williams died. (Id. at ¶ 52). After the shooting, Officer Papi removed the poker from the bed where Mr. Williams lay mortally wounded, placing it onto the floor, and the officers then proceeded to handcuff Mr. Williams before performing CPR and summoning emergency medical personnel. (Doc. 73, at ¶ 53). According to the Defendants, Mr. Williams passed away almost immediately—a point that Plaintiff disputes. (Doc. 73, at ¶ 55); (Doc. 94, at ¶ 55).

Specifically, Plaintiff notes that Defendant Miller testified that Mr. Williams was moving the

poker in a figure-eight motion horizontally at about chest level, whereas Defendant Profka

testified that Mr. Williams was moving the poker at shoulder-level, back and forth, in a

slashing motion. (*Id.*). Officer Papi testified that Mr. Williams was swinging the poker wildly

at chest level, over his head, in all directions in slashing movements whereas Roberts

testified that Mr. Williams was waving the poker in a horizontal figure-eight motion at upper

chest level "to keep people back." (*Id.*). Chief Ely testified that Mr. Williams was standing

on the bed, swinging the poker from right to left down across his body, and Defendant

Hardy testified that Mr. Williams was swinging the poker back and forth and up and down all

over in front of his body. (*Id.*). Defendant Olszewski testified that the poker was coming

down across the front of Mr. Williams' body in a slicing motion and then going back up.

(*Id.*). In sum, Plaintiff disputes that Mr. Williams was trying to strike any of the officers with

the poker, and maintains that Mr. Williams' conduct was inconsistent with the idea that Mr.

Williams was using the poker as a lethal weapon. (*Id.*). In addition, while Plaintiff admits

that Defendants Krieg, Hardy, and Ely fired Tasers at Mr. Williams—which had no effect—

Plaintiff disputes that any of the Tasers actually struck Mr. Williams. (*Id.* at ¶ 48). Plaintiff

further disputes that the poker had a "sharp end" or resembled an ice pick, and that

following Defendant Ely's Tasering that Mr. Williams "resumed menacing the police." (*Id.* at

¶ 50). Plaintiff also disputes that Mr. Williams raised the poker over his head, noting that

Mr. Williams was six feet two inches tall, and that it is seven feet and nine inches from the

floor in the bedroom where Mr. Williams was shot and killed to the rafters of the ceiling, and the poker was approximately two feet long. (Id. at ¶ 51). Accordingly, Plaintiff claims that Defendant "Papi's self-serving claim that Mr. Williams was holding the poker by the handle, vertically, extended almost fully above his head just before he shot Mr. Williams is impossible given the clearance of the ceiling in the room."[20] (Id.).

With respect to the use of deadly force, Officer Roberts testified that "at the same time Officer Papi discharged the weapon, I felt that one of us was about to be seriously injured, and I was reaching for my sidearm as well." (Doc. 73, at ¶ 56). Sergeant Hardy testified that he feared for his safety and for the safety of the other officers when Mr. Williams "started to come forward," and that "from the onset, when he was swinging, had I been any closer, I'm sure he would have hit me" and that the poker "was capable of killing an officer." (Id. at ¶ 57). Corporal Miller testified that "from [his] vantage point and an officer safety issue, [he] believe[s] the right thing was done."[21] (Id. at ¶ 58). It is undisputed that it was a very short amount of time between the time the officers entered the home and the time Mr. Williams was shot and killed.[22] (Doc. 79, at ¶ 127). It is also undisputed that Defendants

---

[20] Plaintiff also notes, and Defendants admit, that Defendant Papi was not instructed by Defendant Miller (whom all the Defendants identified as being in charge of the scene) to even enter the home in the first instance. (Doc. 79, at ¶ 130).

[21] Plaintiff admits that the officers testified as such, but disputes the credibility of these statements. (Doc. 94, at ¶ 57).

[22] Officer Papi testified that it was a "short period of time . . . I'd say minutes," whereas Ely testified that it was "under five minutes, maybe shorter." (Doc. 79, at ¶ 127). Corporal Dunleavy testified that it was "a minute, give or take." (Id.).

Miller, Kreig, Hardy, Ely, Roberts and Papi had never been in a situation where they used deadly force before, nor had they been involved in any prior situation where any other officer used deadly force. (Doc. 79, at ¶ 128).

As for the training received by the officers, the Defendants assert that each of the received Act 120 municipal police officer training, which including training on the use of force, the serving of warrants, and handling interactions with mentally and emotionally disturbed individuals as part of mandatory MPOETC training from 2001 to present."[23] (Doc.

_____

[23] Plaintiff notes that in support of this assertion Defendants "only cite to their expert reports of Emanuel Kapelsohn and Mark Keller for support." (Doc. 94, at ¶ 62). "These reports are the subject of a motion to strike filed by Plaintiff simultaneously with plaintiff's response papers to defendants' motion for summary judgment because the reports were not ever included in any party's pleadings and were never utilized as an exhibit during any deposition and are not a part of the 'record' in this case and are not sworn affidavits or declarations." (Id.). Moreover, Plaintiff asserts that "the 'facts' contained in this paragraph are contrary to the defendants' testimony. Defendants Overfield Township, Tunkhannock Township, and Meshoppen Borough did not have any written policies relating to mentally ill individuals, the ADA or the RA, nor did those municipal defendants provide their officers with training relating to those topics." (Id.). In addition, "plaintiff's expert Dr. Lyman stated in his expert report that Overfield Township, Tunkhannock Township, Tunkhannock Borough and Meshoppen Borough chose not to establish written directives dealing with mentally ill persons, barricaded suspects or compliance with the ADA and RA as they related to field operations dealing with persons experiencing a mental health crisis. Failure on the part of the municipalities to do so not only deprived Mr. Williams of his rights under the ADA and RA, but resulted in a deadly force situation that was completely avoidable." (Id.).

Turning to Plaintiff's "Motion to Strike Defendants' Expert Reports as Exhibits 17 and 18 to Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment," (Doc. 91), Plaintiff's principal argument is that these exhibits "are not part of the 'record' in this case, nor may the Court rely on them in deciding defendants' Motion for Summary Judgment." (Doc. 92, at 4). Moreover, Plaintiff objects to the use of Exhibits 17 and 18 because "Defendants do not support their expert reports with any affidavits or declaration, as is required by Fed. R. Civ. P. 56(c)." (Doc. 91, at 4).

Defendants oppose Plaintiff's Motion, noting that the expert reports "are clearly materials that are properly offered in support of Defendants' Motion for Summary Judgment," as "those materials are now in the record by virtue of Defendants having attached them as Exhibits 17 and 18 to their Statement of Facts in Support of Summary Judgment." (Doc. 97, at 2). Defendants further submitted declarations of their experts, Emanuel Kapelsohn and Mark Keeler, "indicating that they will testify in conformity with these

73, at ¶ 62). Moreover, Defendants maintain that "Plaintiff has no evidence that any policy

of Overfield Township, Tunkhannock Township, Meshoppen Borough, or Tunkhannock

Borough in the manner in which they trained their police officers to serve a 302 mental

health warrant has ever been demonstrated to be constitutionally defective on any occasion

prior to November 7, 2012."[24] (Id. at ¶ 63). Defendants admit, however, that Overfield

Township, Tunkhannock Township, and Meshoppen Borough did not have any written

policies relating to mentally ill individuals, the ADA or the RA, nor did those municipalities

provide their officers with training relating to those topics. (Doc. 79, at ¶ 20); (Doc. 89, at ¶

20).

## III.    STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

---

reports at trial." (Id. at 3). As such, Defendants maintain that "Plaintiff has no good legal objection to the
reports, which were attached to the Statement of Facts as Exhibits 17 and 18 respectively." (Id).

The Court agrees with the Defendants and finds that Plaintiff lacks any legal basis with which to strike
the expert reports from the record and, as such, will deny Plaintiff's Motion to Strike. Plaintiff remains free
to raise any issues with respect these experts at or before trial.

[24] Plaintiff disputes that the municipal defendant's "policies were not defective prior to November 7,
2012." (Doc. 94, at ¶ 63). According to the Plaintiff "[t]hose defective policies which pre-existed the events
of November 7, 2012 were a cause of the death of Brian Williams. It is admitted that those pre-existing
unconstitutional policies and customs did not result in a death prior to November 7, 2012. However, such
unconstitutional policies and/or customs inevitably would lead to a tragedy, as occurred when these
municipalities' police officers, untrained and unguided by constitutional policies, encountered the November
7, 2012 situation. Because these municipalities' police officers were untrained and unguided, pursuant to
the municipalities' policies and/or customs, they were unprepared and caused Mr. Williams' death." (Id.).

18

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993). Where, as here, the Court is "confronted with cross-motions for summary judgment, the court must rule on each party's

motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 187 F. App'x 266, 270 (3d Cir. 2006). "Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (internal citation and quotation marks omitted).

## IV.    ANALYSIS

In the Amended Complaint, Plaintiff asserts various claims pursuant to 42 U.S.C. § 1983, the ADA and the RA, and also raises state law claims under Pennsylvania law. The Court will first address the claims brought pursuant to 42 U.S.C. § 1983—Counts I, II, V, and VI.

### A.  Section 1983 Claims

To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate the violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). Section 1983 is not in itself a source of substantive rights, instead providing a remedy for violations of rights protected by other federal statutes or by the U.S. Constitution.

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L. Ed.2d 791 (1985).
Therefore, in evaluating a § 1983 claim, a Court must "'identify the exact contours of the
underlying right said to have been violated" and determine "whether the plaintiff has alleged
a deprivation of a constitutional right at all.'" *Nicini*, 212 F.3d at 806 (quoting *Cnty. of
Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L. Ed. 1043 (1998)). In
the instant matter, Plaintiff's claims against the Defendants arise under the Fourth
Amendment to the United States Constitution.

### i. Excessive Force Claims & Qualified Immunity

In Counts I and II of the Amended Complaint, Plaintiff asserts Fourth Amendment
excessive force claims against Defendants Mark Papi, Robert Roberts, Chief Ely, Paul
Miller, Slade Profka, Chief Kreig, Roger Hardy, and Chief Olszewski in connection with their
conduct on November 7, 2012, in serving the mental health warrant on Mr. Williams and
subsequently shooting Mr. Williams dead. Specifically, Count I of the Amended Complaint
states that "Defendants conduct against Mr. Williams, including their use of unreasonable
force in entering Mr. Williams' home, constituted an unreasonable seizure under the Fourth
Amendment to the United States Constitution." (Doc. 44, at ¶ 135). Count II asserts that
"Defendant Papi's conduct against Mr. Williams, including his use of unreasonable, deadly
force to seize Mr. Williams, constituted an unreasonable seizure under the Fourth
Amendment to the United States Constitution." (*Id*.). Defendants seek summary judgment
on Counts I and II on the basis of qualified immunity. Plaintiff also seeks summary

judgment on Count I in which she alleges the unreasonable use of force by Defendants

Papi, Roberts, Ely, Miller, Profka, Kreig, Hardy and Olszewski in entering Plaintiff's home

and bedroom.[25]  (Doc. 78, at 6).

As an initial matter, there is no doubt that the Defendant police officers acted under color

of state law within the meaning of § 1983. *See Abbott v. Latshaw*, 164 F.3d 141, 146 (3d

Cir. 1998) (holding that defendant police officers were state actors because "[t]hey were

clearly invested with the power and authority of the state").  Thus, the question becomes

whether the Defendants deprived Mr. Williams of his federal constitutional rights and, if so,

whether the Defendants are nevertheless entitled to qualified immunity.

"Police officers, embodying the authority of the state, are liable under § 1983 when they

violate someone's constitutional rights, unless they are protected by qualified immunity."

*Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007).  District courts must "perform[] a two-step

inquiry to determine whether a particular government official is entitled to summary

judgment based on qualified immunity." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir.

2015) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

First, the Court must consider whether the facts, viewed in the light most favorable to the

non-moving party, show that a state official violated a constitutional right.  *Id.*  Next, the

Court asks "whether that right was clearly established at the time of the official's action." *Id.*

---

[25] Plaintiff notes that "[w]hile the use of deadly force at the moment defendant Papi killed Mr. Williams was constitutionally unreasonable, we do not move for judgment as a matter of law on that issue.  Instead, this limited summary judgment motion concerns the unreasonable **entry** into Mr. Williams' home and bedroom, which then led quickly to defendants killing Mr. Williams."  (Doc. 78, at 15 n.2) (emphasis supplied).

Where, as here, a Plaintiff asserts an excessive force claim, there are "more particularized requirements." *Id.* Specifically, the Court must determine "whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test." *Id.* This requires the Court to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* (internal citation and quotation marks omitted).

### a. Violation of Mr. Williams' Constitutional Rights

"[T]he first step of the analysis addresses whether the force used by the officer was excessive, and therefore violative of plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the office at the time." *Curley*, 499 F.3d at 207. "This is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity." *Id.*

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . searches and seizures." U.S. Const. Amend. IV. "The Fourth Amendment applies to seizures in civil, as well as criminal, proceedings" and "the fundamental inquiry in such proceedings . . . remains whether the government's conduct is reasonable under the circumstances." *Doby v. DeCrescenzo*, 171 F.3d 858, 871 (3d Cir. 1999) (citations omitted).

23

It is well settled that "[u]se of excessive force by a state official effectuating a search or seizure violates the Fourth Amendment." *Estate of Smith v. Marasco*, 430 F.3d 140, 148 (3d Cir. 2005). "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999). A police officer seizes a person whenever he or she "restrains the freedom of a person to walk away." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985).

With respect both to the entry into Mr. Williams' home by the Defendants, and his subsequent shooting by Defendant Papi, there can be no question that the Defendants seized Mr. Williams within the meaning of the Fourth Amendment.[26] *See Kaupp v. Texas*, 538 U.S. 626, 629, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (holding that a seizure occurs when, "taking into account all the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (internal citation and quotation marks omitted); *see also Garner*, 471 U.S. at 7 ("There can be no question that apprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). The question then becomes whether the Defendants' use of force to seize Mr. Williams was reasonable under the circumstances.

---

[26] Where, as here, ten police officers enter an individual's home, and that individual is confined to a small bedroom in a basement with no means to escape, there can be no doubt that he has been seized within the meaning of the Fourth Amendment. Surely, "taking into account all the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp*, 538 U.S. at 629.

24

In order to determine whether the force used was objectively reasonable, the Third

Circuit instructs district courts to consider:

> The severity of the crime at issue, whether the suspect poses an immediate threat to
> safety of the officers or others, and whether he is actively resisting arrest or
> attempting to evade arrest by flight . . . [whether] the physical force applied was of
> such an extent as to lead to injury . . . the possibility that the persons subject to the
> police action are themselves violent or dangerous, the duration of the action,
> whether the action takes place in the context of effecting an arrest, the possibility
> that the suspect may be armed, and the number of persons with whom the police
> officers must contend at one time.

*Sharrar v. Felsing*, 128 F.3d 810, 821-22 (3d Cir. 1997), *abrogated on other grounds in*

*Stetser v. Jinks*, 572 F. App'x 85 (3d Cir. 2014). Put another way, the reasonableness

inquiry, which is "highly individualized and fact specific" should be principally guided by

three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an

imminent threat to the safety of the police or others in the vicinity, and (3) whether the

suspect attempts to resist arrest or flee the scene." *Santini*, 795 F.3d at 417 (citing *Graham*

*v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1965, 104 L.Ed.2d 443 (1989)). The Court must

evaluate the objective reasonableness of the force used "in light of the totality of the

circumstances" which are analyzed "from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight, making allowance for the fact that

police officers are often forced to make split-second judgments—in circumstances that are

tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

particular situation." *Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016)

(internal citation and quotation marks omitted).

In considering whether the force used by the Defendants in the instant matter was objectively reasonable under the circumstances, the Court notes that it is well settled that "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004); *accord Abraham*, 183 F.3d at 290 ("[R]easonableness under the Fourth Amendment should frequently remain a question for the jury."). With that said, the Court finds that, viewing all facts and inference in the light most favorable to the Plaintiff, a reasonable factfinder could find that Mr. Williams' constitutional rights were violated by both the entry into his home and his subsequent deadly shooting, which were objectively unreasonable under circumstances.[27]

First, the severity of Mr. Williams' crimes, or lack thereof, weighs in his favor. Mr. Williams was neither charged with, nor suspected of, committing any crime. Rather, police sought to apprehend him for his own protection, and the ostensible protection of his wife, pursuant to a mental health warrant. Second, there is plainly a factual dispute with respect to whether Mr. Williams posed an imminent threat to the safety of the Defendant officers and others in the vicinity, such that entry into his home, the breaking down of the bedroom door, and subsequent Tasering and shooting was justified under the circumstances. For example, it can be argued that the police knew that Mr. Williams was not a danger to others

---

[27] Equally clear is that, viewing all the facts and inferences in the light most favorable to the Defendants, a reasonable factfinder could find that Mr. Williams' rights were *not* violated by the Defendants' conduct in seizing Mr. Williams. There is plainly a factual dispute surrounding the circumstances preceding Mr. Williams' death which goes to the heart of the reasonableness of the force used by the Defendants. That factual dispute is for the jury, not the Court, to resolve. Therefore, the Court cannot grant Plaintiff's Motion for Summary Judgment with respect to Count I.

because they permitted Mr. Williams' father to go into the home twice to talk to Mr. Williams and his father emerged both times unharmed. With respect to the encounter with Mr. Williams in the basement bedroom, although some (but not all) of the Defendants testified that Mr. Williams was wildly slashing the poker in the direction of the officers and holding it above his head Plaintiff notes that—given Mr. Williams' height and the dimensions of the room—that would be impossible. Plaintiff also claims that, contrary to Defendants' assertion, the poker did not have a sharp edge like an ice pick. Moreover, the Defendant officers were repeatedly informed that Mr. Williams did not possess any firearms, and were aware that there were no other individuals in the home whom Mr. Williams could harm. Cf. Doby, 171 F.3d at 874 (holding that defendants' conduct in executing mental health warrant (without using deadly force) did not amount to excessive force in violation of the Fourth Amendment and noting that "the officer was aware that there were guns in the Dobys' home"). As the Third Circuit recognized in Bennett v. Murphy, 274 F.3d 133, 137 (3d Cir. 2002), a police officer is not "precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff," but such a "contention, however, must be considered at trial." Id.

Third, there is a factual dispute regarding whether Mr. Williams attempted to resist arrest or flee the scene such that the use of force was necessary under the circumstances. While it is apparent that Mr. Williams appeared unwilling to go voluntarily with the police officers, he was actively engaged in negotiations with Chief Ely at the basement door and

communicating with officers such as Chief Fisher on the telephone. Even if the Court were to assume that Mr. Williams resisted arrest, there is a factual dispute as to whether his resistance included the use or threats to use violence, and therefore necessitated the Defendants' entry into Mr. Williams' home and subsequent shooting. Fourth, the duration of the incident also suggests that the use of force was objectively unreasonable under the circumstances. Shortly after arriving at Mr. Williams' house to serve the warrant, approximately ten officers stormed Mr. Williams' house, broke down his bedroom door, and shot him dead (without a warning) in a matter of minutes—all to serve a mental health warrant on a barricaded individual who was, at the time the officers stormed the home, arguably not a threat to himself or others. In fact, from the initial call to the point where Defendant Papi shot and killed Mr. Williams, the Defendant officers had spent a little over two hours at Mr. Williams' home—with the first 45 minutes merely waiting for the civil commitment warrant to arrive. Finally, the extent of the injury inflicted—here, death—again weighs in favor of the Plaintiff.

In sum, material factual disputes exist as to whether Mr. Williams' constitutional rights were violated by the Defendants' entry into his home and subsequent deadly shooting. The existence of those factual disputes leads the Court to conclude that summary judgment is inappropriate as the Court cannot conclude that, as a matter of law, Defendants' use of force was objectively reasonable or unreasonable under the circumstances. *See Santini*,

795 F.3d at 420. It is for the jury to decide whether the Defendants' use of force was objectively reasonable under the circumstances.

### b. Whether the Right Was Clearly Established

Having concluded a reasonable jury presented with the factual circumstances of this case may very well find that Defendants' entry into Mr. Williams home, and subsequent shooting, was unreasonable and in violation of Mr. William's Fourth Amendment rights, the Court must next turn to the second step in the qualified immunity analysis. The second step in the immunity analysis "addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit." *Curley*, 499 F.3d at 207.

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L.Ed.2d 555 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (internal citation and quotation marks omitted). Moreover, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014). "The issue of qualified

immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (citations omitted). "A defendant has the burden to establish that he is entitled to qualified immunity." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

Here, the Court finds that the Defendants have failed to satisfy their burden to demonstrate their entitlement to summary judgment on the basis of qualified immunity. The Court further finds that any reasonable officer would know that it was clearly established that it was an excessive use of force for ten officers to storm a house in order to serve a mental health warrant (after less than 2 hours on the scene and when the individual was actively engaging with the officers), then immediately confront a barricaded individual with a mental illness who had retreated to his bedroom, and who they had reason to know was unarmed, by breaking down the door, Tasering him, and then shooting and killing the individual who was armed only with a fireplace poker when there was no potential for that individual to escape, flee, or harm others.

In *Garner*, the Supreme Court discussed whether a police officer's shooting of a suspect was excessive force in violation of the Fourth Amendment. The Court found that:

> The use of deadly force to prevent escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot

does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. . . .

It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11-12. Moreover, at the time of incident in question, the law in the Third

Circuit clearly established a prohibition on the use of excessive force by police officers in

effectuating a seizure where, as here, the immediacy and necessity of the use of excessive

and deadly force are highly questionable when the facts are viewed in the light most

favorable to the Plaintiff. For example, in *Estate of Smith v. Marasco*, 430 F.3d 140, 151-

153 (3d Cir. 2005) the Third Circuit held that certain officers were not entitled to qualified

immunity for claims that they used excessive force in storming the decedent's shed (where

he was barricaded) in a situation where, as here, the facts viewed in the light most favorable

to the Plaintiff demonstrate that the Plaintiff did not pose an immediate danger to others and

was suffering from a medical condition that may have resulted in harm due to the

Defendants' conduct. In so finding the Court noted that:

We recognize that, in certain situations, the volatile nature of a suspect will weigh in favor of a greater show of force. In all such cases, however, the officer's actions must be evaluated in light of the factors listed in *Sharrar*. When viewing the facts in the light most favorable to the Smiths, we believe that a reasonable officer would have concluded that, at the time the decision was made, Smith did not pose a threat that was sufficiently serious and immediate as to require storming his house. At all events, a reasonable officer would have recognized the significant risk that Smith

31

would suffer serious harm as a result of the decision to do so. Balancing these considerations, we think that a reasonable officer would have concluded that storming the house would violate Smith's constitutional rights

*Id.* at 151-52. The same reasoning applies here.[28]

Although Defendants assert that their conduct did not amount to unreasonable and excessive force under the circumstances, and they did not violate any clearly established law, there is plainly a factual dispute on that issue and, accepting Plaintiff's versions of the fact as true, a reasonable officer would have concluded that Mr. Williams did not pose a threat that was sufficiently serious and immediate as to require storming his house and subsequently shooting him dead. In any event, "[b]ecause the facts to be determined are disputed and as such are the function of the jury," *Rivas*, 365 F.3d at 201, the Court cannot conclude that, as a matter of law, Defendants are entitled to summary judgment on the basis of qualified immunity. "Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley*, 298 F.3d at 278; *see also Giles*, 571 F.3d at 327-28 ("Accordingly, because accounts of this critical event were controverted, on summary judgment it was

---

[28] Additional cases decided by the Supreme Court and this Circuit also demonstrate that the prohibition on the use excessive force in similar circumstances was clearly established at the time of the incident. *See, e.g., Graham*, 490 U.S. 386; *Couden v. Duffey*, 412 F. App'x 476 (3d Cir. 2011); *Green v. New Jersey State Police*, 246 F. App'x 158 (3d Cir. 2007); *Curley*, 499 F.3d 199; *Estate of Smith v. Marasco*, 318 F.3d 498 (3d Cir. 2003); *Curley v. Klem*, 298 F.3d 271 (3d Cir. 2002); *Abraham* 183 F.3d 279; *Sharrar*, 128 F.3d at 821-22.

improper to dismiss Giles' complaints against [the defendants] on the basis of qualified immunity."). The Court will therefore deny Defendants' Motion for Summary Judgment with respect to Counts I and II and deny Plaintiff's Motion for Summary Judgment with respect to Count I.

## ii.    Supervisor Liability & Qualified Immunity

In Count VI Plaintiff asserts claims against Chiefs Fisher, Ely, Kreig, and Olszewski and against Corporal Miller alleging supervisory liability under § 1983. According to Plaintiff, Chief Fisher failed to supervise Corporal Miller by refusing to the come to the scene of the incident, whereas Corporal Miller, and Chiefs Ely, Kreig, and Olszewski "failed to supervise their subordinates on the scene by their knowledge and acquiescence to the subordinates' Fourth Amendment violations for entry into Mr. Williams home." (Doc. 44, at ¶¶ 160-173). Moreover Plaintiff alleges that each of individuals named in Count VI, with the exception of Chief Fisher, "each individually participated in violating Mr. Williams' Fourth Amendment rights by their own unreasonable entry into Mr. Williams' home" and that Chief Ely failed to supervise Defendant Papi, his subordinate, "by his knowledge and acquiescence to Papi's unreasonable use of deadly force." (Id.). In addition, Plaintiff alleges supervisory liability based on the Defendants' failure "to implement and maintain policies," failure to "obtain training," and failure "to send their subordinates to training relating to issues such as service of civil commitment warrants, dealing with mentally ill or barricaded persons and use of

force on mentally ill individuals, which directly caused harm to Mr. Williams with deliberate indifference to the consequences." (Id.).

Defendants maintain that they are entitled to summary judgment on this Count for a variety of reasons. First, they maintain that no officer ordered Mark Papi, Chief Kreig, Chief Ely, or Roger Hardy to use force against Brian Williams. Rather, "each officer acted independently based upon his training and reasonable perception of the dire circumstances facing them while Williams was menacing them with the two-foot long poker." (Doc. 74, at 25). Second, Defendants allege that Mr. Williams' rights were not violated by the police officers, and that Plaintiff has no evidence of a subordinate actually committing a constitutional tort for which to hold any of the Defendant supervisors responsible. (Id.). Third, to the extent that the officers were personally involved in the use of force, such as by Chief Ely and Chief Kreig Tasering Mr. Williams, "these facts would not give rise to supervisor liability, but are rather redundant and repetitive of the individual liability claims in Count I." (Id. at 26). Finally, Defendants maintain they "are entitled to qualified immunity because any obligation as supervisors was not clearly established law when these events took place." (Id.).

A supervisor may be personally liable under § 1983 for, among other things, "if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." A.M. ex. Rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (citing Baker v.

*Monroe Twp.*, 530 F.3d 1186, 1190-91 (3d Cir. 1995)). Viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could conclude that each of the named supervisor Defendants—who were either present at the scene of the incident or directly participated in the events giving rise to Plaintiff's claims—may be held liable under the circumstances. As discussed above in connection with Counts I and II, genuine issues of material fact with respect to both the objective reasonableness of the use of force against Mr. Williams, and whether the Defendants are entitled to qualified immunity, lead the Court to conclude that summary judgment must be denied. Accordingly, the Court will deny the Defendants' Motion with respect to Count VI.

### iii.    *Monell* Claims Against the Municipalities

Count V of the Amended Complaint asserts a Section 1983 *Monell* claim against Overfield Township, Tunkhannock Township, Meshoppen Borough, and Tunkhannock Borough based upon the alleged excessive force used by the Defendant police officers of the respective municipalities. According to the Plaintiff, Defendants Chief Fisher, Chief Ely, Chief Kreig, and Chief Olszewski "were the highest law enforcement policymakers in Overfield Township, Tunkhannock Township, Meshoppen Borough and Tunkhannock Borough respectively." (Doc. 44, at ¶ 151). As such, each of these Defendants "had the responsibility and authority to establish policy for their respective municipalities and their actions and omissions were the actions and omissions of their respective municipalities." (*Id.* at ¶ 152). In addition, each of these named Defendants, with the exception of Chief

35

Fisher, "personally participated in the entry into Mr. Williams' home," (*Id.* at ¶ 153), and these "illegal actions set illegal policy for Tunkhannock Township, Meshoppen Borough, and Tunkhannock Borough." (*Id.* at ¶ 154).[29] Plaintiff further alleges that Defendant Tunkhannock Township "had written policies in place at the time of this incident for handling a scene with a barricaded individual" and this policy mandated "that in negotiations, no demands are off limits except supplying the actor with weapons or additional hostages, and that no officer should enter a structure or area controlled by a barricaded individual unless it is a special response officer executing a specific tactic." (*Id.* at ¶ 155). However, "[n]o defendant on scene was a 'special response officer.'" (Doc. 44, at ¶ 156). "Even though Tunkhannock Township had this written policy," Plaintiff claims that "Chief Ely chose to directly violate this policy and form a new policy through his actions which involved refusing Mr. Williams' demand to speak to his wife and mother and participating in and permitting the entry into Mr. Williams' home by police who were not 'special response officers.'" (*Id.* at ¶ 157). Defendants seek summary judgment on this count on the theory that "Plaintiffs have failed to set forth sufficient evidence to establish a claim against the boroughs and townships." (Doc. 74, at 26).

---

[29] With respect to the Defendant Chief Fisher, Plaintiff alleges that he "knew something bad would happen to Mr. Williams during this incident yet was deliberately indifferent to the situation by refusing to be present and take command of the scene." (Doc. 44, at ¶ 158). Moreover, Defendant Chief Fisher "by his own illegal action and/or omission set illegal policy for Overfield Township by leaving an individual in charge of the scene whom he failed to train to handle a situation such as described above." (*Id.*). With respect to Chief Fisher, Plaintiff further alleges that "by his own illegal action and/or omission" Chief Fisher "set illegal policy for Overfield Township by failing to come to the scene and set legal policies for the peaceful service of this civil commitment warrant and by his conduct as described above." (*Id.*).

A municipality may be held liable under § 1983 when the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers", including "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, "a municipality cannot be held liable *solely* because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. As the Third Circuit has observed:

> There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Natale v. Camden Cnty Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (internal citations and quotation marks omitted).

Here, the Court finds that, viewing all the evidence in the light most favorable to the Plaintiff, the conduct of Chief Ely, Chief Kreig, and Chief Olszewski, falls squarely into the second category of *Monell* violations set forth by the Third Circuit in *Natale*. In *Natale*, the Third Circuit noted that a municipality may be liable under § 1983 for the acts of its employees "where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Natale*, 318 F.3d at 584. As previously discussed, the conduct Plaintiff complains of involves alleged violations of federal law through the use of excessive force by individuals who were the highest law enforcement officers and policymakers in their respective municipalities. That is plainly sufficient for *Monell* liability to attach to the Defendant municipalities should the factfinder determine that the Defendants engaged in the use of excessive force. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001) ("Only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability.") (internal citation and quotation marks omitted). Accordingly, Defendants Tunkhannock Township, Meshoppen Borough, and Tunkhannock Borough's Motion for Summary Judgment with respect to Count V will be denied.

With respect to the liability of Overfield Township, Plaintiff asserts an additional theory of Monell liability. Here, Plaintiff alleges that Overfield Township is liable under § 1983 because Chief Fisher, as a policy maker, "failed to act affirmatively . . . though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Natale, 318 F.3d at 584. Viewing all the evidence in the light most favorable to the Plaintiff, as the Court must at this stage, the Court finds that factual disputes exist as to whether Chief Fisher's acts or omissions during the incident in question caused the constitutional violation at issue such that Overfield Township may be liable under the circumstances For example, all the Defendant officers testified that they were of the belief that Chief Fisher— who was friends with Mr. Williams—should have been present at the scene.

Plaintiff also alleges, and the record evidence viewed in the light most favorable to the Plaintiff suggests, that Chief Fisher "was deliberately indifferent to the situation by refusing to be present and take command of the scene" and that Chief Fisher "by his own illegal action and/or omission set illegal policy for Overfield Township by leaving an individual in charge of the scene whom he failed to train to handle" the situation. (Doc. 44, at ¶ 158). Moreover, there is evidence in the record to conclude that Overfield Township had a policy, practice, or custom of failing to train its officers on how to appropriately deal with barricaded individuals, and how to conduct themselves while serving mental health warrants such that

a reasonable factfinder could conclude that such a failure directly caused a constitutional violation to occur and was a highly predictable consequence of such failure. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 137 L.Ed.2d 626 (1997) (noting that *Monell* liability may attach in circumstances where "a violation of federal rights [is] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations," such as, for example, dealing with barricaded individuals and appropriately serving mental health warrants); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Simply put, there is evidence by which a jury could conclude that Plaintiff has met his burden on his *Monell* failure to train claim. "If the jury were to credit the opinion of plaintiff's expert," Dr. Lyman, "the jury could find that the training of officers on dealing with ill and mentally ill persons was so inadequate as to represent deliberate indifference to citizens' constitutional rights." *Shultz v. Carlisle Police Dept.*, 706 F. Supp. 2d 613, 625 (M.D. Pa. 2010). Accordingly, the Court will deny Overfield Township's Motion for Summary Judgment with respect to Count V.

### B. ADA & RA Claims Against the Municipalities

In Count VII of the Amended Complaint (erroneously labeled as Count VI) Plaintiff raises a claim of disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 792 *et seq.* against Defendants Overfield Township, Tunkhannock Township, Meshoppen Borough, and Tunkhannock

Borough. Both the Plaintiff and the Defendants have moved for summary judgment with respect to Count VII. The crux of Plaintiff's claim appear to be that the Defendants failed to make reasonable accommodations to ensure the safe execution of the involuntary mental health commitment warrant. Defendants seek summary judgment on Count VII on the theory that Mr. Williams was not "disabled" within the meaning of the ADA and RA. (Doc. 74, at 32). In addition, Defendants maintain that Plaintiffs theory of "wrongful arrest" and failure to make a "reasonable accommodation" do not apply under the circumstances. (*Id.*).

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such a disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12102. "The *prima facie* cases for compensatory claims brought pursuant to § 504 [of the RA] and ADA are identical." *Broadwater v. Fow*, 945 F. Supp. 2d 574, 590 (M.D. Pa. May 14, 2013) (citing *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009)). Therefore, "[i]n order to state a claim under the ADA and § 504 [a plaintiff] must sufficiently allege that he (1) is disabled, (2) is otherwise qualified for the service, program, or activity of the public entity, and (3) was discriminated against in that service, program, or activity solely on the basis of his disability." *Id.* Put another way, in order to survive Defendants' motion for summary judgment, Plaintiff "need only establish that (1) Decedent had a disability, (2) Decedent was denied the benefit of a service to which he was entitled, and (3) Decedent was denied the

same by reason of his disability." *Heckenswiler v. McLaughlin*, Civil No. 06-4151, 2008 WL 4442945, at *15 (E.D. Pa. Sept. 29, 2008).

As an initial matter, the Court notes that Courts in this Circuit have found that "safely serving an involuntary mental-health commitment warrant is a service or activity covered by Title II." *Id.*; *see also Broadwater*, 945 F. Supp. 2d at 591 (plaintiff adequately stated claim under ADA and RA where he alleged that the defendants "failed to properly train troopers to have peaceful encounters with mentally and physically disabled persons and failed to establish a proper policy for handling such encounters" and that the Defendants were "well aware of [the plaintiff's] disabilities and were attempting to escort him to a hospital for a mental health evaluation" and during that encounter engaged in excessive force); *Mohney v. Pennsylvania*, 809 F. Supp. 2d 384, 398-400 (W.D. Pa. 2011) (Title II of the ADA is applicable in the context of arrests); *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 238-39 (M.D. Pa. 2003) ("In sum, this Court finds that the plain language of the statute, other legislative material, and case precedent all strongly indicate that properly executing a § 302 involuntary commitment warrant and modifying police practices to accommodate subjects of the warrant are included in the 'programs, services, or activities of a public entity' under § 12132 of the ADA."). Accordingly, the Court rejects Defendants' arguments that the conduct Plaintiff complains of is not cognizable under the ADA and the RA.

The Court further rejects Defendants' argument that Mr. Williams was not disabled within the meaning of the ADA and RA as utterly lacking in merit. "A disability is defined as (1) a

physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarded as having such an impairment." *Id.* There is no question that a mental health disorder qualifies as a disability. *See Conneen v. MBNA Am. Bank, N.A.,* 334 F.3d 318, 329 (3d Cir. 2003) (ADA applies to mental disabilities). Furthermore, the mental health warrant issued pursuant to Pennsylvania law (which required a finding that Mr. Williams was "severely mentally disabled") plainly demonstrates that he was regarded as having a disability. With respect to the remaining elements of Plaintiff's ADA and RA claim the Court concludes that factual disputes exist regarding whether Mr. Williams was denied a particular benefit or service to which he was entitled as a result of his disability. That issue is for the jury, not the Court, to decide and it would be inappropriate to grant either party relief as a matter a law with respect to Plaintiff's ADA and RA claim. Accordingly, the Court will deny both Plaintiff's and the Defendants' Motions for Summary Judgment with respect to Count VII.

### C. Intentional Tort Claims

Finally, Defendants seek summary judgment on Count III (assault) and Count IV (battery) brought against Defendant Papi. According to Defendants, "Plaintiff has no evidence that Officer Papi fired the shots that killed Brian Williams intending to harm him for any purpose other than to protect his life and those of the other officers as Williams was advancing upon them with the raised two-foot long, sharpened fireplace poker." (Doc. 74, at 35).

"Under Pennsylvania law, an assault occurs when: (1) one acts with the unprivileged

intent to put another in reasonable and immediate apprehension of harmful or offensive

conduct; and (2) the act does cause such apprehension." *Gruver v. Borough of Carlisle,*

No. 4:CV 05-1206, 2006 WL 1410816, at *5 (M.D. Pa. May 19, 2006). Battery, on the other

hand, requires that the Plaintiff "establish that a particular defendant intended to cause

harmful or offensive contact to the plaintiff, or an imminent apprehension of such contact in

plaintiff, and that such contact with plaintiff resulted." *Id.* (internal citation and quotation

marks omitted). "It is well settled Pennsylvania law that a police officer is justified when

making an arrest in committing what would otherwise be an assault and/or battery, provided

the force used is reasonable." *Id.* (citing *Commonwealth v. Jayne,* 11 Pa. Super. 459

(1899)).

Here, the Court rejects Defendants' assertion that Defendant Papi cannot be held liable

for assault or battery because he did not intend to harm Mr. Williams. "A police officer may

be held liable for assault and battery when a jury determines that the force used in making

an arrest was excessive, . . . . It is conceivable that a jury could find a police officer liable for

those torts under circumstances which demonstrate that the officer did not intentionally use

unnecessary and excessive force." *Brummell v. City of Harrisburg,* Civil Action No. 1:09-

CV-01816, 2010 WL 3896382, at *4 (M.D. Pa. Sept. 30, 2010) (internal citation and

quotation marks omitted). In addition, because, as discussed above, there are genuine

material facts in dispute as to the reasonableness of the force used by Defendant Papi, the

44

Court cannot grant summary judgment with respect to Counts III and IV. Therefore,

Defendants' Motion for Summary with respect to Counts III and IV will be denied.

## V.   CONCLUSION

For the foregoing reasons, both the Plaintiff's and the Defendants' cross-motions for

summary judgment will be denied in their entirety. A separate order follows.

Robert D. Mariani
United States District Judge